**UNITED STATES of America**

v.

**Leo M. EISENBERG, Richard S. Cannistraro and Richard O. Bertoli, Defendants.**

**Crim. No. 89–218.**

United States District Court, D. New Jersey.

July 26, 1991.

Robert P. Warren, John M. Fietkiewicz, Asst. U.S. Attys., Newark, N.J., for the U.S.

Barry M. Fallick, Rochman, Platzer, Fallick & Rosmarin, New York City, for defendant Leo M. Eisenberg.

Michael B. Pollack, New York City, for defendant Richard S. Cannistraro.

Franklin M. Sachs, Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello, Newark, N.J., for defendant Richard O. Bertoli.

OPINION

LECHNER, District Judge.

TABLE OF CONTENTS

Facts............................................................ 672

Discussion...................................................... 680

 I. Discovery–Related and Miscellaneous Motions .................... 680

 A. Motion for Statements of Co–Conspirators ................... 680

 B. Motion for List of Government Witnesses ................... 683

 C. Motion for *Giglio* Material.................................. 684

 D. Motions for Disclosure of Rule 404 Evidence the Government Intends to Admit ........................................ 685

 E. Motion for Identification of *Brady* Material Among Documents Previously Produced ...................................... 687

 F. Motion for Production of Materials Initially Disclosed to the Defendants But Later Withdrawn ......................... 688

 G. Motion for a Bill of Particulars ............................ 688

 H. Motion for the Production of Enumerated Documents Characterized as *Brady* Material ...................................... 692

 I. Preservation of Rough Notes and Other Communications ...... 692

 J. Motion for Transcripts and Tape Recordings ................. 692

 K. Motion for an Order Precluding the Admission of Any Testimony by David O'Connor, Esq., or Marvin Gersten, Esq., Protected by the Attorney–Client Privilege.............................. 692

 L. Motion for an Order Preserving the Right of Bertoli to Make Applications Under Fed.R.Crim.P. 17(c) for Subpoenas Prior to Trial ...................................................... 693

 M. Motion for an Order Preserving Bertoli's Right to Move to Suppress Wiretap Evidence or Evidence Seized in Searches ..... 693

 II. Motion for a Change of Venue as to the Obstruction of Justice Allegations ................................................... 694

 III. Motion for Severance ........................................ 695

 IV. Motion to Strike Surplusage.................................. 698

 V. Motion to Dismiss and for Discovery Based on Allegations of Prosecutorial Misconduct ........................................ 701

 A. Motions to Dismiss and for Discovery Based on Specific Allegations of Prosecutorial Misconduct......................... 702

 1. Alleged Failure to Obtain Approval of RICO Charges ..... 702

 2. Alleged Conflict of Interest .............................. 703

 3. Allegations as to Improper Sealing of the Indictments..... 706

 4. Alleged Misconduct Relating to the Grand Jury Proceedings 707

 a. Alleged Disclosure of Bertoli *Nolo Contendere* Plea ... 708

 b. Alleged Mischaracterizations to the Grand Jury of Testimony Given Before Previous Grand Juries........... 709

 c. Alleged Use of Summaries of Evidence................ 709

 d. Alleged Fed.R.Crim.P. 6(e) Violations ................. 710

 e. Alleged Violation of the Right to Financial Privacy Act 712

 B. Motion to Dismiss and for Discovery Based on Alleged Cumulative Misconduct........................................... 713

 VI. Motion to Dismiss Based on Prosecutorial Vindictiveness .......... 714

 VII. Motion to Dismiss Counts 1 through 3 for Failure to State an Offense 717

VIII. Motion to Dismiss Racketeering Acts 5(j) and 5(k) ................ 725
 IX. Constitutional Challenge to the RICO "Pattern" Requirement ...... 726
 X. Motion for Recusal ......................................... 731
Conclusion........................................................ 735

Presently before the court are the pretrial omnibus motions of defendants Leo M. Eisenberg ("Eisenberg"), Richard S. Cannistraro ("Cannistraro") and Richard O. Bertoli ("Bertoli") (collectively, the "Defendants").[1]

Bertoli moves to dismiss Counts 1 and 2 of the Superseding Indictment, which charge the Defendants with violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), respectively, on the ground that the RICO "pattern" requirement is unconstitutionally vague.[2] In addition, Bertoli moves to dismiss Counts 1, 2 and 3, the last of which charges the Defendants with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, for failure to state an offense. Bertoli moves to dismiss the Superseding Indictment based on alleged prosecutorial misconduct, or in the alternative, for discovery of grand jury materials.

In addition, Bertoli moves pursuant to Fed.R.Crim.P. 16 for discovery of statements made by unindicted co-conspirators, for notice pursuant to Fed.R.Crim.P. 12(d)(2) of the Government's intention to introduce under Fed.R.Evid. 404(b) evidence of other crimes, wrongs or acts by Bertoli ("Rule 404(b) Evidence"), for a list of witnesses the Government intends to call at trial, for impeaching material with respect to Government witnesses and for exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ("*Brady*" material). In addition, Bertoli moves for an order precluding certain testimony by David O'Connor, Esq., and Marvin Gersten, Esq., on the ground that it is protected by the attorney-client privilege, or in the alternative for identification by the Government of the anticipated testimony of David O'Connor, Esq., and Marvin Gersten, Esq., pursuant to Fed.R.Crim.P. 12(d)(2).

Bertoli also seeks an order preserving his right to make applications, as necessary under Fed.R.Crim.P. 17(c), for subpoenas prior to trial, an order preserving his right to move to suppress wiretap evidence or evidence seized in searches or the fruits thereof, an order striking purported surplusage from the Superseding Indictment, an order compelling the Government to identify the *Brady* material contained among documents it has thus far produced, an order compelling the Government to preserve notes of its interviews of Bertoli and an order compelling the Government to

---

**1.** The length of this opinion reflects the fact that the instant motions filed by the Defendants total approximately twenty-two in number and raise approximately thirty issues for discussion. In addition, it is necessary to detail the substance of the Superseding Indictment due to the nature of many of the motions.

**2.** RICO section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). RICO section 1962(d) provides:

It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

18 U.S.C. § 1962(d). Racketeering activity is defined in the RICO statute to include mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, obstruction of justice in violation of 18 U.S.C. § 1503, interstate transportation of property taken by fraud in violation of 18 U.S.C. § 2314 and any offense involving fraud in the sale of securities. *See* 18 U.S.C. § 1961(1). In addition, "pattern of racketeering" is defined as follows: "at least two acts of racketeering activity, ... the last of which occurred within ten years ... after the commission of a prior act of racketeering...." *See* 18 U.S.C. § 1961(5).

produce for inspection and copying materials previously produced by the Government but later withdrawn by the Government. Bertoli also moves for a Bill of Particulars pursuant to Fed.R.Crim.P. 7(f).

Defendant Eisenberg moves for severance of his trial from that of Cannistraro, for transfer of the charges of obstruction of justice, set forth in Counts 4, 5 and 6 of the Superseding Indictment, to the Eastern District of New York and for pre-trial disclosure of all Rule 404(b) Evidence. Defendant Cannistraro moves to dismiss the Superseding Indictment against him as violative of his due process right to be free from vindictive prosecution and for recusal of the court pursuant to 28 U.S.C. § 455.[3]

By letter, dated 19 March 1991, Eisenberg joined in Bertoli's motions to dismiss portions of the Superseding Indictment and his motions relating to discovery [4] and for a Bill of Particulars. *See* 19 March 1991 Eisenberg Letter.[5] Counsel for Eisenberg reiterated at oral argument, held 3 July 1991, that Eisenberg joined in only Bertoli's motions to dismiss, for discovery and for a Bill of Particulars. 3 July 1991 Tr. at 13. By letter, dated 3 April 1991, Bertoli joined in Cannistraro's recusal motion and Eisenberg's severance motion. *See* 3 April 1991 Bertoli Letter.[6]

---

**3.** Cannistraro's recusal motion is the third recusal motion brought by one or more of the Defendants in this matter. *See infra* at 731.

**4.** Eisenberg did not elaborate in his submissions or at oral argument, held 3 July 1991, as to which Bertoli motions he regards as discovery motions for the purpose of joining in such motions. His request to join in Bertoli's discovery motions is therefore read broadly to include any motion by Bertoli for disclosure of information or for production of documents.

**5.** In his letter-reply, Cannistraro makes reference to "motions of his co-defendants in which he joined." Cannistraro Letter–Reply at 1. However, no submission has been received from Cannistraro indicating in which motions of his co-defendants he joined. In addition, counsel for Cannistraro did not indicate at oral argument, held on 3 July 1991, that Cannistraro wished to join in any of the motions of his co-defendants.

Even if Cannistraro had joined in any of the motions of his co-defendants, the motions would be denied as to Cannistraro for the same reasons given for the denial as to the moving parties. Cannistraro has presented no circumstances warranting different treatment.

**6.** In support of his motions, Bertoli submitted: the Brief in Support of Defendant Bertoli's Motions to Dismiss Counts 1 Through 3 of the Indictment (the "Bertoli Dismissal Brief"); the 12 March 1991 Certification of Marianne C. Tolomeo (the "First Tolomeo Cert.") and exhibits, including the Supplemental Affidavit of Marianne C. Tolomeo (the "Tolomeo Supp.Aff."), attached to the First Tolomeo Cert. as Exhibit 1, with attachments, including the 6 February 1989 grand jury subpoena, attached to the Tolomeo Supp.Aff. as Exhibit A, the 6 February 1989 search warrant authorizing a search of 8 Avenue C, Nanuet, New York (the "Nanuet Search Warrant"), attached to the Tolomeo Supp.Aff. as Exhibit B, a 22 January 1988 letter from the Bank of New York to Maria Hyman and a 19 January 1988 grand jury subpoena issued to the Bank of New York, attached to the Tolomeo Supp.Aff. as Exhibit C, a 11 July 1988 letter from the American Express Travel Related Services Company, Inc. to Bertoli (the "11 July 1988 American Express Letter to Bertoli"), attached to the Tolomeo Supp.Aff. as Exhibit D, and the 6 March 1991 Declaration of Eric H. Moss, attached to the Tolomeo Supp.Aff. as Exhibit E, and attachments, and the 12 March 1990 Affidavit of Richard O. Bertoli (the "Bertoli Aff."), attached to the First Tolomeo Cert. as Exhibit 2, Appendix B of the Department of Justice Guidelines regarding Title 9 (the "United States Attorney's Manual"), pages B–1 through B–24, attached to the First Tolomeo Cert. as Exhibit 3, an excerpt from a 26 November 1990 *Barron's* article, attached to the First Tolomeo Cert. as Exhibit 4, a 1 October 1990 *Forbes* article entitled, "The Secret World of Richard Bertoli," attached to the First Tolomeo Cert. as Exhibit 5, and an excerpt from the transcript of proceedings held on 20 July 1983 in *In Re Liquidation Control, et al.,* attached to the First Tolomeo Cert. as Exhibit 6; the undated Certification of Marianne C. Tolomeo (the "Second Tolomeo Cert.") and exhibits, including the Superseding Indictment, attached to the Second Tolomeo Cert. as Exhibit 1, the 11 March 1991 Affidavit of David O'Connor (the "First O'Connor Aff."), attached to the Second Tolomeo Cert. as Exhibit 2, the transcript of the 8 February 1990 proceedings in *United States v. Cannistraro,* Cr. No. 87–193, attached to the Second Tolomeo Cert. as Exhibit 3, the 21 February 1991 letter from Marianne C. Tolomeo, Esq. ("Tolomeo") to A.U.S.A. John M. Fietkiewicz ("Fietkiewicz"), attached to the Second Tolomeo Cert. as Exhibit 4, the 12 March 1990 Affidavit of Marianne C. Tolomeo (the "Tolomeo Aff."), attached to the Second Tolomeo Cert. as Exhibit 5, the 11 March 1991 Certification of H. Richard Chattman (the "Chattman Aff."), attached to the Second Tolomeo Cert. as Exhibit 6, and exhibits, including the 16 May 1990 letter from H. Richard Chattman ("Chattman") to A.U.S.A. David

*Facts*

On 16 June 1989, an Indictment was returned against the Defendants and sealed by order of Magistrate Judge Stanley R. Rosenfield ("Rosenfield"), attached to the Chattman Aff. as Exhibit A, and the 22 May 1990 letter from Rosenfield to Chattman, attached to the Chattman Aff. as Exhibit B, and the 7 June 1990 letter from Tolomeo to Fietkiewicz, attached to the Second Tolomeo Cert. as Exhibit 7, the 21 June 1990 letter from Tolomeo to Fietkiewicz, attached to the Second Tolomeo Cert. as Exhibit 8, the 22 June 1990 letter from Fietkiewicz to Tolomeo, attached to the Second Tolomeo Cert. as Exhibit 9, the 2 July 1990 letter from Tolomeo to Fietkiewicz, attached to the Second Tolomeo Cert. as Exhibit 10 and the 17 July 1990 letter from Fietkiewicz to Tolomeo, attached to the Second Tolomeo Cert. as Exhibit 11; the Brief in Support of Defendant Bertoli's Discovery and Evidentiary Motions (the "Bertoli Discovery Brief"); the Notice of Motion for Bill of Particulars (the "Bill of Particulars"); the Brief in Support of Defendant Bertoli's Motion to Dismiss Indictment for Prosecutorial Misconduct, or, in the Alternative, for Discovery of Grand Jury Materials (the "Bertoli Prosecutorial Misconduct Brief"), and exhibits attached thereto (these exhibits are identical to the exhibits attached to the First Tolomeo Cert.); the Reply Brief in Further Support of Defendant Bertoli's Pretrial Motions (the "Bertoli Reply Brief"), and the 9 April 1991 *Wall Street Journal* article attached thereto as Exhibit A; the 3 April 1991 letter from Franklin M. Sachs, Esq., counsel for Bertoli, to the court, by which Bertoli joined in the recusal motion of Cannistraro and the severance motion of Eisenberg (the "3 April 1991 Bertoli Letter"); the 19 July 1991 letter from Tolomeo to the court; and the 24 July 1991 letter from Tolomeo to the court (the "24 July 1991 Tolomeo Letter to the Court").

In support of his motions, Eisenberg submitted: the Brief for Leo Eisenberg in Support of Motions for a Severance, a Change of Venue and Discovery (the "Eisenberg Brief"); the Affidavit of Barry M. Fallick; and the 19 March 1991 letter from Barry M. Fallick, Esq., counsel for Eisenberg, to the court, by which Eisenberg joined in Bertoli's motions to dismiss and in his discovery motions and motion for a Bill of Particulars (the "19 March 1991 Eisenberg Letter").

In support of his motions, Cannistraro submitted: the Memorandum of Law in Support of Richard Cannistraro's Pre–Trial Motions (the "Cannistraro Brief"); the Affirmation of Michael B. Pollack in Support of Richard Cannistraro's Pre–Trial Motions (the "Pollack Aff.") and exhibits, including the 11 March 1991 Affidavit of David O'Connor (the "Second O'Connor Aff."), attached thereto as Exhibit A, and the results of an opinion survey conducted 26 September through 5 October 1990 (the "Recusal Motion Survey"), attached thereto as Exhibit B; and the 10 May 1991 letter-reply (the "Cannistraro Letter–Reply").

In opposition to the Defendants' motions, the Government submitted: the Brief of the United States In Opposition to the Defendants' Pretrial Motions (the "Government Brief"); the Sealed Exhibits to the Brief of the United States in Opposition to the Defendants' Pretrial Motions, including the sealed affidavit of David M. Rosenfield (the "Sealed Rosenfield Aff."), attached thereto as Exhibit 1; and the Exhibits to the Brief of the United States in Opposition to the Defendants' Pretrial Motions, including the Affidavit of David M. Rosenfield (the "Rosenfield Aff."), the transcript of the 1 February 1990 proceedings in *United States v. Cannistraro,* Cr. No. 87–193 (the "1 February 1990 Tr."), the transcript of the 24 September 1987 proceedings in *United States v. Cannistraro,* Cr. No. 87–193 (the "24 September 1987 Tr."), the 20 March 1990 letter from the Office of Professional Responsibility, United States Department of Justice, to Cannistraro (the "20 March 1990 Justice Department Letter"), and the Affidavit of Michael J. Cahill (the "Cahill Aff.").

Also relevant are the transcript of the guilty plea and allocution of Cannistraro relative to the 1987 Indictment (the "21 September 1987 Tr.") and the transcript of oral argument held on the instant motions (the "3 July 1991 Tr.").

On 29 September 1989, the instant six-count Superseding Indictment[7] was returned against the Defendants and sealed by Magistrate Judge Chesler.[8] It was unsealed on Chesler. Government Brief at 3 n. 1.

---

7. The charges against Bertoli and Eisenberg in the Indictment were identical to the charges against them in the Superseding Indictment. Cannistraro, however, was charged in the Indictment only with the conspiracy concerning the securities of Solar Age Manufacturing Corp. Government Brief at 4 n. 3.

8. The Superseding Indictment was filed as part of a second prosecution of Cannistraro. As to the first prosecution, on 28 May 1987, a federal grand jury sitting in Newark, New Jersey returned a nine-count indictment, indictment number 87–193 (the "1987 Indictment"), against Cannistraro. The 1987 Indictment charged Cannistraro with conspiracy to violate the securities laws, securities fraud, mail fraud, interstate transportation of stolen property and obstruction of justice. An earlier decision concerning the proceedings relative to the 1987 Indictment described that indictment as follows:

Specifically, the indictment alleged that between 1982 and 1983 Cannistraro entered into an arrangement with portfolio managers of mutual and bank funds whereby they agreed to assist him in manipulating the price of the securities of Liquidation Control, Inc. ("LCI") and Toxic Waste Containment, Inc. ("TWC"). According to the indictment, the portfolio

5 October 1989. Count 1 of the Superseding Indictment charges the Defendants with racketeering activities involving Monarch Funding Corporation ("Monarch") in violation of RICO, 18 U.S.C. § 1962(c). Count 2 charges the Defendants with conspiracy to commit racketeering in violation of RICO, 18 U.S.C. § 1962(d). Count 3 charges the Defendants with conspiracy in violation of 18 U.S.C. § 371 to commit securities fraud in violation of section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)"), 15 U.S.C. § 78j(b) and Securities and Exchange Commission ("SEC") Rule 10b–5 promulgated thereunder ("Rule 10b–5"), 17 C.F.R. § 240.10b–5. Counts 4 through 6 charge Eisenberg alone with obstruction of justice in violation of 18 U.S.C. § 1503.

As to Count 1, the Superseding Indictment states Monarch, the enterprise, was a securities brokerage firm which was engaged in the business of underwriting, purchasing and selling securities primarily traded in the over-the-counter markets. Superseding Indictment, Count 1, ¶ 1. It is stated in Count 1 that Eisenberg was the owner and president of Monarch and, as such, directed the trading of securities in Monarch's own brokerage account (the "Monarch Trading Account"). *Id.*, ¶ 2. It is stated Cannistraro was a securities research analyst with Wood Gundy, Inc. ("Wood Gundy"), a brokerage firm located in New York City, New York. *Id.*, ¶ 3. It is stated Bertoli was the former president of a brokerage firm not named in the Superseding Indictment and controlled and had a beneficial interest in several brokerage accounts maintained at Monarch. *Id.*, ¶ 4. The pattern of racketeering engaged in by the Defendants is described as consisting of predicate acts of mail fraud, wire

managers agreed to buy large blocks of these stocks for their funds' accounts, in return for which Cannistraro agreed to establish "nominee" brokerage accounts for the fund managers to conceal their fundamental interest in the transactions. The indictment further alleged Cannistraro, who at the time was a securities analyst at Wood Gundy, Inc. ("Wood Gundy"), drafted a false and misleading Wood Gundy research investment report concerning TWC and distributed this report through the United States mails. Finally, the indictment alleged Cannistraro had provided money to a grand jury witness in an effort to have this witness lie under oath to the grand jury about the witness' stock nominee relationship with Cannistraro.

*United States v. Cannistraro*, 694 F.Supp. 62, 65 (D.N.J.1988), *aff'd in part and vacated in part,* 871 F.2d 1210 (3d Cir.1989). *See also United States v. Cannistraro*, 734 F.Supp. 1110 (D.N.J.1990), *aff'd without opinion,* 919 F.2d 137 (3d Cir.1990).

On 21 September 1987, shortly before trial, Cannistraro pleaded guilty to all nine counts of the indictment. He did so without the benefit of a plea agreement with the Government. *Cannistraro,* 694 F.Supp. at 65. On 2 November 1987, Cannistraro was sentenced to a term of imprisonment totalling eight years, followed by five years of probation, fines totalling $330,000, restitution in the amount of $394,847 and a special assessment of $50. *Id.* at 67. Cannistraro challenged his sentence on Eighth Amendment grounds and moved to reduce or correct the sentence under Fed.R.Crim.P. 35 (the "Rule 35 Motion"). Cannistraro's challenge to his sentence was denied. *Id.* at 62. Cannistraro appealed the denial of his challenge to the sentence. On 9 April 1989, the Third Circuit affirmed the denial of the challenge on Eighth Amendment grounds, but remanded the action for clarification of the statistics used in the sentencing relative to the Rule 35 Motion, if such statistics were relied upon in determining the sentence. *United States v. Cannistraro*, 871 F.2d 1210 (3d Cir.1989). On remand, it was determined at a 5 May 1989 hearing that the statistics in question were not relied upon in sentencing Cannistraro. *Cannistraro,* 734 F.Supp. at 1117.

Cannistraro was not re-sentenced at that time, however, because he had moved pursuant to Fed.R.Crim.P. 32(d) to withdraw his guilty plea. This motion was denied in an opinion and order filed 12 April 1990, and he was resentenced on 23 April 1990 to the same punishment. *See id.* at 1110. The denial of Cannistraro's motion to withdraw his guilty plea was affirmed by the Third Circuit. *See United States v. Cannistraro,* 919 F.2d 137 (3d Cir.1990). The Supreme Court denied certification of Cannistraro's appeal from the Third Circuit's affirmance. *See Cannistraro v. United States,* —— U.S. ——, 111 S.Ct. 2011, 114 L.Ed.2d 98 (1991).

After the Superseding Indictment was filed against the Defendants, Cannistraro moved for dismissal of the Superseding Indictment against him for violation of the Double Jeopardy Clause of the United States Constitution. This motion was denied in an unpublished opinion and order filed 15 August 1990. *See United States v. Eisenberg,* Cr. No. 89–218 (D.N.J. 15 August 1990). The Third Circuit affirmed this decision by judgment order, filed 9 November 1990. The Supreme Court denied certification on 29 April 1991. *See Cannistraro v. United States,* —— U.S. ——, 111 S.Ct. 1682, 114 L.Ed.2d 77 (1991).

fraud, interstate transportation of money taken by fraud, securities fraud and obstruction of justice. *Id.*, ¶ 9.

Count 1 charges that from about January 1982 to at least January 1989, in the District of New Jersey and elsewhere, the Defendants participated in the affairs of Monarch through a pattern of racketeering activity, the object of which was to "use Monarch as a vehicle to engage in fraudulent securities trading practices and thereby obtain money and other things of value for the [D]efendants...." *Id.*, ¶¶ 6–7. It is stated in Count 1 that the Defendants perpetrated such racketeering activity by maintaining accounts in which they had a beneficial interest and which were in the names of other persons or entities ("Nominee Brokerage Accounts"). *Id.*, ¶ 8(a). It is stated that the Nominee Brokerage Accounts enabled the Defendants to surreptitiously engage in securities trading for their own personal benefit. *Id.* In addition, the Defendants are charged with engaging in such racketeering activity by preparing and distributing false and misleading research reports recommending the purchase of the securities of Astrosystems, Inc. ("Astrosystems"), Nature's Bounty, Inc. ("Nature's Bounty"), Liquidation Control, Inc. ("LCI"), Toxic Waste Containment, Inc. ("Toxic Waste"), High Technology Capital Corp. ("High Tech") and Solar Age Manufacturing Corp. ("Solar Age"). *Id.*, ¶ 8(b).

It is further stated in Count 1 that the Defendants engaged in such racketeering activity by bribing the portfolio manager of the M & I Growth Fund (the "M & I Fund"), a trust fund, the portfolio manager of Aggressive Growth Shares, Inc. (the "Bullock Fund"), an investment company and mutual fund and the research analyst of Hallswell Corp. ("Hallswell"), a corporation which purchases and sells over-the-counter securities. *Id.*, ¶ 8(c). It is stated Cannistraro and Eisenberg opened Nominee Brokerage Accounts at Monarch for the benefit of the M & I Fund and Bullock Fund portfolio managers and the Hallswell research analyst. These Nominee Brokerage Accounts "generate[d] large sums of money ... through the fraudulent trading

of LCI and Toxic Waste securities." *Id.* in exchange for such trading, the portfolio managers of the M & I Fund and Bullock Fund and the research analyst of Hallswell caused the M & I Fund and Bullock Fund and Hallswell to purchase large blocks of LCI, Toxic Waste and High Tech securities. *Id.*

In addition, it is stated in Count 1 that the racketeering activity of the Defendants included non-disclosure of their interest in High Tech in order to enable them to raise capital for that company, control its management and policies and profit on the sale of its securities. *Id.*, ¶ 8(d). Finally, it is stated that Cannistraro paid a witness in grand jury proceedings to conceal Cannistraro's interest in a Nominee Brokerage Account at Monarch and Eisenberg secreted thousands of Monarch documents which were required to be produced pursuant to a grand jury subpoena. *Id.*, ¶¶ 8(e)–(f).

Count 1 charges the Defendants with engaging in racketeering activity through the execution of seven separate schemes. As to the first scheme (the "Astrosystems Scheme"), it is stated in Count 1 that between approximately October 1982 and approximately August 1983, in the District of New Jersey and elsewhere, the Defendants established Nominee Brokerage Accounts at Monarch and elsewhere to purchase Astrosystems securities from the investing public with the knowledge that favorable research reports were to be prepared by Cannistraro and disseminated by Wood Gundy to the investing public. *Id.*, ¶ 11. Count 1 identifies three such reports. It is charged the reports were misleading in that they did not disclose that the Defendants "had purchased Astrosystems securities based upon advance knowledge of the reports, and intended to profit on the sale of these securities once the dissemination of the reports had caused the price of Astrosystems securities to rise." *Id.*, ¶¶ 12–13.

Count 1 also states that as part of the Astrosystems Scheme, an article recommending the purchase of Astrosystems securities was prepared by Cannistraro and disseminated to the investing public in an

industry newsletter, "Portfolio Letter," dated 14 March 1983 (the "14 March 1983 Portfolio Letter"). *Id.*, ¶ 14. It states this article did not disclose the scheme to defraud. *Id.* Count 1 further states the Defendants sold their Astrosystems securities without disclosing the scheme to defraud and obtained profits totalling at least $138,000 from such sale. *Id.*, ¶ 15.

Count 1 identifies by date and content six instances of mail fraud in violation of 18 U.S.C. § 1341, two instances of wire fraud in violation of 18 U.S.C. § 1343 and one instance of securities fraud in violation Section 10(b) and Rule 10b–5, all perpetrated by the Defendants in executing the Astrosystems Scheme. *Id.*, ¶¶ 16–18.

With respect to the second scheme (the "Nature's Bounty Scheme"), Count 1 states that from approximately December 1982 to approximately March 1983 the Defendants engaged in a scheme involving the securities of Nature's Bounty. *Id.*, ¶¶ 19–20. It states that in or about January 1983, the Defendants used nominee and other brokerage accounts at Monarch and elsewhere, including the Monarch Trading Account, to purchase Nature's Bounty securities from the investing public "with the knowledge that favorable research reports were to be prepared by [Cannistraro] and disseminated by Wood Gundy to the investing public, and with the expectation that the reports would cause the price of Nature's Bounty securities to rise." *Id.*, ¶ 20. Count 1 identifies such reports and states they were false and misleading in that they "failed to disclose, among other things, that the [D]efendants had purchased Nature's Bounty securities based upon advance knowledge of the reports and intended to profit on the sale of these securities once the dissemination or anticipated dissemination of the reports had caused the price of Nature's Bounty securities to rise." *Id.*, ¶ 22.

It alleges the Defendants sold their Nature's Bounty securities "to the investing public without disclosing the scheme to defraud, and thereby fraudulently obtained profits totalling at least $220,000." *Id.*, ¶ 23. It identifies by date and content five instances of mail fraud, three instances of wire fraud and one instance of securities fraud in violation of Section 10(b) and Rule 10b–5, all perpetrated by the Defendants in executing the Nature's Bounty Scheme. *Id.*, ¶¶ 24–26.

As to the third scheme (the "LCI Scheme"), Count 1 states that between approximately October 1982 and approximately November 1983, the Defendants engaged in a scheme concerning the securities of LCI. It alleges that in or about November and December 1982, the Defendants used nominee and other brokerage accounts at Monarch to purchase "substantial amounts of LCI securities at minimal cost during LCI's initial public offering and during the first few days of public trading." *Id.*, ¶ 28. It states: "These purchases were made with the expectation that the price of LCI securities would rise as a result of, among other things, the issuance of a favorable research report to be prepared by [Cannistraro] but disseminated to the investing public as [the report of] G.K. Scott[, Inc.] [ ("G.K. Scott"), a brokerage firm] ..., and the bribery of individuals to cause the purchase of large blocks of LCI securities." *Id.*, ¶ 28.

Count 1 states Eisenberg and Cannistraro opened Nominee Brokerage Accounts at Monarch for the benefit of the M & I Fund and Bullock Fund portfolio managers and the Hallswell research analyst and "used these nominee accounts to generate large sums of money for the [portfolio managers] and the [research analyst] through the fraudulent trading of LCI and Toxic Waste securities." *Id.*, ¶ 29. It states: "In exchange the M & I [Fund] and Bullock [Fund portfolio managers] caused their respective funds to purchase large blocks of LCI securities, and the [Hallswell research analyst] caused Hallswell to open a brokerage account at Monarch that purchased a large block of LCI securities." *Id.*

Count 1 further states Cannistraro prepared a report which was disseminated to the investing public on G.K. Scott letterhead. *Id.*, ¶ 30. It states this report recommended the purchase of LCI securities (the "LCI Report") in order to artificially

inflate the price of such securities. *Id.*, ¶ 30. It states the LCI Report was false and misleading because it did not disclose that it was actually prepared by Cannistraro, that the Defendants purchased LCI securities based on advance knowledge of the dissemination of such report and that individuals had been bribed to cause the purchase of large amounts of LCI securities. *Id.*, ¶ 31.

Count 1 states the Defendants sold their LCI securities to the investing public "without disclosing the scheme to defraud, and thereby fraudulently obtained profits totalling at least $690,000." *Id.*, ¶ 32. Count 1 identifies by date and content six instances of mail fraud, five instances of wire fraud and one instance of securities fraud in violation of Section 10(b) and Rule 10b–5, all perpetrated by the Defendants in executing the LCI Scheme. *Id.*, ¶¶ 33–35.

As to the fourth scheme (the "Toxic Waste Scheme"), Count 1 states that between approximately December 1982 and approximately October 1983, the Defendants engaged in a scheme concerning Toxic Waste securities. It states that in approximately February and March 1983, the Defendants used nominee and other accounts at Monarch and elsewhere "to purchase substantial amounts of Toxic Waste securities at minimal cost during Toxic Waste's initial public offering and during the first few days of public trading." *Id.*, ¶ 37. It further states that the "purchases were made with the expectation that the price of Toxic Waste securities would rise as a result of, among other things, the dissemination to the investing public of favorable Wood Gundy research reports to be prepared by [Cannistraro] and the bribery of individuals to cause the purchase of large blocks of Toxic Waste securities." *Id.* It states that as part of the Toxic Waste Scheme, Eisenberg and Cannistraro used these nominee accounts to "generate large sums of money and securities for the [M & I Fund and Bullock Fund portfolio managers] through the trading of Toxic Waste securities." *Id.*, ¶ 38.

In addition, Count 1 states that as part of the Toxic Waste Scheme, Cannistraro caused Wood Gundy to disseminate to the investing public certain research reports recommending the purchase of Toxic Waste securities. *Id.*, ¶ 40. Count 1 identifies these reports by content and date, one of which it identifies as a five-page "Basic Report," dated 17 March 1983 (the "Basic Report"). *Id.*, ¶ 40. It states these reports were false and misleading in that they did not disclose that the Defendants had purchased Toxic Waste securities based on advance knowledge of the content and dissemination of the reports and that individuals had been bribed to cause the purchase of large amounts of Toxic Waste securities. *Id.*, ¶¶ 40–41.

In addition, Count 1 states Eisenberg caused over 18,000 copies of the Basic Report, which recommended the purchase of Toxic Waste securities, to be disseminated to brokers, research analysts, securities newsletter publishers, Monarch customers and others throughout the United States. *Id.*, ¶ 42. It also states that in approximately March and April 1983, Cannistraro caused to be prepared and disseminated to the investing public articles in the 14 March 1983 Portfolio Letter and in the 22 April 1983 edition of "Ground Floor," a securities investment newsletter. *Id.*, ¶ 43. It states these articles recommended the purchase of Toxic Waste securities without disclosing the scheme to defraud. *Id.*

Count 1 states that from about March 1983 to about October 1983, the Defendants and others sold their Toxic Waste securities to the investing public without disclosing their scheme to defraud for a profit of $4,400,000. *Id.*, ¶ 44. It identifies by date and content eleven instances of mail fraud, two instances of wire fraud, one instance of interstate transportation of money taken by fraud in violation of 18 U.S.C. § 2314 and one instance of securities fraud in violation of Section 10(b) and Rule 10b–5, all perpetrated by the Defendants in executing the Toxic Waste Scheme. *Id.*, ¶¶ 45–48.

As to the fifth scheme (the "Beneficial Owners Concealment Scheme"), Count 1 states that from about March 1983 to about November 1984, in the District of New

Jersey and elsewhere, the Defendants executed a scheme to conceal the identities of the promoter and beneficial owners of High Tech. *Id.,* ¶ 49. It states that in about March 1983, Bertoli became the promoter of High Tech, founding High Tech, appointing its officers, board of directors and advisory board, allocating the distribution of its securities and arranging for the initial public offering of its securities, which were underwritten by Monarch. *Id.,* ¶ 50.

Count 1 further states that prior to the public offering of the High Tech securities, the Defendants caused 3.1 million shares of High Tech common stock to be placed in the names of nominees while the shares were beneficially owned by the Defendants. *Id.,* ¶ 51. It states the Defendants did not disclose in High Tech's registration statements and prospectus the role of Bertoli as High Tech's promoter and the Defendants' beneficial ownership of more than 10% of High Tech's common stock and more than 10% of High Tech's outstanding stock. *Id.,* ¶ 52.

Count 1 states that having concealed such information, the Defendants raised $425,000 in capital for High Tech from the investing public. *Id.,* ¶ 53. In addition, it states that from approximately February 1984 to approximately July 1984, the Defendants caused 3.1 million shares of High Tech common stock beneficially owned by them to be sold for a profit of at least $115,000. *Id.,* ¶ 54. It identifies by content and date six instances of mail fraud, three instances of wire fraud and two instances of securities fraud in violation of 15 U.S.C. §§ 77g, 77x, 77aa(4), 77aa(6) and 77j(a)(1), all perpetrated by the Defendants in executing the Beneficial Owners Concealment Scheme. *Id.,* ¶¶ 55–58.

As to the sixth scheme (the "High Tech Scheme"), Count 1 states the Defendants engaged in a scheme concerning High Tech securities from about March 1983 to about February 1984, in the District of New Jersey and elsewhere. It states that the Defendants used nominee and other brokerage accounts at Monarch and elsewhere to purchase High Tech securities at minimal cost during its initial public offering and

during the first few days of public trading. *Id.,* ¶ 61. It states: "These purchases were made with the expectation that the price of High Tech securities would rise as a result of, among other things, the bribery of individuals to cause the purchase of large blocks of High Tech securities, and the transfer of 200,000 shares of Solar Age common stock to High Tech." *Id.*

Count 1 states Eisenberg and Cannistraro allocated securities available as part of the High Tech initial public offering to the Nominee Brokerage Account of the Hallswell research analyst at Monarch. *Id.,* ¶ 62. In exchange for such allocation, and in exchange for money which Eisenberg and Cannistraro provided to the Hallswell research analyst through their trading of LCI and Toxic Waste securities in the Hallswell nominee accounts at Monarch, the Hallswell research analyst caused Hallswell to purchase a large block of High Tech securities. *Id.* Count 1 states Eisenberg and Cannistraro entered into a similar arrangement with the M & I Fund portfolio manager, who agreed on similar terms to cause the M & I Fund to purchase a large block of High Tech securities under similar conditions. *Id.,* ¶ 63.

In addition, Count 1 states Bertoli and Cannistraro agreed with the president and vice president of Solar Age that in exchange for the transfer of 200,000 shares of Solar Age common stock to High Tech, Cannistraro would prepare a favorable research report recommending the purchase of Solar Age securities. *Id.,* ¶ 64. It states that in fact, Cannistraro prepared three such reports for dissemination by Wood Gundy and identifies such reports by date. *Id.,* ¶ 65. It states such reports were disseminated by Wood Gundy to the investing public and were false and misleading in that they failed to disclose that the reports were prepared in exchange for the transfer of 200,000 shares of Solar Age stock to High Tech and that they were prepared in order to increase the value of High Tech's portfolio of securities. *Id.,* ¶ 66.

Count 1 states that as a result of the dissemination of such reports, the price of

Solar Age securities was artificially inflated and the transfer of Solar Age securities to High Tech thereby artificially increased the value of High Tech's portfolio. *Id.,* ¶ 67. It states the fraudulently inflated value of High Tech securities was then publicized to the investing public in various newsletters and letters from High Tech. *Id.*

Count 1 states that from about June 1983 to about February 1984, the Defendants sold their High Tech securities to the investing public without disclosing the scheme to defraud for a profit of at least $1,300,000. *Id.,* ¶ 68. It identifies by date and content nine instances of mail fraud, three instances of wire fraud and one instance of securities fraud in violation of Section 10(b) and Rule 10b–5, all perpetrated by the Defendants in executing the High Tech Scheme.

As to the seventh and last scheme (the "Cover–Up Scheme"), Count 1 asserts Eisenberg and Cannistraro obstructed justice to conceal their wrongdoing. It states that a subpoena of a grand jury empaneled in the District of New Jersey was served on Monarch on 25 August 1985 requiring it to produce documents and to produce a records custodian to testify before the grand jury on 9 September 1985. *Id.,* ¶¶ 72–73. It states that at Eisenberg's direction, Monarch's corporate counsel misrepresented to the Office of the United States Attorney for the District of New Jersey that the documents responsive to the subpoena had previously been sent to the Chicago Strike Force of the Organized Crime and Racketeering Section of the United States Department of Justice (the "Chicago Strike Force"). *Id.,* ¶ 74.

In addition, Count 1 states that a subpoena of a grand jury empaneled in the District of New Jersey was served on Monarch on 14 July 1988 requiring it to produce documents and to produce a records custodian to testify before the grand jury on 2 August 1988. *Id.,* ¶ 77. It states Eisenberg misrepresented in a letter to the Office of the United States Attorney that certain of the documents responsive to the

grand jury subpoena were previously sent by Monarch to the Chicago Strike Force in response to other grand jury subpoenas. *Id.,* ¶ 78. It states that in fact, Eisenberg had removed these documents from Monarch's offices and secreted them in a bakery in Brooklyn, New York (the "Brooklyn Bakery"). *Id.*

Count 1 also states that on about 26 August 1987 the Office of the United States Attorney for the District of New Jersey served a subpoena *duces tecum* on Monarch, requiring it to produce documents on or before 9 September 1987 relative to the then upcoming trial of Cannistraro for the 1987 Indictment. The subpoena also required Monarch to produce a records custodian to testify at the trial of Cannistraro, scheduled to commence 24 September 1987.[9] *Id.,* ¶¶ 81–83. In addition, an order was entered by the United States District Court for the District of New Jersey on 10 September 1987 requiring Monarch to produce the documents responsive to the subpoena by 5:00 p.m. on 11 September 1987. *Id.,* ¶ 83.

Count 1 states that at the direction of Eisenberg, Monarch's records custodian and corporate counsel misrepresented to the Federal Bureau of Investigation (the "FBI") and to the Office of the United States Attorney that the documents Monarch was required to produce were previously sent to the Chicago Strike Force in response to other grand jury subpoenas. *Id.,* ¶ 85. Count 1 states that in fact, the responsive documents not produced by Monarch were hidden at the Brooklyn Bakery. *Id.*

Finally, Count 1 states a subpoena of a grand jury empaneled in the District of New Jersey was served on one· of Cannistraro's nominees on or about 24 January 1986, requiring the nominee to produce documents and to testify before the grand jury. *Id.,* ¶ 88. It states Cannistraro instructed and directed this nominee in return for cash payments to conceal Cannistraro's beneficial ownership in the nominee's Monarch account. *Id.,* ¶ 89.

**9.** *See supra* n. 8.

Count 2 of the Superseding Indictment charges the Defendants with conspiracy to violate RICO section 1962(c) by agreeing to conduct the affairs of Monarch through a pattern of racketeering in violation of RICO section 1962(d). It charges the conspiracy existed from about January 1982 to at least about January 1989 in the District of New Jersey and elsewhere. Superseding Indictment, Count 2, ¶ 2. It lists seventeen overt acts perpetrated by the Defendants in furtherance of their conspiracy, including their meeting on 17 May 1983 with the president of G.K. Scott and other G.K. Scott personnel to discuss the purchase of a "large block of the securities of a public corporation in exchange for a favorable Wood Gundy research report by Cannistraro," overt act number 1, false and misleading testimony by Eisenberg to the SEC on 26 March 1984 and 9 August 1984, overt act numbers 2 and 3, and 1987 and 1988 deliveries by Eisenberg of several boxes and file cabinets containing Monarch documents to the Brooklyn Bakery, overt act numbers 15 and 16.

Count 3 charges the Defendants with conspiracy in violation of 18 U.S.C. § 371 to violate Section 10(b) and Rule 10b–5 in connection with the purchase and sale of Solar Age securities. Superseding Indictment, Count 3, ¶ 2. Count 3 states the conspiracy existed between about May 1983 and about October 1985 in the District of New Jersey and elsewhere. *Id.* It states that as part of this conspiracy, Bertoli and Cannistraro agreed with the president and vice president of Solar Age that in exchange for the transfer of 200,000 shares of Solar Age common stock to High Tech, Cannistraro would prepare a favorable research report recommending the purchase of Solar Age securities for dissemination to the investing public by Wood Gundy. *Id.*, ¶ 3. It states that it was additionally part of the agreement that Bertoli and High Tech, in exchange for the Solar Age common stock, would obtain additional financing for Solar Age by means of a secondary public offering of securities. *Id.*

Count 3 states that in or about June 1983, the Defendants used Nominee Brokerage Accounts to purchase Solar Age securities with the advance knowledge of the favorable research reports to be disseminated by Wood Gundy and with the expectation that the price of Solar Age securities would rise as a result of such reports. *Id.*, ¶ 5. It states Cannistraro prepared and caused Wood Gundy to disseminate to the investing public research reports recommending the purchase of Solar Age securities. *Id.* It states these research reports were false and misleading in that they failed to disclose that they were prepared by Cannistraro in exchange for the transfer of 200,000 shares of Solar Age common stock to High Tech. In addition, it states the Defendants had purchased Solar Age securities based on advance knowledge of the reports and intended to profit on the sale of the Solar Age securities after the dissemination of the reports caused the price of the securities to rise. *Id.*

Count 3 states that between about June 1983 and about December 1983, the Defendants sold their Solar Age securities to the investing public, without disclosing their scheme to defraud, for a profit of at least $265,000. *Id.*, ¶ 6. Count 3 further states that the secondary public offering of Solar Age securities arranged by Bertoli raised over $990,000 for Solar Age. *Id.*, ¶ 7.

Count 3 lists sixteen overt acts committed by the Defendants between June 1983 and September 1985 in furtherance of this conspiracy. These overt acts are too numerous to set forth in full. However, they include a 6 June 1983 meeting attended by Bertoli, Cannistraro and the executive vice president of Solar Age in New York City, New York, overt act numbers 1 and 2, various telephone calls and correspondence made on 6 June 1983 and 20 June 1983 by Solar Age personnel at the prompting of Bertoli and Cannistraro, overt act numbers 4, 5 and 6, the 28 June 1983 wire transmission by Wood Gundy, made at the prompting of Cannistraro, of a research report recommending the purchase of Solar Age securities, overt act number 9, and the August and September 1985 mailing of the Solar Age prospectus in connection with

the secondary offering of Solar Age securities, overt act number 15.

Finally, Counts 4, 5 and 6 charge Eisenberg alone with obstruction of justice in violation of 18 U.S.C. § 1503. These counts incorporate by reference the factual allegations relating to the Cover–Up Scheme described in Count 1. Count 4 charges that from about August 1985 to about September 1985, in the District of New Jersey and elsewhere, Eisenberg secreted Monarch documents which were required to be produced pursuant to a grand jury subpoena *duces tecum.* Superseding Indictment, Count 4, ¶¶ 1–2. The grand jury had been empaneled by the United States District Court for the District of New Jersey on or about 18 March 1985. *Id.* Count 4 states Eisenberg prevented Monarch from producing documents responsive to a subpoena served on Monarch on 25 August 1985 by directing Monarch's records custodian to misrepresent to the Office of the United States Attorney for the District of New Jersey that the documents were previously sent to the Chicago Strike Force. *Id.* Count 5 charges that from about July 1988 to about September 1988, in the District of New Jersey and elsewhere, Eisenberg concealed various Monarch documents which were required to be produced pursuant to the subpoena of a grand jury empaneled in the District of New Jersey on 17 March 1987 and caused false and misleading sworn testimony to be provided to the grand jury. Superseding Indictment, Count 5, ¶¶ 1–2. It states that in response to the subpoena, which was served on Monarch on 14 July 1988 and which required Monarch to produce documents and a records custodian to testify on 2 August 1988 before the grand jury, Eisenberg misrepresented in a letter to the Office of the United States Attorney that certain of these documents were previously sent to the Chicago Strike Force in response to other grand jury subpoenas. *Id.* It states that in fact, Eisenberg had previously secreted such documents in the Brooklyn Bakery. *Id.* In addition, Count 5 states that at the direction of Eisenberg,

Monarch's records custodian testified under oath before the grand jury that documents responsive to the grand jury subpoena and not produced had previously been sent by Monarch to the Chicago Strike Force in response to other grand jury subpoenas. *Id.*

Finally, Count 6 states that from about August 1987 to about September 1987, Eisenberg secreted Monarch documents which were required to be produced pursuant to a trial subpoena *duces tecum* and an order of the United States District Court for the District of New Jersey. Superseding Indictment, Count 6, ¶¶ 1–2. It states that a trial subpoena *duces tecum* was served on Monarch on or about 26 August 1987 in connection with the trial of Cannistraro for the crimes charged in the 1987 Indictment. It states this subpoena required Monarch to produce documents to the Office of the United States Attorney on or before 9 September 1987 and to produce a records custodian to testify at trial, then scheduled for 24 September 1987. *Id.* It further states that on or about 10 September 1987, the United States District Court for the District of New Jersey issued an order requiring Monarch to produce the documents responsive to the subpoena. *Id.* It states that Monarch's records custodian, at Eisenberg's direction, misrepresented to the Office of the United States Attorney and to the FBI that such documents were previously sent to the Chicago Strike Force in response to other grand jury subpoenas, when in fact they were secreted by Eisenberg at the Brooklyn Bakery. *Id.*

*Discussion*

I. Discovery–Related and Miscellaneous Motions

A. *Motion for Statements of Co–Conspirators*

 Bertoli, joined by Eisenberg, moves for disclosure by the Government of the statements of unindicted co-conspirators. Bertoli argues such statements are discoverable as his own statements under Fed. R.Crim.P. 16(a)(1)(A).[10] Bertoli Discovery

---

**10.** The provisions of Rule 16 pertaining to dis-

covery by the Government provide in relevant

Brief at 16. In addition, Bertoli argues such statements are discoverable under Fed.R.Crim.P. 16(a)(1)(C). *Id.* at 16–17 (citing *United States v. Enright,* 579 F.2d 980 (6th Cir.1978); *Government of Virgin Islands v. Ruiz,* 495 F.2d 1175 (3d Cir.1974);

part as follows:
> **Discovery and Inspection**
> **(a) Disclosure of Evidence by the Government**
> **(1) Information Subject to Disclosure**
> **(A) Statement of Defendant.** Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government; the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent; and recorded testimony of the defendant before a grand jury which relates to the offense charged....
> **(B) Defendant's Prior Record.** Upon request of the defendant, the government shall furnish to the defendant such copy of the defendant's prior criminal record, if any, as is within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government.
> **(C) Documents and Tangible Objects.** Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.
> **(D) Reports of Examinations and Tests.** Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial....

*United States v. Smith,* 65 F.R.D. 464, 473 (N.D.Ga.1974); *United States v. McMillen,* 489 F.2d 229 (7th Cir.1972), *cert. denied,* 410 U.S. 955, 93 S.Ct. 1420, 35 L.Ed.2d 687 (1973); *United States v. Bloom,* 78 F.R.D. 591 (E.D.Pa.1977)).[11]

Fed.R.Crim.P. 16(a).
In support of his motion based on Rule 16(a)(1)(A), Bertoli cites *United States v. Thevis,* 84 F.R.D. 47, 56–57 (N.D.Ga.1979); *United States v. Agnello,* 367 F.Supp. 444, 448–49 (E.D.N.Y.1973); *United States v. Madeoy,* 652 F.Supp. 371, 375 (D.D.C.1987). The continuing vitality of the holdings of these cases, granting production of co-conspirator statements under Rule 16, is questionable in light of more recent cases in their respective circuits which hold such statements are not discoverable under that rule. *See United States v. Orr,* 825 F.2d 1537, 1541 (11th Cir.1987); *United States v. Percevault,* 490 F.2d 126, 130–32 (2d Cir.1974); *In re United States of America,* 834 F.2d 283, 286–87 (2d Cir.1987); *United States v. Tarantino,* 846 F.2d 1384, 1418 (D.C.Cir.), *cert. denied,* 488 U.S. 840, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988).

**11.** The cases cited by Bertoli for the proposition that statements of co-conspirators are discoverable under Fed.R.Civ.P. 16(a)(1)(C), for which Bertoli for the most part does not provide pinpoint cites, do not appear to support this argument. The Sixth Circuit's decision in *Enright,* 579 F.2d at 980, concerned the admissibility of co-conspirator statements under Fed.R.Evid. 104. The Third Circuit's decision in *Ruiz,* 495 F.2d at 1178, involved production of a defendant's statements to his own lawyer under Fed.R.Crim.P. 16(a)(1)(A), which production is within the ambit of that rule. In *Smith,* 65 F.R.D. at 473, the court granted the defendant's motion for the statements of co-conspirators without stating the rule on which it relied for granting such motion, without providing any reasoning for its decision and citing only a 1969 edition of C. Wright's Federal Practice and Procedure. In *McMillen,* 489 F.2d at 231, the Seventh Circuit granted the defendant's motion for co-defendants' statements, without providing any reasoning for doing so, without citing to the rule which authorized such production and citing only a 1953 edition of Moore's Federal Practice and a 1966 law review article. Finally, *Bloom,* 78 F.R.D. at 618, concerns the production of co-conspirator statements under Fed.R.Crim.P. 16(a)(1)(A).

Bertoli has pointed to no authority which supports the proposition that co-conspirator statements are discoverable under Fed.R.Crim.P. 16(a)(1)(C). Bertoli's request is denied to the extent it relies on Fed.R.Crim.P. 16(a)(1)(C). The discussion of Bertoli's request for disclosure of co-conspirator statements, *infra,* is therefore limited to his request for disclosure under Fed.R.Crim.P. 16(a)(1)(A).

Some courts have held that on a broad reading of Rule 16(a)(1)(A), it is possible to regard the statements of co-conspirators made during the course of and in furtherance of a conspiracy as the statements of the defendant and discoverable as such. 2 C. Wright, *Federal Practice and Procedure*, § 253 n. 17 (1982 & Supp.1987); *United States v. Jackson*, 757 F.2d 1486, 1491 (4th Cir.) (statements of a co-conspirator may be imputed to a defendant under Federal Rule of Evidence 801(d)(2)(E) and are discoverable under Federal Rule of Criminal Procedure 16(a)(1)(A)), *cert. denied*, 474 U.S. 994, 106 S.Ct. 407, 88 L.Ed.2d 358 (1985); *United States v. Konefal*, 566 F.Supp. 698, 705–07 (N.D.N.Y.1983):

Even under this broad interpretation of Rule 16(a)(1)(A), however, discovery of the statements of co-conspirators may only be permitted on a Rule 16 motion if the Government does not intend to call such co-conspirators as witnesses at trial. *Jackson*, 757 F.2d at 1491; *Konefal*, 566 F.Supp. at 706. If the Government intends to call such co-conspirators as witnesses, the Jencks Act, 18 U.S.C. § 3500, expressly makes statements of Government witnesses, including co-conspirators, not discoverable until such time as the witness testifies. 18 U.S.C. § 3500(a).[12]

This broad interpretation of Rule 16(a)(1)(A) is not adopted. The weight of authority does not support extending Rule 16(a)(1)(A) beyond its literal mandate requiring disclosure of a defendant's own statements. *See, e.g., United States v. Mayberry*, 896 F.2d 1117, 1122 (8th Cir. 1990); *Tarantino*, 846 F.2d at 1418 (holding Rule 16(a)(1)(A) does not include statements made by co-conspirators even if

those statements can be attributed to the defendant for purposes of the rule against hearsay); *Orr*, 825 F.2d at 1541 (Rule 16(a)(1)(A) does not apply to co-conspirators' statements); *United States v. Roberts*, 811 F.2d 257 (4th Cir.1987) (*en banc*) (plain language of Rule 16(a)(1)(A) does not mention and is not intended to apply to statements made by co-conspirators; such statements are more properly governed by the Jencks Act); *Percevault*, 490 F.2d at 130–32 (Rule 16(a) does not encompass statements made by co-conspirators who are potential government witnesses and the Jencks Act does not permit their disclosure). *See also In re United States*, 834 F.2d 283, 284–86 (2d Cir.1987) (in which the Second Circuit cited with favor its previous decision in *Percevault*, 490 F.2d at 126); *United States v. Fischbach & Moore, Inc.*, 576 F.Supp. 1384, 1390 (W.D.Pa.1983) (rejecting broad interpretation of Rule 16 and expressing the view that co-conspirators' statements are within the purview of the Jencks Act and not within the reach of Rule 16).

To the extent the statements of co-conspirators encompass exculpatory information, the Government has pledged to comply with its obligations under *Brady*. Government Brief at 71. In addition, as mentioned, the statements of co-conspirators may be discoverable under the Jencks Act, if the co-conspirators testify at trial. *Roberts*, 811 F.2d at 259; *Fischbach & Moore, Inc.*, 576 F.Supp. at 1390; *United States v. Wolczik*, 480 F.Supp. 1205, 1209 (W.D.Pa.1979); *see* Fed.R.Crim.P. 16(a)(2) (citing 18 U.S.C. § 3500).

Under the Jencks Act and Rule 26.2 of the Federal Rules of Criminal Procedure, which incorporates the substance of the

**12.** The Jencks Act provides in relevant part:
 (a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena [sic], discovery, or inspection until said witness has testified on direct examination in the trial of the case.
 (b) After a witness called by the United States has testified on direct examination, the

court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use....
18 U.S.C. § 3500.

Jencks Act, a defendant may request the pretrial statements of a Government witness that relate to his testimony once the witness has finished testifying on direct examination. The Jencks Act states: "[N]o statement or report in the possession of the United States which was made by a Government witness ... shall be the subject of subpena [sic], discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a). As the Third Circuit explained in *United States v. Murphy*, 569 F.2d 771 (3d Cir.), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1588, 55 L.Ed.2d 807 (1978): "The blunt command of the statute together with the unequivocal legislative history has led to unbroken precedent in the Courts of Appeals denying to district courts the power to compel production of the statements of government witnesses until conclusion of direct examination at the trial." *Id.* at 773. In the instant case, the Government has indicated it will disclose any Jencks Act material the day before the witness testifies, Government Brief at 61 n. 30, although it is not required to do so.

The request by Bertoli, joined by Eisenberg, under Rule 16 for statements of coconspirators is denied.

**B.** *Motion for List of Government Witnesses*

■ Bertoli, joined by Eisenberg, seeks an order compelling disclosure by the Government of the witnesses it will call at trial. He argues such disclosure is warranted, *inter alia*, in light of the complexity of this case and in light of the lack of showing by the Government of any risk that witness intimidation would result from disclosure. This motion is baseless.

A defendant in a noncapital case does not have a right to discover a list of prospective Government witnesses. *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977) (due process does not require Government to provide names of witnesses unfavorable to defendant); *Government of the Virgin Islands v. Martinez*, 847 F.2d 125, 128 (3d Cir.1988)

("[T]he government is not automatically required to disclose the name[s] of ... witness[es] in a non-capital criminal case."); *United States v. Di Pasquale*, 740 F.2d 1282, 1294 (3d Cir.1984) (Government is not required to divulge the identity of its witnesses in a non-capital case), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985); *United States v. Addonizio*, 451 F.2d 49, 62 (3d Cir.1971) ("[I]n no event is the Government required to divulge the identity of its witnesses in a non-capital case."), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812, *reh'g denied*, 405 U.S. 1048, 92 S.Ct. 1309, 31 L.Ed.2d 591 (1972).

■ It is within the discretion of a court to "order such disclosure to ensure the effective administration of the criminal justice system." *United States v. Higgs*, 713 F.2d 39, 44 n. 6 (3d Cir.1983), *cert. denied sub nom.*, 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984). However, it is likewise within the discretion of a court to refuse to compel such disclosure where such disclosure may endanger the witnesses. *Martinez*, 847 F.2d at 128. A request to compel disclosure has been denied where no compelling justification for such disclosure was offered. *See United States v. Zolp*, 659 F.Supp. 692, 704 (D.N.J.1987) ("The Third Circuit does not require that the Government divulge its trial witnesses and defendants herein have presented no compelling justification for departing from this settled principle."). In addition, disclosure has been denied even in complex cases. *See, e.g., Zolp*, 659 F.Supp. at 704; *United States v. Vastola*, 670 F.Supp. 1244, 1268 (D.N.J.1987).

Bertoli does not contend he is entitled to the list of Government witnesses he seeks. Rather, he argues this court has discretionary power to order such disclosure and that it is warranted in this case because the need of the defense for the disclosure of prospective witnesses outweighs the Government's interest in not divulging the identities of the witnesses or the content of its case in advance of trial. Bertoli, however, has not presented any justification, much more compelling justification, for such sweeping discovery in this case.

In addition, compelling reasons exist to refuse such disclosure. The Government submitted the affidavit of FBI Special Agent Michael J. Cahill ("Cahill") to support its contention that Eisenberg and Bertoli have attempted to buy the silence of Cannistraro. Cahill asserted: "My investigation has revealed evidence that Richard Bertoli and Leo Eisenberg have promised Richard Cannistraro one million dollars for every year he spent in jail in return for Cannistraro's silence about the illegal activities of the Monarch RICO enterprises." Cahill Aff., ¶ 2.[13]

In addition, the Superseding Indictment charges Eisenberg with obstructing justice by directing the Monarch records custodian to misrepresent to the Office of the United States Attorney, and to do so under oath during grand jury proceedings, that subpoenaed documents had previously been sent to the Chicago Task Force. It also charges that Eisenberg obstructed justice by secreting certain subpoenaed documents in the Brooklyn Bakery. Moreover, Cannistraro pleaded guilty to the 1987 Indictment which charged him with obstructing justice by providing money to a grand jury witness in an effort to have the witness lie under oath to the grand jury about the witness' stock nominee relationship with Cannistraro. *See Cannistraro*, 694 F.Supp. at 65.

Although not required to do so, the Government has agreed to provide the Defendants with a list of unindicted co-conspirators and co-racketeers. Government Brief at 57 n. 26 and 74 n. 33. Bertoli's motion for an order compelling the Government to disclose its witness list is denied.

### C. *Motion for Giglio Material*

Bertoli, joined by Eisenberg, additionally seeks impeaching materials possessed by the Government as to its witnesses. Such material is discoverable pursuant to *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

In *Giglio*, the Supreme Court extended the rule set forth in *Brady*, 373 U.S. at 83, 83 S.Ct. at 1194, requiring the Government to disclose to the defendant exculpatory material in its possession, to encompass information that might be used to impeach the credibility of Government witnesses when the reliability of those witnesses could be determinative of guilt or innocence. *Id.* 405 U.S. at 154, 92 S.Ct. at 766.[14] Evidence that might be used to impeach Government witnesses by showing bias or interest has been deemed to fall within the purview of *Giglio*. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *Higgs*, 713 F.2d at 42.

In *Higgs*, the Third Circuit held a defendant's due process right to a fair trial is satisfied when information relating to the credibility of Government witnesses is disclosed the day the witnesses are scheduled to testify. *Higgs*, 713 F.2d at 44. The Circuit explained the requirements of due process depend upon what information has been requested and how that information will be used by the defendant. *Id.* at 43–44.

In *Higgs*, the defendant made a specific request for the names and addresses of Government witnesses who were granted

---

**13.** Bertoli objects to the Cahill affidavit on the ground that the "Government's reliance on an *ex parte* affidavit is entirely suspect." Bertoli Reply Brief at 39. However, the Cahill affidavit is not submitted by the Government to prove Bertoli's guilt or innocence relative to the charges in the Superseding Indictment. It is merely submitted to oppose a pre-trial motion which Bertoli has brought for disclosure of certain information. Moreover, it is observed that Bertoli has submitted several *"ex parte"* affidavits of his own relative to several of the instant motions, when doing so has suited his purposes. *See* Tolomeo Aff., Supp. Tolomeo Aff., Bertoli Aff., Second Tolomeo Cert. and the Chattman

Aff. Bertoli's assertion that the Cahill affidavit should be disregarded is rejected.

In addition, Bertoli's motion for disclosure of the Government's witness list would be denied even without the Cahill affidavit, in light of the allegations of the Superseding Indictment and in light of Cannistraro's conviction for obstruction of justice included in the 1987 Indictment.

**14.** The Government represents it has complied with its obligation to produce exculpatory material pursuant to *Brady* ("*Brady* material") and will continue to do so should exculpatory material come into its possession. Government Brief at 57.

immunity or leniency and for the substance of any agreements between those witnesses and the Government. *Id.* at 42. The Circuit stated:

> The *Brady* material in this case was information that appellees could use on cross-examination to challenge the credibility of government witnesses. For that type of material, *we think appellee's right to a fair trial will be fairly protected if disclosure is made the day that the witness testifies.* Disclosure at that time will fully allow appellees to effectively use that information to challenge the veracity of the government's witnesses.

*Id.* at 44 (emphasis added).

The *Higgs* court held it was an abuse of discretion for the trial court to order disclosure of the material a week prior to trial. In so holding, the court observed the purpose of requiring disclosure of impeachment information is not to assist the defense in a general pretrial investigation, but only to give the defense an opportunity to effectively cross-examine the Government's witnesses at trial. *See id.* at 44–45.

Here, the Government has indicated it will disclose any *Giglio* material in its possession the day before the witness testifies. Government Brief at 61. In addition, the same reasons set forth above for denying Bertoli's motion for disclosure of the Government's witnesses also weigh against ordering disclosure of *Giglio* material at this time. Bertoli's motion for early disclosure of *Giglio* material is denied.[15]

### D. Motions for Disclosure of Rule 404(b) Evidence the Government Intends to Admit

■ Bertoli and Eisenberg[16] seek disclosure of Rule 404(b) Evidence the Govern-

ment intends to admit concerning other crimes, wrongs or acts by Bertoli and Eisenberg in order to prove motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident with respect to the offenses charged. Bertoli Discovery Brief at 14; Eisenberg Brief at 11–13.

Bertoli argues: "The importance of disclosure of evidence of other crimes, wrongs, or acts is apparent.... [P]re-trial disclosure of the Government's intention to use such evidence would enable the court to make a carefully reasoned judgment with respect to the admissibility of such evidence." *Id.* at 15. Eisenberg argues pre-trial disclosure of such evidence "would minimize any improper prejudicial effect of this evidence." Eisenberg Brief at 12.

■ Questions as to the admissibility of prior bad acts under Rule 404(b) are properly asserted during trial, not at the pretrial stage. *Vastola*, 670 F.Supp. at 1268 (it would be "unduly speculative" to rule on the admissibility of "other acts" evidence before hearing the factual context at trial); *see United States v. Matos–Peralta*, 691 F.Supp. 780, 791 (S.D.N.Y.1988) (disclosure of Rule 404(b) material not subject to minimum time limit because relevance will change as "the proof and possible defenses crystallize").

■ Federal Rules of Criminal Procedure 12(d)(2) requires the Government to give notice of its intention to use evidence at the request of the defendant. This rule, however, is limited to evidence needed for a defendant's motion to suppress and to evidence discoverable under Fed.R.Crim.P. 16. Although a defendant's prior criminal record is discoverable under Rule 16, evidence of prior bad acts is not. *See Fischbach & Moore, Inc.*, 576 F.Supp. at 1384;

---

**15.** Bertoli, joined by Eisenberg, also seeks early disclosure of "any Jencks Act material, which also constitutes *Brady* or *Giglio* material." Bertoli Discovery Brief at 32. The Government indicates it has complied with its obligations under *Brady* and will continue to do so should any exculpatory material come within its possession in the future. Government Brief at 57–58. The Government also states it will provide both *Giglio* and Jencks Act material to the Defendants the day before the witness to which

such material pertains testifies. *Id.* at 61 n. 30. The motion for early disclosure of such Jencks Act material is denied.

**16.** Eisenberg did not join in the Bertoli motion, but moved separately for early disclosure by the Government of Rule 404(b) Evidence. *See* Eisenberg's Notice of Motion; Eisenberg Brief at 11–13.

*United States v. Ramirez*, 602 F.Supp. 783 (S.D.N.Y.1985) (defendant's request for pretrial hearing to determine admissibility of alleged prior or subsequent similar act denied; defendant instructed to seek ruling during course of trial).

Prior to the Supreme Court's decision in *Huddleston v. United States*, 485 U.S. 681, 687, 108 S.Ct. 1496, 1500, 99 L.Ed.2d 771 (1988), courts encouraged pretrial disclosure by the Government of its intention to introduce evidence of prior bad acts. *See United States v. Foskey*, 636 F.2d 517, 525–26 (D.C.Cir.1980); *Fischbach & Moore, Inc.*, 576 F.Supp. at 1397–98. This early disclosure has been encouraged in order to facilitate the court's determination as to the admissibility of evidence under Rule 404(b). In order for bad acts evidence to be admissible, the Government must establish the relevancy of the evidence to a material issue other than character, such as motive, opportunity, intent, identity or absence of mistake or accident. *See Huddleston*, 485 U.S. at 687, 108 S.Ct. at 1500; *Foskey*, 636 F.2d at 523. In *Huddleston*, the Court explained that "[i]n the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Huddleston*, 485 U.S. at 689, 108 S.Ct. at 1501.

After the threshold determination is made that the evidence is probative of one of the issues listed in Rule 404(b), the court must determine "whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403." [17] *Huddleston*, 485 U.S. at 688, 108 S.Ct. at 1500 (quoting Fed.R.Evid. 404(b) advisory committee note); *Foskey*, 636 F.2d at 523. In *Hud-*

*dleston*, the Court indicated that "the strength of the evidence establishing the similar act is one of the factors the court may consider when conducting the Rule 403 balancing." *Huddleston*, 485 U.S. at 689 n. 6, 108 S.Ct. at 1501 n. 6.

In *Foskey*, the D.C. Circuit suggested that the Government should exercise its discretion under Fed.R.Crim.P. 12(d)(1) [18] and notify the defense before trial of its intention to introduce any evidence of prior bad acts. *Foskey*, 636 F.2d at 526 n. 8. The court indicated further that if the defense raised a motion to suppress, the Government should then supply the district court with a written analysis of the logical inferences justifying admission of the evidence. Given the complexity of these questions, the court reasoned such a procedure would obviate the need for speculation regarding the Government's theory of the relevance of the evidence to the issues listed in Rule 404(b). *Id.* The *Foskey* court explained:

> Rules 403 and 404(b) are not obstacles to be cleared at all costs, even by cutting around corners whenever it is possible to do so. These rules were designed to ensure a defendant a fair and just trial based upon the evidence presented, not upon impermissible inferences of criminal predisposition or by confusion of the issues. The district court, required to make on-the-spot decisions, does not have the luxury of engaging in the type of careful balancing we have undertaken here.... There is a large measure of responsibility in the prosecutor to weigh the evidence independently: if its relevance is outweighed by the danger of unfairly prejudicing, confusing, or misleading the jury, it should not be introduced. The assistant United States attorney must step back from his or her partisan role and make these determina-

*Id.*

---

**17.** Fed.R.Evid. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**18.** Rule 12(d)(1) provides that the Government may in its discretion give notice to the defendant of its intention to use specified evidence at trial in order to afford the defendant an opportunity to move to suppress such evidence. Fed. R.Crim.P. 12(d)(1).

tions in an objective and fair-minded fashion before proffering the evidence. *Id.* at 525–26.

Similarly, the district court in *Fischbach* encouraged the Government to exercise its discretion and disclose to the defense bad acts which it intended to introduce at trial. *Fischbach & Moore, Inc.,* 576 F.Supp. at 1397–98 (quoting *Foskey,* 636 F.2d at 525–26). The court pointed out, however, that "[w]hile we believe this early disclosure is to be encouraged, we know of no authority requiring the government to disclose such information." *Id.* at 1398.

Although the *Foskey* decision offered various reasons for early disclosure and the *Fischbach* decision encouraged such disclosure, it is significant that in *Huddleston,* a unanimous decision, the Supreme Court did not mandate or even address the timing of such disclosure. In light of the holdings of *Foskey* and *Fischbach,* as well as of other cases, it appears that the Supreme Court was aware of such pretrial discovery requests concerning Rule 404(b) Evidence but chose to continue the procedure of allowing the Government to determine when such pretrial disclosure will be made.

In the instant case, the Government asserts: "Should the United States seek to offer any evidence pursuant to Rule 404(b), it will notify the [c]ourt and the [D]efendants prior to the introduction of such evidence. This will afford the [D]efendants adequate notice, and the [c]ourt adequate time, to weigh the probative value of the evidence against its possible prejudicial impact." Government Brief at 64. The motions of Bertoli and Eisenberg for pre-trial disclosure of Rule 404(b) Evidence are denied.

### E. *Motion for Identification of Brady Material Among Documents Previously Produced*

■ Bertoli, joined by Eisenberg, seeks an order compelling the Government to identify the specific documents among the materials thus far produced which constitute *Brady* material. Bertoli Discovery Brief at 37. In response, the Government asserts it has no obligation to identify *Brady* material among documents produced, but has an obligation only to make available to the Defendants *Brady* material in its possession to which the Defendants do not have access or to which the Defendants could not obtain access through the exercise of reasonable diligence. Government Brief at 66. The Government argues the identification of *Brady* material is information which the Defendants could ascertain through the exercise of reasonable diligence. *Id.* at 67. The Government asserts its records indicate that between 10 November 1989 and 9 February 1990, representatives of the Defendants spent over 100 hours reviewing these documents and deciding which documents it would seek to have copied. *Id.* at 65.

*Brady* is "designed to 'assure that the defendant will not be denied *access* to exculpatory evidence *only known to the Government.*'" *United States v. Grossman,* 843 F.2d 78, 85 (2d Cir.1988) (quoting *United States v. LeRoy,* 687 F.2d 610, 619 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983)) (emphasis added), *cert. denied,* 488 U.S. 1040, 109 S.Ct. 864, 102 L.Ed.2d 988, *reh'g denied,* 490 U.S. 1059, 109 S.Ct. 1974, 104 L.Ed.2d 442 (1989). As the Third Circuit has stated, " 'the [G]overnment is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.'" *United States v. Starusko,* 729 F.2d 256, 262 (3d Cir.1984) (quoting *United States v. Campagnuolo,* 592 F.2d 852, 861 (5th Cir.1979)). *See also United States v. Wilson,* 901 F.2d 378, 381 (4th Cir.1990); *United States v. Meros,* 866 F.2d 1304, 1309 (11th Cir.), *cert. denied,* 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989); *United States v. Newman,* 849 F.2d 156, 161 (5th Cir.1988).

The Government represents it has complied with its *Brady* obligations. Bertoli does not assert that the Government has concealed exculpatory evidence. Rather, he asserts that he should not have to expend the effort required to review a substantial number of documents in order to

ascertain whether they contain exculpatory information. He asserts the onus of making such effort should be borne by the Government. The Government represents, and Bertoli does not dispute, that counsel for the Defendants spent a substantial amount of time reviewing the documents produced by the Government. Moreover, Bertoli does not complain that he was denied sufficient access to these documents. The Government has complied with its *Brady* obligations and the motion of Bertoli, joined by Eisenberg, is denied.

### F. *Motion for Production of Materials Initially Disclosed to the Defendants But Later Withdrawn*

■ Bertoli, joined by Eisenberg, moves for production of evidence which was initially produced in November 1989 for inspection and copying. Counsel for Bertoli states that after the material had been reviewed and marked for copying by Bertoli, and after the copying process was completed, the Government first informed counsel for Bertoli that certain items had been withdrawn and would not be copied for Bertoli. Bertoli now moves for production of these items for inspection and copying or, in the alternative, for a detailed explanation of these items in order to determine whether they are discoverable under Fed.R.Crim.P. 16. Bertoli Discovery Brief at 33. Bertoli argues: "In light of the fact that the Government has already produced the grand jury transcripts and the audio cassette tapes, it should be compelled to copy and provide them to defendant Bertoli." *Id.* at 35.

H. Richard Chattman ("Chattman"), an attorney for Bertoli, states that on 6 November 1989, at the arraignment of Bertoli, the Government offered to make available a substantial amount of evidence in this case for inspection and copying by the Defendants. Subsequently, the Government produced documents and tapes for the Defendants. Chattman Aff., ¶ 2. The produced materials included twenty-four transcripts of grand jury testimony in the matter of *United States v. Richard Roe*, dated May, 1980, venued in the Southern District of New York (the "*Roe* Transcripts"). *Id.*, ¶ 4. In addition, seventeen audio cassette tape recordings were marked for copying. *Id.* On 11 April 1990, after the materials marked for copying by the Defendants were reproduced, Chattman was told by David Rosenfield ("Rosenfield"), Special Assistant United States Attorney, that the *Roe* Transcripts were removed from the copied materials and would not be turned over. *Id.*, ¶ 5. Rosenfield informed Chattman these materials did not relate to activities charged in the Superseding Indictment and the tapes were not recordings of conversations of any of the Defendants. *Id.*, ¶ 5.

Bertoli cites no authority for the proposition that a defendant is entitled as a matter of right to materials inadvertently disclosed by the Government. The Government represents it "is well aware of, and has complied with, its obligations under Rule 16 and this [c]ourt's discovery order." Government Brief at 46. It represents that shortly after the Defendants' arraignment on 6 November 1989, it made discovery material available to the Defendants for review and copying, including a substantial amount of material it was not required to produce at that time. *See infra* at 689–691. In addition, the Government states it has complied with its obligation to produce *Brady* material and will continue to comply with it should any exculpatory material come into its possession. *Id.* at 691–692. The Government additionally represents it will produce *Giglio* and Jencks Act material concerning a witness the day before the witness testifies. *Id.* at 693. The Defendants are entitled to no more. The motion of Bertoli and Eisenberg for discovery of materials previously produced inadvertently by the Government is denied.

### G. *Motion for a Bill of Particulars*

■ Bertoli, joined by Eisenberg, moves pursuant to Fed.R.Crim.P. 7(f) for a Bill of Particulars. The Bill of Particulars submitted by Bertoli is thirty-three pages in length and includes seventy questions relative to Count 1, seven questions relative to Count 2, fifteen questions relative to Count 3 and seven questions relative to the

forfeiture allegations of the Superseding Indictment. Many of these questions contain multiple subparts.

The Bill of Particulars submitted by Bertoli is too lengthy and detailed to set forth in full or to describe comprehensively. The questions include requests for specifics as to the identities of the alleged Nominee Brokerage Accounts, the identities of persons coming under the rubric of "others" set forth in the Superseding Indictment, specific places within the District of New Jersey referred to in the Superseding Indictment, specifics as to how various documents referred to in the Superseding Indictment were fraudulent, the subject documents of the charged instances of mail fraud perpetrated by Bertoli, how such instances related to the execution of the charged scheme and specifics as to transactions executed by the M & I Fund and Bullock Fund portfolio managers, *inter alia.*

■ Serving a function analogous to an indictment, a Bill of Particulars provides the defendant with notice of the charges against him. It is designed " 'to identify with sufficient particularity the nature of the charge[s] pending against [the defendant], thereby enabling [him] to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.' " *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir.1988) (quoting *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir.1987) (*per curiam* )); *see United States v. Rosa*, 891 F.2d 1063, 1066 (3d Cir.1989); *United States v. Adams*, 759 F.2d 1099, 1113 (3d Cir.), *cert. denied sub nom.*, 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985). A Bill of Particulars should be granted when, in the trial court's discretion, it appears the indictment is too vague to inform the defendant of the nature of the charges against him. *Rosa*, 891 F.2d at 1067; *Addonizio*, 451 F.2d at 63–64; *Zolp*, 659 F.Supp. at 706.

■ Although Rule 7(f) is construed liberally, it does not permit a defendant to receive wholesale discovery of the Government's evidence. *Rosa*, 891 F.2d at 1066; *Addonizio*, 451 F.2d at 64. Nonetheless, if the defendant seeks legitimate information, his request for a Bill of Particulars cannot be denied merely because providing the information would divulge details of the Government's evidence. *Addonizio*, 451 F.2d at 64 n. 16. The Third Circuit has stated:

> [T]rial judges must be allowed to exercise broad discretion in order to strike a prudent balance between the defendant's legitimate interest in securing information concerning the government's case and numerous countervailing considerations ranging from the personal security of witnesses to the unfairness that can result from forcing the government to commit itself to a specific version of the facts before it is in a position to do so.

*Rosa*, 891 F.2d at 1066.

■ In order to determine whether a Bill of Particulars is appropriate in this case, it is necessary to examine the discovery already produced by the Government in addition to the allegations of the indictment. *United States v. Boffa*, 513 F.Supp. 444, 485 (D.Del.1980). As to the discovery produced in the instant case, the Government represents it has complied with its obligations under Fed.R.Crim.P. 16 [19] and this court's discovery order, filed 23 May 1990 (the "23 May 1990 Order"),[20] as well as its obligations under *Brady*. Government Brief at 46–47. In addition, the Government represents it has made documents and other discovery materials available to the Defendants for review and copying. It states:

> These materials included, not only that which would then have been discoverable under Rule 16 and the [c]ourt's probable discovery order, but also many documents that would not have been discoverable until thirty days before trial

---

**19.** *See supra* at n. 10.

**20.** The 23 May 1990 Order required the Government to produce materials which are discover-

able under Rule 16 and which must be produced pursuant to *Brady*. *See* 23 May 1990 Order.

and many documents that fell beyond the scope of the discovery rules. Moreover, the [D]efendants have received two lengthy and detailed affidavits outlining evidence that connects the [D]efendants to various Cayman Islands bank accounts and [N]ominee [B]rokerage [A]ccounts [21] and have had access to numerous relevant documents and testimony from [the] 1987 [Cannistraro] criminal prosecution and the related SEC civil case.

Government Brief at 46.[22] The Government also asserts:

[T]he [D]efendants are also defendants in the related SEC civil case concerning LCI and Toxic Waste currently pending in the Southern District of New York,[23]

**21.** On 6 November 1990, the Government made a motion for leave to take foreign depositions and for foreign judicial assistance. Government Brief at 7. The motion was not decided because the Government sought to obtain foreign evidence under the Mutual Legal Assistance Treaty between the United States and the United Kingdom concerning the Cayman Islands (the "Treaty"). *Id.* On 24 April 1990, the Government was granted leave to conduct foreign depositions in connection with its Treaty request. *Id.* at 7–8.

**22.** Elsewhere in the Government Brief, the Government describes the documents as follows:

(1) Approximately 40 boxes of Monarch records, including the following:
(a) records of the defendants' nominee accounts;
(b) records of the fraudulent trading activities engaged in by the defendants and others in connection with the stocks set forth in the Superseding Indictment;
(c) records of the nominee accounts of the Fund Manager and the Research analyst mentioned in the Superseding Indictment;
(d) all records hidden at the Brooklyn bakery by defendant Eisenberg, as a result of which Eisenberg has been charged with obstruction of justice;
(e) new account cards of all Monarch customers;
(f) ledger sheets of the trading activity by Monarch customers;
(g) Monarch bank records, including checks, monthly statements and wire transfer records;
(h) Monarch corporate bills and invoices.
(2) Over 100 boxes of Citiwide Securities Corp. ("Citiwide") records; the categories of Citiwide records in most instances parallel the categories of Monarch records listed herein;
(3) Several boxes of High Tech records;

and, as a result, have had access to voluminous SEC records and to numerous transcripts of witness testimony before the SEC that are relevant to the charges in the Superseding Indictment. Moreover, prior to the issuance of the stay of discovery in that case, Bertoli, acting *pro se*, and Eisenberg's counsel attended several depositions and were able to question these witnesses. Even subsequent to the issuance of the stay, Bertoli, along with Eisenberg's counsel, were able to depose at great length SEC investigator Fred Florschutz.

Government Brief at 80 (citation omitted). The Defendants do not dispute these representations of the Government.[24]

(4) Several boxes of records of High Tech portfolio companies;
(5) Several boxes of Solar Age records;
(6) Several boxes of Toxic Waste records;
(7) A box of LCI records;
(8) A box of Astrosystems records;
(9) A box of Nature's Bounty records;
(10) Several boxes of Wood Gundy, Inc. records;
(11) A number of boxes of records subpoenaed from various financial institutions and brokerage firms relevant to the charges in the Superseding Indictment;
(12) Tape recordings of the Bullock Manager discussing his role in the fraudulent schemes with his nominee;
(13) A tape recording of defendant Eisenberg and one of Monarch's customers; and
(14) Several boxes of records related to the defendants Cayman Islands activities.

Government Brief at 79. In addition, it describes the affidavits provided relative to the Government's attempt to obtain Rule 15 discovery in the Cayman Islands as "two lengthy detailed affidavits of FBI Special Agent Michael Cahill outlining evidence that connects the [D]efendants to various Cayman Islands bank accounts and [N]ominee [B]rokerage [A]ccounts. The two affidavits total 62 pages and include 73 exhibits." Government Brief at 80.

**23.** This action is a civil case filed in September 1985 in the Southern District of New York in which the SEC charged Cannistraro, Bertoli, Eisenberg and a former Monarch broker with securities fraud in connection with LCI and Toxic Waste securities transactions (the "SEC Civil Action"). *SEC v. Monarch Funding Corp.,* Civ. No. 85–7072 (LBS) (S.D.N.Y.). That action is still pending and discovery has been stayed until the resolution of the instant criminal action. Government Brief at 2 n. 1.

**24.** Rather, Bertoli states in reply, *inter alia,* that the two Cahill affidavits are virtually identical

In addition, the Superseding Indictment is a seventy-nine page document which describes the alleged illegal conduct in detail too exhaustive to set forth in full. To describe a few of its allegations, as to the violation of RICO section 1962(c) charged in Count 1, the Superseding Indictment identifies the RICO enterprise as Monarch, states the period of time during which the racketeering schemes took place and states these schemes took place in New Jersey. While Bertoli's Bill of Particulars requests information as to the substance of the alleged fraud and specifics as to the instances of mail fraud, the Superseding Indictment identifies several reports and articles which were allegedly fraudulent, states several ways in which they were fraudulent and identifies by date and content several instances of mail and wire fraud which constitute the predicate acts of racketeering. The Superseding Indictment exhaustively describes the racketeering schemes and their objects and identifies additional participants in the scheme as the M & I Fund and Bullock Fund portfolio managers and the Hallswell research analyst.

As to Count 2, charging conspiracy to violate RICO section 1962(c) in violation of RICO section 1962(d), the Superseding Indictment states the period of the duration of the conspiracy and lists seventeen overt acts perpetrated in furtherance of the conspiracy. As to Count 3, charging conspiracy to violate Section 10(b) and Rule 10b–5 in violation of 18 U.S.C. § 371, the Superseding Indictment states the period during which the conspiracy took place, that it existed in New Jersey and describes the schemes as to which the Defendants conspired, involving the securities of Solar Age and High Tech and the use of Nominee Brokerage Accounts. All that is required of an indictment is that it give the defendant sufficient information to prepare his defense against the crimes alleged. *United States v. Debrow*, 346 U.S. 374, 377–78, 74 S.Ct. 113, 115, 98 L.Ed. 92 (1953).

Numerous courts have ruled that detailed discovery requests, such as those made by Bertoli in his request for a Bill of Particulars, need not be granted. As stated by the Third Circuit: "Appellant's request for the 'when, where and how' of any overt acts not alleged in the indictment [is] tantamount to a request for 'wholesale discovery of the Government's evidence,' which is not the purpose of a [B]ill of [P]articulars under Fed.R.Crim.P. 7(f)." *United States v. Armocida*, 515 F.2d 49, 54 (3d Cir.) (citing *Addonizio*, 451 F.2d at 64), *cert. denied sub nom.*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). For example, as discussed, a defendant is not entitled to a list of the identities of Government witnesses. *Di Pasquale*, 740 F.2d at 1294; *United States v. Mitchell*, 540 F.2d 1163, 1166 (3d Cir.1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1119, 51 L.Ed.2d 547 (1977); *Government of Virgin Islands v. Ventura*, 476 F.2d 780, 781 n. 1 (3d Cir. 1973) *(per curiam)*; *Addonizio*, 451 F.2d at 62. Moreover, a defendant is not entitled to a list of uncharged overt acts and uncharged criminal conduct. *Vastola*, 670 F.Supp. at 1270. The detail contained in the instant Superseding Indictment is well beyond that required of an indictment. The requested Bill of Particulars is a patent abuse and is baseless.

Similar requests for specific facts about an alleged conspiracy sought by way of demand for a Bill of Particulars have been denied by district courts. *See, e.g., Zolp*, 659 F.Supp. at 706; *United States v. Wilson*, 565 F.Supp. 1416, 1438–39 (S.D.N.Y.1983); *Boffa*, 513 F.Supp. at 485 ("[N]or is it necessary for the Government to disclose in a [B]ill of [P]articulars the precise details that a defendant and his alleged co-conspirators played in forming and executing a conspiracy or all the overt acts the Government will prove in establishing the conspiracy."); *United States v. Heldon*, 479 F.Supp. 316, 323 (E.D.Pa.1979) (court denied motion for Bill of Particulars

---

and so in effect constitute only one affidavit. Bertoli Reply Brief at 32. In addition, he apparently asserts that the boxes of documents do not satisfy the Government's obligation to provide

information sufficient to prepare a defense because the documents were in no particular order and allegedly contain both relevant and irrelevant documents. *Id.* at 33.

brought by defendants charged with drug conspiracy who sought specific times and places drugs were allegedly distributed and overt acts in furtherance of conspiracy).

For the above reasons, the motion of Bertoli, joined by Eisenberg, for a Bill of Particulars is denied.

### H. *Motion for the Production of Enumerated Documents Characterized as Brady Material*

Without briefing this question, and without explaining how such a request falls under *Brady* or is otherwise relevant, Bertoli, joined by Eisenberg, requested in his Notice of Motion a number of documents of the SEC and National Association of Securities Dealers ("NASD").[25] In response, the Government again pledges to provide any exculpatory materials which come into its possession. Government Brief at 58 n. 27. The motion for the discovery of the materials specified in Bertoli's Notice of Motion is denied.

### I. *Preservation of Rough Notes and Other Communications*

Bertoli, joined by Eisenberg, requests the Government retain any rough notes of interviews with all witnesses for possible production at a later date, pursuant to *United States v. Vella*, 562 F.2d 275 (3d Cir.1977), *cert. denied*, 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978). There are instances in which such rough notes must be produced, as when they contain exculpatory material under *Brady*, 373 U.S. at 83, 83 S.Ct. at 1194, or qualify as *Jencks* material, 18 U.S.C. § 3500. *United States v. Ammar*, 714 F.2d 238 (3d Cir.), *cert. denied sub nom.*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983).

The Government states it does not oppose this motion and is "aware of its obligation under [*Ammar*] to preserve notes of interviews and will comply with those obligations." Government Brief at 12. The motion by Bertoli and Eisenberg is denied as moot.

### J. *Motion for Transcripts and Tape Recordings*

Without stating the basis under which such materials are discoverable, without briefing the question and without describing the relevance of such materials, Bertoli, joined by Eisenberg, seeks production of "[a]ny transcripts made of the audio cassette tapes provided to the defendants" and "[a]ll tape recordings made of defendant Cannistraro's phone calls while incarcerated in federal prisons." Notice of Motion. The Government represents that in the event it decides to use any transcripts of audio tapes in its direct case it will provide such transcripts to the Defendants at the appropriate time. Government Brief at 87. As stated, Bertoli has set forth no basis for ordering production of these materials. The motion is denied.

### K. *Motion for an Order Precluding the Admission of Any Testimony by David O'Connor, Esq., or Marvin Gersten, Esq., Protected by the Attorney–Client Privilege*

Bertoli moves to suppress all statements made during any meeting between or among Bertoli and Cannistraro and Cannistraro's former defense counsel, David O'Connor, Esq. ("O'Connor"), and Marvin Gersten, Esq. ("Gersten"), as inadmissible against Bertoli based on the joint defense privilege. Bertoli Discovery Brief at 9.

---

**25.** The Notice of Motion requests:
 (e) The following exculpatory evidence under *Brady v. Maryland:*
 (i) all SEC and NASD records relating to investigations of and/or securities violations by the following firms: Monarch Funding Corporation, Citiwide Securities, Broadcort Capital Corporation and Weaver Johnson & Co., and Friedman Manager.
 (ii) all SEC records on the securities referred to in the Indictment;

(iii) SEC records on the securities referred to in the Affidavit of Michael Cahill dated December 21, 1989, and/or in the Government's Request for Foreign Evidence dated April 4, 1990;
 (iv) all exhibits from the investigation conducted by the [Chicago Strike Force].
 Notice of Motion.

In support of the motion, Bertoli submits the affidavit of O'Connor, in which O'Connor states he represented Cannistraro in connection with an investigation by the SEC beginning in March 1984. O'Connor Aff., ¶ 1. O'Connor states Bertoli and Cannistraro were named as co-defendants in the SEC Civil Action, in which Bertoli represented himself *pro se. Id.,* ¶ 3. O'Connor states that beginning in 1987, he met on a "regular basis" with Bertoli, Cannistraro and O'Connor's law partner, Gersten, to prepare a common defense strategy. *Id.,* ¶ 5. In addition, O'Connor met separately with Bertoli alone on occasion and provided Bertoli and Cannistraro with a work space at his office, where Bertoli and Cannistraro jointly worked on various aspects of their joint defense. *Id.,* ¶¶ 6–7. O'Connor states he was retained by Cannistraro to represent him when Cannistraro was indicted under the 1987 Indictment, which prosecution involved "factual and legal issues directly related to the [SEC] [C]ivil [A]ction." *Id.,* ¶ 8. He concludes:

> From the first time I met Richard Bertoli, shortly after Mr. Cannistraro was indicted, until after my client pleaded guilty and was sentenced ..., every contact I had with Mr. Bertoli was part of a joint defense, and, thus, I believe that all statements made during our conferences were and continue to be privileged as to Mr. Bertoli.

*Id.,* ¶ 9.

In response, the Government states it "will not offer into evidence against Bertoli or Eisenberg any testimony by [Gersten] or [O'Connor] that is protected by a valid joint defense privilege." Government Brief at 13. In reply, Bertoli argues the Government's assertion cannot be tested unless it discloses the substance of the testimony. He argues such disclosure is necessary in order for him to move for severance from

Cannistraro. Bertoli Reply Brief at 36. In a footnote, Bertoli observes: "Obviously, testimony by Messrs. Gersten and O'Connor which is in violation of defendant Bertoli's attorney-client privilege could not be introduced at a joint trial." Bertoli Reply Brief at 35 n. 12.

The Government represents it will not seek to introduce testimony which is protected by a joint defense privilege. The Government's representation is accepted and Bertoli's motion is denied as moot.

**L.** *Motion for an Order Preserving the Right of Bertoli to Make Applications Under Fed.R.Crim.P. 17(c) for Subpoenas Prior to Trial*

In his Notice of Motion, Bertoli moved for an "[o]rder preserving the right of defendant Bertoli to make applications under Fed.R.Crim.P. 17(c)[26] for subpoenas prior to trial as such become necessary." Notice of Motion, ¶ 3. The Government "does not oppose the right of any party, in appropriate circumstances, to apply to the [c]ourt for a Rule 17(c) subpoena." Government Brief at 13. In light of the Government's representation, the motion is denied as moot.

**M.** *Motion for an Order Preserving Bertoli's Right to Move to Suppress Wiretap Evidence or Evidence Seized in Searches*

In his Notice of Motion, Bertoli moves for an "[o]rder preserving Defendant Bertoli's right to move to suppress wiretap evidence seized in searches, or the fruits thereof, including but not limited to the February 6, 1989 search of 8 Avenue 'C', Nanuet, New York, if the Government gives notice of its intent to use such evidence." Notice of Motion, ¶ 4. The Government states in response:

---

**26.** Rule 17(c) provides:

(c) **For Production of Documentary Evidence and of Objects.** A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct

that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys.

Fed.R.Crim.P. 17(c).

694

[I]f the United States is in a position to use the seized documents to which the [D]efendants refer, it will inform the [D]efendants of that fact, and it will not oppose their right to make an appropriate motion to suppress. Similarly, if the United States is in a position to use any wiretap evidence and if that evidence is discoverable under Rule 16 ..., the United States will inform the [D]efendants of that evidence and will not oppose their right to make an appropriate motion to suppress.

Government Brief at 13. Bertoli's motion is denied as moot. Bertoli should move, as promptly as possible, so as not to delay or disrupt trial.

## II. Motion for Change of Venue as to the Obstruction of Justice Allegations

■■■ Eisenberg moves for a change of venue of his trial insofar as the allegations as to obstruction of justice are concerned. "Eisenberg argues that this [c]ourt is not the proper venue for trial of the obstruction of justice counts and related racketeering acts and overt acts since the alleged obstructive conduct took place in the Eastern District of New York." Eisenberg Brief at 7.

The Superseding Indictment alleges the Cover–Up Scheme, the seventh scheme alleged in Count 1, involved a scheme to cover-up the Defendants' racketeering activity by obstructing justice. It alleges Eisenberg obstructed justice by concealing documents responsive to the subpoenas of two different grand juries empaneled in the District of New Jersey. It alleges Eisenberg concealed such documents by directing that misrepresentations be made to the Office of the United States Attorney for the District of New Jersey as to the whereabouts of such documents. In addition, it alleges Eisenberg directed such misrepresentations to be made under oath before those grand juries as to the whereabouts of the relevant documents. It also alleges Eisenberg obstructed justice by secreting documents in the Brooklyn Bakery, which is located within the Eastern District of New York.

In addition, Counts 4, 5 and 6, which incorporate by reference the factual allegations concerning the Cover–Up Scheme, charge Eisenberg with obstruction of justice in violation of 18 U.S.C. § 1503. Count 4 states that Eisenberg obstructed justice by directing that misrepresentations be made to the Office of the United States Attorney for the District of New Jersey as to the whereabouts of documents responsive to the subpoena of a grand jury empaneled on 18 March 1985 in the District of New Jersey. Count 5 states that Eisenberg obstructed justice by misrepresenting in a letter to the Office of the United States Attorney the whereabouts of documents responsive to the subpoena of a grand jury empaneled in the District of New Jersey on 17 March 1987. It states that documents responsive to such subpoena were secreted by Eisenberg in the Brooklyn Bakery. It also states Eisenberg directed the Monarch records custodian to misrepresent under oath before the grand jury the whereabouts of such documents. Count 6 states that Eisenberg obstructed justice by preventing documents responsive to a trial subpoena *duces tecum* relative to the 1987 Indictment of Cannistraro, and to an order of the United States District Court for the District of New Jersey enforcing that subpoena, from being produced. It states that Eisenberg secreted such documents in the Brooklyn Bakery and directed the Monarch records custodian to misrepresent to the FBI and to the Office of the United States Attorney the whereabouts of such documents.

The United States Constitution guarantees to criminal defendants a trial "in the State where the said Crimes shall have been committed," U.S. Const. art. III, § 2, cl. 3, by a "jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. This right is implemented by Fed.R.Crim.P. 18, which provides: "Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed." *Id.* The situs of a crime must be determined by reference to the statute proscribing the criminal act. *Johnston v. United States*, 351 U.S. 215,

220, 76 S.Ct. 739, 742, 100 L.Ed. 1097 (1956), *reh'g denied*, 352 U.S. 860, 77 S.Ct. 23, 1 L.Ed.2d 69 (1956).

While the Third Circuit has not ruled on the question, the majority of circuit courts which have considered the proper venue for charges of obstruction of justice in violation of 18 U.S.C. § 1503 have ruled that venue lies where the obstructed proceedings took place. *See United States v. Reed*, 773 F.2d 477, 486 (2d Cir.1985); *United States v. Scaife*, 749 F.2d 338, 341, 346 (6th Cir.1984); *United States v. Barham*, 666 F.2d 521, 523–24 (11th Cir.), *cert. denied*, 456 U.S. 947, 102 S.Ct. 2015, 72 L.Ed.2d 470, *reh'g denied*, 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982); *United States v. Kibler*, 667 F.2d 452, 454–55 (4th Cir.), *cert. denied*, 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982); *United States v. Tedesco*, 635 F.2d 902, 904–06 (1st Cir.1980), *cert. denied*, 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 974 (1981); *United States v. O'Donnell*, 510 F.2d 1190, 1192–95 (6th Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975). The Circuit for the District of Columbia alone has ruled that venue lies where the acts taken to obstruct justice occurred, in a case decided twenty years ago without the benefit of the views of the circuits which have since ruled to reject that view. *See United States v. Swann*, 441 F.2d 1053, 1055 (D.C.Cir.1971).[27]

The courts which have ruled that the crime of obstruction of justice occurs where the obstructed proceedings took place have reasoned that the language of 18 U.S.C. § 1503 indicates that the primary concern of Congress was the effect of the obstruction on the proceedings in question.[28] *See United States v. Johnson*, 713 F.2d 654, 659 (11th Cir.1983), *cert. denied*,

465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984); *Barham*, 666 F.2d at 523–24; *Tedesco*, 635 F.2d at 905. In addition, it has been reasoned that the obstruction of justice statute grew out of the contempt powers afforded courts by the Judiciary Act of 1789, ch. 20, § 17, 1 Stat. 73, 83 (1789), which powers were lodged with the court in which the proceedings took place. *See Reed*, 773 F.2d at 485–86; *Kibler*, 667 F.2d at 454–55; *Tedesco*, 635 F.2d at 905–06.

In light of the formidable authority holding that venue for obstruction lies in the district in which the obstructed proceedings took place and in light of the fact that the allegedly obstructed proceedings in the instant case took place within this district, Eisenberg's motion for a change of venue is denied.[29]

### III. Motion for Severance

 Eisenberg, joined by Bertoli, moves for severance from Cannistraro pursuant to Fed.R.Crim.P. 14, which provides: "If it appears that a defendant is prejudiced by a joinder of offenses or of defendants in an indictment ..., the court may order ... separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires." Fed. R.Crim.P. 14. Eisenberg argues that severance is warranted in light of the "likelihood of prejudice to be caused by the introduction of Cannistraro's prior guilty plea [to the 1987 Indictment]." Eisenberg Brief at 6. Because Eisenberg and Bertoli have not shown they will be substantially prejudiced if they are tried with Cannistraro, the severance motion is denied. *United States v. Gorecki*, 813 F.2d 40, 43 (3d Cir.1987).

Although the motion is made under Fed. R.Crim.P. 14, Fed.R.Crim.P. 8 of the Feder-

---

**27.** *See also United States v. Bachert*, 449 F.Supp. 508 (E.D.Pa.1978), a district court opinion following *Swann* and issued prior to many of the above-cited circuit court opinions.

**28.** Section 1503 provides in relevant part: "Whoever ... corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more

than $5,000 or imprisoned not more than five years, or both." 18 U.S.C. § 1503.

**29.** In addition, it is observed that much of the alleged obstructive activity, such as misrepresentations made to the Office of the United States Attorney and before grand juries empaneled in this district, took place in this district. It appears that venue would be properly laid in this district even if the holding of *Swann* were followed.

al Rules of Criminal Procedure merits consideration. Rule 8 permits joinder of offenses and defendants.[30] Joinder of offenses and defendants promotes economy of judicial and prosecutorial resources, as well as the public interest in avoiding expensive and duplicative trials. *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814, *reh'g denied*, 475 U.S. 1104, 106 S.Ct. 1507, 89 L.Ed.2d 907 (1986); *Gorecki*, 813 F.2d at 42; *United States v. Jackson*, 649 F.2d 967, 973 (3d Cir.), *cert. denied*, 454 U.S. 1034, 102 S.Ct. 574, 70 L.Ed.2d 479 (1981). When distinct offenses have both a logical and temporal relationship, joinder permits the Government to present its evidence in an efficient manner. Such evidentiary overlap "strongly counsels in favor of joinder." *United States v. McDonnell*, 699 F.Supp. 1348, 1351 (N.D.Ill.1988) (citing *United States v. Shue*, 766 F.2d 1122, 1134 (7th Cir.1985), *cert. denied*, 484 U.S. 956, 108 S.Ct. 351, 98 L.Ed.2d 376 (1987)).[31] This rationale applies with equal force to the joinder of defendants. *United States v. Dickens*, 695 F.2d 765, 778–79 (3d Cir.1982), *cert. denied sub nom.*, 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983).

█ When, as here, the literal requirements of Rule 8 are met, a presumption arises in favor of joinder. *See United States v. Swift*, 809 F.2d 320, 322 (6th Cir.1987) (Rule 8(b) "can, and should, be 'broadly construed in favor of initial joinder'....") (quoting *United States v. Isaacs*, 493 F.2d 1124, 1158 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974)). Indeed, there is a presumption against severance because it is "assum[ed] that closely related charges

are being tried together...." *United States v. Velasquez*, 772 F.2d 1348, 1355–56 (7th Cir.1985), *cert. denied*, 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986); *see United States v. Serubo*, 604 F.2d 807, 819 (3d Cir.1979); *United States v. Wofford*, 562 F.2d 582, 585 (8th Cir.1977) ("Ordinarily, if defendants are jointly indicted and similar evidence from the related series of events is used to convict each defendant, the defendants should be tried together."), *cert. denied*, 435 U.S. 916, 98 S.Ct. 1471, 55 L.Ed.2d 507 (1978).

█ If, however, offenses or defendants have been improperly joined, severance is required as a matter of law under Rule 8. *United States v. Andrews*, 765 F.2d 1491, 1496 (11th Cir.1985) ("Misjoinder under Rule 8(b) is prejudicial per se....."), *cert. denied sub nom.*, 474 U.S. 1064, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986); *United States v. Bledsoe*, 674 F.2d 647, 654 (8th Cir.) ("[M]isjoinder of defendants is inherently prejudicial."), *cert. denied sub nom.*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982); *Vastola*, 670 F.Supp. at 1261 (citing *United States v. Somers*, 496 F.2d 723, 729 (3d Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974)).

█ When a series of offenses are joined in one indictment or multiple defendants are jointly charged with a single offense, "[s]ome prejudice almost necessarily results." *Vastola*, 670 F.Supp. at 1261 (quoting *Cupo v. United States*, 359 F.2d 990, 993 (D.C.Cir.1966), *cert. denied*, 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967)). This level of prejudice, however, is permissible so long as the technical strictures of Rule 8 are met. Thus, Rule 8(b) is

**30.** Rule 8 provides:

(a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

(b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to

have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Fed.R.Crim.P. 8.

**31.** Although *McDonnell* addresses joinder of offenses under Rule 8(a), the underlying policy considerations of joinder pursuant to Rules 8(a) and (b) are similar.

generally satisfied if the indictment charges a single conspiracy. *United States v. Cole,* 717 F.Supp. 309, 317 (E.D.Pa.1989); *United States v. Di Pasquale,* 561 F.Supp. 1338, 1347 (E.D.Pa. 1983), *aff'd,* 740 F.2d 1282 (3d Cir.1984), *cert. denied,* 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985).

As noted above, Eisenberg, joined by Bertoli, does not contest joinder under Rule 8. Rather, he argues joinder would be unduly prejudicial under Rule 14. Severance under Rule 14 is within the sound discretion of the trial court. *United States v. Boyd,* 595 F.2d 120, 125 (3d Cir.1978).

■ Rule 14 authorizes a trial court to sever counts or defendants where, despite an indictment's technical compliance with Rule 8, joinder would result in a "manifestly unfair trial." *Vastola,* 670 F.Supp. at 1261 (citing *United States v. Reicherter,* 647 F.2d 397, 400 (3d Cir.1981)). Defendants bear a heavy burden when they move for severance under Rule 14. See *United States v. Sandini,* 888 F.2d 300, 305 (3d Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1831, 108 L.Ed.2d 959 (1990); *United States v. Friedman,* 854 F.2d 535, 563 (2d Cir.1988), *cert. denied sub nom.,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989); *United States v. De Peri,* 778 F.2d 963, 983 (3d Cir.1985), *cert. denied sub nom.,* 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986); *Di Pasquale,* 740 F.2d at 1293. Mere allegations of prejudice are insufficient to meet this burden. Defendants must "demonstrate clear and substantial prejudice." *Gorecki,* 813 F.2d at 43 (quoting *United States v. Sebetich,* 776 F.2d 412, 427 (3d Cir.1985)); *United States v. Wright–Barker,* 784 F.2d 161, 175 (3d Cir.1986).

Eisenberg states that the Government intends to offer into evidence at a joint trial Cannistraro's judgment of conviction, guilty plea and allocution relative to the 1987 Indictment, during which allocution Cannistraro mentioned Eisenberg.[32] Eisenberg Brief at 3. He argues: "It is inconceivable that knowledge of Cannistraro's prior conviction would not play some significant part in the decision of at least some of the jurors." *Id.* Eisenberg argues Cannistraro's allocution constitutes a confession and admission of such allocution at a joint trial would violate his Sixth Amendment right to confront his accuser, under the rule announced in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and its progeny.

In *Bruton,* a defendant, Bruton, and his co-defendant were jointly tried for armed postal robbery. A postal inspector testified that the co-defendant confessed to him that he and Bruton had committed the crime. The testimony was admissible only against the confessing co-defendant under an exception to the hearsay rule and accordingly the trial court gave a limiting instruction to the jury that the hearsay was not to be considered against the defendant. *Id.* at 27. The Supreme Court held, however, that because the co-defendant did not take

---

**32.** During the allocution, Cannistraro did not mention Bertoli and mentioned Eisenberg only three times. Cannistraro testified in relevant part as follows:

> As to count number two ..., I assisted in the opening of a nominee account in the name of Mary Godano in which account I had a partial beneficial interest.
>
> I used this account to purchase [LCI] stock on the initial public offer. I was able to get allocations of the initial offer in [LCI] due to my prominent role in the company and *my personal business relationship with the president of Monarch, Leo Isenberg* [sic].

21 September 1987 Tr. at 26 (emphasis added).

> As to count number four, I set up a nominee account for myself at Monarch Funding in the name of Donna Lee Clarambeau. In this account, Toxic Waste stock was purchased by me under the initial public offer. *Since I had a personal business relationship with the president of Monarch, Leo Isenberg [sic], I was able to obtain an allocation in the initial offer of Toxic Waste.*

21 September 1987 Tr. at 27 (emphasis added).

> *My arrangement with Leo Isenberg [sic], the president of Monarch, was that if he ever needed the shares because he had large purchases, he could use Mary Godano's shares.*

21 September 1987 Tr. at 37 (emphasis added). Bertoli joined in the motion of Eisenberg for severance and relied on Eisenberg's brief. It is curious that Bertoli relied on Eisenberg's arguments, which rest on *Bruton, see infra,* in light of the fact that he is nowhere mentioned in the transcript of Cannistraro's guilty plea and allocution relative to the 1987 Indictment.

the stand, Bruton's right to confront his accuser was violated. In addition, the Supreme Court held that even though a limiting instruction had been given to the jury, the threat that Bruton would be convicted on the strength of hearsay evidence was too great to be borne. The Court ruled that the admission of the testimony was prejudicial error.

In response to Eisenberg's argument, the Government agrees that Cannistraro's allocution is the equivalent of a confession. Government Brief at 98. However, it represents: "If Cannistraro's guilty plea and allocution are introduced at trial, they will be introduced against Cannistraro without any mention of Eisenberg or Bertoli. Thus, *Bruton* will not be implicated, and Eisenberg and Bertoli will not be 'substantially prejudiced' because the statements will not be 'powerfully' or 'facially' incriminating of them." *Id.* at 102. It asserts its offer is consistent with the Supreme Court's holding in *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).

In *Richardson,* the Supreme Court stated: "We hold that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211, 107 S.Ct. at 1709. The Supreme Court approved redaction as a method of preserving a defendant's Sixth Amendment rights while preserving the state's interest in joint trials:

> It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts. The other way of assuring compliance with an expansive *Bruton* rule [other than redaction] would be to forgo use of codefendant confessions. That price also is too high, since confessions "are more than merely 'desirable'; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law."

*Id.* 481 U.S. at 210, 107 S.Ct. at 1708–09 (footnote omitted) (quoting *Moran v. Burbine,* 475 U.S. 412, 426, 106 S.Ct. 1135, 1143, 89 L.Ed.2d 410 (1986)).

Redaction is an appropriate method of protecting the Sixth Amendment rights of both Eisenberg and Bertoli. Neither Eisenberg nor Bertoli have submitted any reply to the Government's argument to dispute this.[33] In light of the Government's representation that it will make appropriate redactions if it determines to offer into evidence Cannistraro's guilty plea and allocution testimony, the motion for severance is denied.

## IV. Motion to Strike Surplusage

■■■■■ Bertoli moves pursuant to Fed. R.Crim.P. 7(d)[34] to strike certain phrases in the Superseding Indictment as surplusage. Bertoli seeks an order striking certain

---

**33.** Eisenberg submitted no reply to the opposition of the Government concerning any of his motions.

**34.** Rule 7 provides in relevant part:
 **Rule 7. The Indictment and the Information**
 . . . .
 **(d) Surplusage.** The court on motion of the defendant may strike surplusage from the indictment or information.
 Fed.R.Crim.P. 7(d).

"catch-all" phrases from the Superseding Indictment as follows:

Defendant Bertoli moves to strike certain language from the indictment which could prove unfairly prejudicial. Specifically, defendant Bertoli requests that the [c]ourt strike the word "among" in Paragraph 8 of the First Court [sic] (*"among the means and methods by which the defendants ... achieve the purpose of the racketeering activity and conducted and participated in the affairs of the enterprise were the following: ...."*); the term "elsewhere" throughout the indictment with respect to both where the alleged racketeering acts occurred and with respect to where the defendants maintained nominee accounts; the term "among other things" in describing the false and misleading aspects of the research reports referred to in the indictment; the term "others" in almost every paragraph in the indictment to refer to co-conspirators and those people with whom the Government alleges the [D]efendants participated in the alleged racketeering activity; and the term "among other things" as used to describe the areas investigated by the grand juries empaneled in New Jersey to investigate the charges in the instant indictment. Bertoli Discovery Brief at 26. He argues such phrases have no purpose other than to "create an impression in the minds of the jurors that the [D]efendants were involved in a much broader conspiracy." Id. at 28. In addition Bertoli seeks the striking of mention in paragraph 4 of Count 1 that Bertoli "was the former president of a brokerage firm who, in 1979, was permanently barred by the [SEC] from associating with any brokerage firm." He argues his past employment is irrelevant and the reference to the previous sanction is prejudicial. Bertoli Discovery Brief at 28. He also seeks to have the terms "bribes" and "bribery," used in the Superseding Indictment to describe the illicit scheme involving the portfolio managers and the research analyst, stricken as implying crimes which are not charged and as being "unnecessarily inflammatory." *Id.* Finally, he seeks to have paragraph 54 of the Superseding Indictment, relating to the amount of profit reaped by the Defendants through the Beneficial Owners Concealment Scheme described in paragraphs 50 through 53 of the Superseding Indictment,[35] and racketeering

---

**35.** These paragraphs provide:

50. It was a part of this [Cover–Up Scheme] that, in or about March 1983, the defendant Richard O. Bertoli became the promoter of High Tech, as that term is defined in the securities laws, in that he took the initiative in founding High Tech, appointed High Tech's officers, board of directors, and advisory board, allocated the distribution of High Tech's securities, and arranged for High Tech's securities, and arranged for High Tech's initial public offering of securities, which offering was underwritten by Monarch.
51. It was further part of this scheme to defraud that, in or about March 1983, prior to High Tech's public offering of securities, the defendants Leo M. Eisenberg, Richard S. Cannistraro, and Richard O. Bertoli, caused the record ownership of 3.1 million shares of High Tech common stock to be placed in the names of nominees, although these securities were beneficially owned by them.
52. It was a further part of this scheme to defraud that, in the registration statements and prospectus prepared and issued in connection with High Tech's initial public offering of securities, the defendants Leo M. Eisenberg, Richard S. Cannistraro, and Richard O. Bertoli, willfully and knowingly concealed from the SEC and the investing public the following facts that they were legally required to disclose: (a) the defendant Richard O. Bertoli's role as High Tech's promoter, and (b) their beneficial ownership of more than 10% of High Tech's common stock and more than 10% of High Tech's outstanding stock.
53. It was a further part of this scheme to defraud that, by deliberately concealing the defendant Richard O. Bertoli's role as High Tech's promoter, and their beneficial ownership of more than 10% of High Tech's common stock and more than 10% of High Tech's outstanding stock, the defendants Leo M. Eisenberg, Richard S. Cannistraro, and Richard O. Bertoli, were able to raise $425,000 in capital for High Tech from the investing public, and direct the management and policies of High Tech for their own benefit.
54. It was a further part of this scheme to defraud that, from in or about February 1984 to in or about July 1984, the defendants Leo M. Eisenberg, Richard S. Cannistraro, and Richard O. Bertoli, caused the 3.1 million shares of High Tech common stock beneficially owned by them, but held of record in the names of their nominees, to be sold, and thereby obtained undisclosed profits totalling at least $115,000.

Superseding Indictment, Count 1, ¶¶ 50–54.

acts 5(e) and 5(f),[36] referring to two predicate acts of mail fraud, stricken as irrelevant to the scheme charged and as prejudicial surplusage. *Id.* at 29.

 It is well-settled that a motion to strike surplusage from an indictment may be granted only if the challenged allegations are not relevant to the charges and are inflammatory and prejudicial. *United States v. Huppert,* 917 F.2d 507, 511 (11th Cir.1990); *United States v. Terrigno,* 838 F.2d 371, 373 (9th Cir.1988); *United States v. Fahey,* 769 F.2d 829, 841–42 (1st Cir. 1985); *United States v. Bullock,* 451 F.2d 884, 888 (5th Cir.1971); *United States v. Wecker,* 620 F.Supp. 1002, 1006 (D.Del. 1985) (quoting *Fischbach & Moore, Inc.,* 576 F.Supp. at 1398); *United States v. DePalma,* 461 F.Supp. 778, 797 (S.D.N.Y.1978). It is an exacting standard which is met only in rare cases. *Huppert,* 917 F.2d at 511; *Wecker,* 620 F.Supp. at 1006; *Fischbach & Moore, Inc.,* 576 F.Supp. at 1398; *DePalma,* 461 F.Supp. at 797.

In the instant case, the Government asserts that the catch-all phrase "among" within the phrase "among the means and methods" in paragraph 8 of Count 1 of the Superseding Indictment *"accurately* indicates that the [D]efendants used means and methods" other than those enumerated in racketeering acts 8(a) through 8(f). Government Brief at 106 (emphasis added). As to the term "elsewhere," the Government asserts the proof at trial will include evidence that certain activities charged in the Superseding Indictment occurred outside of New Jersey. *Id.* at 107. It adds that the term "among other things," as used to describe the false and misleading aspects of the various research reports referred to in the Superseding Indictment and the matters investigated by the grand juries empaneled in this District, accurately reflects the fact that the proof at trial will include evidence of fraudulent aspects of the research reports not specifically listed in the Superseding Indictment and matters investigated by the grand juries relative to the Cover–Up Scheme. *Id.* at 108–09. As to the term "and others," referring to co-conspirators and co-racketeers, the Government asserts this phrase reflects evidence which will be included in the proof at trial in fleshing out the racketeering schemes alleged in Counts 1 and 2, the conspiracy alleged in Count 3 and the obstructions of justice alleged in Counts 4 through 6. *Id.* at 111.

These phrases relate to the proof the Government will present at trial. As such, they are relevant and, as innocuous, non-pejorative terms, non-prejudicial. As one court has stated, such terms

> only refer[ ] to the proof of the crimes, and serve[ ] as a device to allow the government to prove more than that alleged in the indictment. If the government were required to detail *all* of its proof in an indictment, rather than the portions they include now, the indictments in many cases would resemble books.

*United States v. Climatemp, Inc.,* 482 F.Supp. 376, 392 (N.D.Ill.1979) (emphasis in original), *aff'd without opinion sub nom.,* 705 F.2d 461 (7th Cir.), *cert. denied sub nom.,* 462 U.S. 1134, 103 S.Ct. 3116, 77 L.Ed.2d 1370 (1983).

 As to the reference in the Superseding Indictment to the fact that Bertoli was permanently barred by the SEC

---

**36.** Racketeering acts 5(e) and 5(f) describe two predicate acts of mail fraud as follows:

| | | |
|---|---|---|
| 5(e) | 6/28/84 | Mailing of confirmation by Broadcort Capital Corp., New York, New York, to a Citiwide Securities Corp. ("Citiwide") customer in Burke, Virginia, confirming the purchase of 265,000 Cinematronics, Inc. warrants at a price of $.30 per warrant and a cost of $79,600: |
| 5(f) | 10/24/84 | Mailing of confirmation by Edward A. Viner & Co., Inc., New York, to the Citiwide customer in Burke, Virginia, confirming the sale of 265,000 Cinematronics warrants at a price of $.001 per warrant, generating proceeds of $210. |

Superseding Indictment, Count 1, ¶ 55.

from associating with any brokerage firm, the Government asserts this reference is relevant because it explains the motivation of the Defendants for engaging in the Beneficial Owners Concealment Scheme, whereby Bertoli's status as the promoter of High Tech was concealed. *Id.* at 112–13. In addition, it argues the terms "bribes" and "bribery" are used in the Superseding Indictment as an accurate description of the *quid pro quo* established by the Defendants with the M & I Fund and Bullock Fund portfolio managers and the Hallswell research analyst, are not meant to connote the uncharged crime of bribery and will not be understood by the jury as such. *Id.* at 114–15. Finally, as to paragraph 54 and racketeering acts 5(e) and 5(f), the Government asserts paragraph 54 is relevant because the Beneficial Owners Concealment Scheme was consummated by the sale of the High Tech stock, to the profit of the Defendants. *Id.* at 116. In addition, it alleges racketeering acts 5(e) and 5(f) relate to the transfer by the Defendants of the proceeds of the High Tech stock sale to the Cayman Islands, which transfer constituted part of the Beneficial Owners Concealment Scheme. *Id.* at 117.

It is clear from their context within the Superseding Indictment that the terms "bribes" and "bribery" are accurately used to connote the *quid pro quo* established between the Defendants and the M & I Fund and Bullock Fund portfolio managers and the Hallswell research analyst and not to connote the uncharged crime of bribery. For example, in describing the LCI Scheme, the Superseding Indictment refers to "bribery of individuals to cause the purchase of large blocks of LCI securities." Superseding Indictment, ¶ 28. In the next paragraph, the Superseding Indictment fleshes out the meaning of "bribery" as follows: "In exchange [for the deposit of the proceeds from the fraudulent trading of LCI and Toxic Waste securities] into their Mon-

arch accounts the M & I [Fund] and Bullock [Fund portfolio managers] caused their respective funds to purchase large blocks of LCI securities, and the [Hallswell research analyst] caused Hallswell to open a brokerage account at Monarch that purchased a large block of LCI securities." *Id.,* ¶ 29. The term "bribery" accurately describes the nature of the agreement reached between the Defendants and the M & I Fund and Bullock Fund portfolio managers and the Hallswell research analyst. This agreement is an integral part of the schemes alleged in the Superseding Indictment; the term "bribes" and "bribery" are not stricken.

▮▮▮ Paragraph 54, relating to the proceeds received by the Defendants from the consummation of the Beneficial Owners Concealment Scheme, is not stricken because it may be relevant to motive and intent. *See Terrigno,* 838 F.2d at 373; *Wecker,* 620 F.Supp. at 1006; *United States v. Krasnoff,* 480 F.Supp. 723, 730 (S.D.N.Y.1979). As to racketeering acts 5(e) and 5(f), the Government represents they relate to the Defendants' transfer of racketeering proceeds to the Cayman Islands. As well as being relevant simply by virtue of constituting part of the Beneficial Owners Concealment Scheme, such transfer of money may also be relevant to intent. These allegations relating to the transfer are not stricken.

For the foregoing reasons, the motion of Bertoli to strike surplusage is denied.

V. Motions to Dismiss and for Discovery Based on Allegations of Prosecutorial Misconduct

Bertoli moves to dismiss the Superseding Indictment on the grounds of prosecutorial misconduct, or in the alternative, for discovery.[37] Bertoli argues as to the alleged prosecutorial conduct: "Although few, if any, of the grounds raised have ever been

---

37. In the Notice of Motion pertaining to the motions concerning prosecutorial misconduct, Bertoli includes a five-page list of documents he seeks produced or questions to which he seeks answers. *See* Bertoli Notice of Motion. This list is much too extensive to set forth in full, but it includes a request for the log of all exhibits submitted to each grand jury, a log of grand jury witnesses, names of prosecutors and investigators making presentations before each grand jury and grand jury transcripts, *inter alia. See* Notice of Motion.

the basis for dismissal of an indictment in and of themselves, their accumulation in one case reveals a certain overzealousness which warrants, at the least, *in camera* review by the [c]ourt of the grand jury records." Bertoli Prosecutorial Misconduct Brief at 3.

### A. *Motions to Dismiss and for Discovery Based on Specific Allegations of Prosecutorial Misconduct*

#### 1. Alleged Failure to Obtain Approval of the RICO Charges

■ Counsel for Bertoli asserts that "[o]n information and belief, the United States Attorney's Office for the District of New Jersey did not obtain written approval from the Organized Crime & Racketeering Section, Criminal Division, United States Justice Department prior to presenting the indictment in *United States v. Eisenberg, et al.,* Criminal No. 89–218 to the grand jury." First Tolomeo Cert., ¶ 5. Tolomeo asserted at oral argument on the instant motions, held on 3 July 1991, that her source for such information was obtained from an individual whose identity she was not willing to disclose. She stated she was not willing to make such disclosure due to a personal commitment to the individual, although she acknowledged that such nondisclosure was not based on any privilege.

Tolomeo was advised that more concrete substantiation of the allegations concerning violation by the Government of guidelines pertaining to RICO indictments would be needed. Tolomeo stated she would submit for *in camera* review such substantiation. *See* 3 July 1991 Tr. at 11–12. However, on 24 July 1991, twenty-one days after oral argument was held, Tolomeo ad-

vised the court she was not at liberty to disclose the basis for Bertoli's allegations concerning failure to obtain the written approval of the Justice Department for the RICO charges due to personal commitments to her informants. *See* 24 July 1991 Tolomeo Letter to the Court.[38]

■ United States Department of Justice Guidelines require prior approval of a RICO charge.[39] However, these guidelines do not require written approval to be obtained, as suggested by Bertoli.

In response, the Government submits the affidavit of David M. Rosenfield ("Rosenfield"), Special Assistant United States Attorney. Rosenfield states:

> The U.S. Attorney's Office for the District of New Jersey did not violate United States Department of Justice guidelines governing the commencement of RICO prosecutions, in connection with this case. In fact, both the proposed Indictment and proposed Superseding Indictment in this case were sent to, and approved by, the Organized Crime and Racketeering Section, Criminal Division, of the United States Department of Justice in Washington, D.C., prior to the actual return of the Indictments by the indicting federal grand jury in Newark, New Jersey.

Rosenfield Aff., ¶ 7.

■ Given that the guidelines cited by Bertoli do not require written approval, Bertoli has not even adequately alleged (much more demonstrated) a violation by the Government of such guidelines. In addition, Bertoli does not adequately rebut the representation made by the Govern-

---

38. Tolomeo also stated such disclosure was not necessary because the Government did not dispute that no written approval was obtained from the Justice Department. However, as will be discussed, the Justice Department guidelines at issue do not state the approval of the Justice Department for RICO charges must be in writing.

39. Section 9–110.101 of the United States Attorney's Manual provides in relevant part:

**9–110.101 Division Approval**

No RICO criminal indictment or information or civil complaint shall be filed, and no civil

investigation demand shall be issued, without the prior approval of the Criminal Division. United States Attorney's Manual at B–1. Section 9–110.320 provides:

**9–110.320 Approval of Organized Crime and Racketeering Section Necessary**

No criminal or civil prosecution or civil investigative demand shall be commenced or issued under the RICO statute without the prior approval of the Organized Crime and Racketeering Section, Criminal Division.

*Id.* at B–5.

ment that it obtained the requisite approval prior to bringing the RICO charges contained in the Superseding Indictment against the Defendants. Finally, even if Bertoli had substantiated that the Government violated the guidelines, violation of such guidelines would not form the basis for dismissal of the Superseding Indictment. *See United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979).

Bertoli admits "it is doubtful [under *Caceres*] that dismissal of the indictment for failure to follow the Guidelines would be appropriate." Bertoli Prosecutorial Misconduct Brief at 6. He argues, however: "Nevertheless, the thrust of defendant Bertoli's argument is not that the failure to obtain written RICO desk clearance preindictment is, of itself, enough to warrant dismissal of the indictment. Rather, his argument is that the accumulation of abuses by the prosecutors in this case warrants dismissal." *Id.* Bertoli's motion based on cumulative alleged prosecutorial misconduct is denied. *See infra* at 713.

### 2. Alleged Conflict of Interest

■ Bertoli asserts Rosenfield, one of the United States Attorneys prosecuting the instant case, is operating under a conflict of interest. Bertoli Prosecutorial Misconduct Brief at 10. He asserts Rosenfield was employed by the SEC and was actively involved in the proceedings relative to the SEC Civil Action and has been sworn in as a Special Assistant United States Attorney to assist with this case. *Id.* In addition, Tolomeo, counsel for Bertoli, states: "On information and belief, ... [Rosenfield] elicited and presented ... testimony to the grand jury. No other Government attorneys or agents were present in the grand jury proceedings [at the time]." Supp.Tolomeo Aff., ¶¶ 2-3. Bertoli seeks the following: "[D]iscovery of information as to Mr. Rosenfield's role and position as both an S.E.C. Attorney and as a Special Assistant United States Attorney in order to support his motion to dismiss the indictment on the grounds that Mr. Rosenfield had an impermissible conflict of interest in representing the Justice Department in the grand jury proceedings in this case." *Id.*

In addition, Bertoli states "Philip Giordano shared Mr. Rosenfield's status. Accordingly, defendant Bertoli's discovery request is tailored to elicit information as to Mr. Giordano as well as Mr. Rosenfield." *Id.* at 10 n. 3.

Rosenfield states in his affidavit that he was a staff attorney in the Division of Enforcement of the SEC in Washington, D.C. from May 1987 through December 1987, and as such, worked on the SEC Civil Action against the Defendants. Rosenfield Aff., ¶¶ 3-4. He states that prior to leaving the SEC to become a Special Assistant United States Attorney, he entered into an agreement with the SEC that he would not participate in the SEC Civil Action if he were to return to the SEC following a departure from the Office of the United States Attorney. *Id.,* ¶ 5. In addition, he states he has not participated in the SEC Civil Action since becoming a Special Assistant United States Attorney. *Id.,* ¶ 6. The Government provided no information with respect to Philip Giordano ("Giordano").

As to Rosenfield, the Government argues no impermissible conflict of interest is present in light of the Third Circuit's decision in *United States v. Birdman,* 602 F.2d 547 (3d Cir.1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980). In *Birdman,* Dennis Taylor ("Taylor"), an attorney for the SEC, directed the SEC's investigation of the defendant (the "SEC Action") for a period of approximately two years. At the culmination of the two years, the Justice Department initiated criminal prosecutions of several subjects of the SEC investigation, including a prosecution of the defendant (the "Criminal Action"). Taylor was appointed as a Special Assistant United States Attorney and conducted the grand jury proceedings relative to the Criminal Action.

During his tenure as Special Assistant United States Attorney, Taylor remained on the SEC payroll and continued to act as the SEC's attorney in matters related to the SEC Action. The defendant argued

that a conflict of interest existed by virtue of Taylor's dual role as an attorney for the SEC in the SEC Action and as a Special Assistant United States Attorney for the Justice Department in the Criminal Action. The Third Circuit ruled no conflict of interest inhered in a dual role by a government attorney, recognizing the policy favoring intragovernmental cooperation. *Id.* at 562–63. In addition, the court observed that "abuse of an attorney's dual employment status might be shown in particular cases, especially where the agency uses the grand jury investigation to gather information for civil administrative proceedings to which it would not otherwise have access." *Id.* at 563. However, it denied the defendant's motion to dismiss the indictment based on the purported conflict of interest, finding the record did not support any such allegations of abuse. *Id.*

Bertoli acknowledges the precedential value of *Birdman* in the Bertoli Prosecutorial Misconduct Brief. He argues, however, the applicability of *Birdman* should be reexamined in light of the Supreme Court's holding in *Young v. United States,* 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987). In *Young,* the plaintiff's attorney in a trademark infringement civil action obtained an injunction against the defendant restraining the defendant from further infringement. After it appeared the injunction was violated by the defendant, the court agreed, at the request of the plaintiff's attorney, to appoint the plaintiff's attorney as Special Assistant United States Attorney to prosecute a criminal contempt action for violation of the injunction.

On appeal, the Supreme Court agreed with the defendant's argument that the assumption by the plaintiff's attorney of the role of Special Assistant United States Attorney, in proceedings initiated to enforce a court order benefitting the plaintiff, created the appearance of impropriety on the part of the attorney. *Id.* at 805, 107 S.Ct. at 2136. In addition, it held harmless error analysis did not apply to the court's decision to appoint an interested attorney as Special Assistant United States Attorney because the error was "so fundamental and pervasive that [it] requir[ed] reversal without regard to the facts or circumstances or the particular case." *Id.* at 809–10, 107 S.Ct. at 2139.

Since *Young,* it appears only two circuit courts, the Ninth and the Fifth Circuits, have considered the application of *Young* in a context involving Government, not private, attorneys serving in dual capacities. In *Federal Trade Commission v. American National Cellular,* 868 F.2d 315 (9th Cir.1989), the Ninth Circuit considered whether *Young* operated to bar the appointment of an attorney for the Federal Trade Commission (the "FTC"), who had participated in FTC civil proceedings against the defendants, from acting as Special Assistant United States Attorney for the Government in the criminal contempt proceedings arising out of action taken in the FTC proceedings. The Ninth Circuit distinguished *American National Cellular* from *Young* because *Young* involved the appointment of a *private* attorney, where there existed the potential for a financial conflict of interest. *Id.* at 319. The court stated: "We doubt the Supreme Court intended [*Young*] to disqualify automatically any FTC attorney as 'interested' simply by virtue of employment with the agency that brought the underlying suit." *Id.* The court therefore rejected a *per se* rule barring dual representation by Government attorneys, but stated under certain circumstances "a [G]overnment attorney may lack the impartiality and appearance of impartiality that our system of justice demands of its prosecutors." *Id.*

The court rejected the FTC's argument that "[G]overnment attorneys are basically fungible, united in their vision of the public interest, such that no conflicts of interest, or intolerable appearances of such conflicts, could arise." *Id.* It observed:

Casting [G]overnment attorneys into adversarial roles in civil litigation results in vigorous advocacy for their client, the United States Government. Such vigor may cloud the attorneys' ability to distinguish between contempt prosecutions that further their purported primary objective—compliance with the court's or-

der—and those that are driven by a primary motive to further the goals of the underlying litigation. For example, [G]overnment attorneys may be tempted to pursue a nonmeritorious contempt prosecution because the prosecution would allow them to obtain documents or access to information useful in the underlying civil litigation. They may also be tempted to abandon, press or compromise a prosecution wholly apart from its merits to leverage settlement in the underlying litigation. If their perspective is colored by involvement with the underlying civil action, then they more closely resemble the "interested parties" in [*Young*] than impartial U.S. Attorneys. *Id.*

The court held two factors must be reviewed in order to ascertain whether an impermissible conflict of interest or the appearance of an impermissible conflict is present. First, the level of control by the Office of the United States Attorney must be ascertained, because a high level of involvement by that office may render harmless any conflict of interest by the Special Assistant United States Attorney. *Id.* at 320. Second, the level of involvement by the Special Assistant United States Attorney in the underlying civil action must be ascertained. *Id.* The court was persuaded that no impermissible conflict or the appearance thereof was present in *American National Cellular,* given that the Assistant United States Attorney accompanied the Special Assistant United States Attorney in the contempt proceedings and the level of involvement by the Special Assistant United States Attorney in the underlying FTC civil action was not high. *Id.*

In *United States ex rel. Securities and Exchange Commission v. Carter,* 907 F.2d 484 (5th Cir.1990), the SEC obtained an injunction against the defendants restraining them from violating anti-fraud and registration provisions of the securities laws. Several months later, the court appointed an SEC attorney to serve as a Special Assistant United States Attorney in subsequent criminal contempt proceedings held to enforce the injunction. The Fifth Circuit commenced its analysis by observing that

at the time the court appointed the SEC attorney as Special Assistant United States Attorney, the SEC action had not yet been concluded. *Id.* at 486. The Fifth Circuit applied the two factors set forth in *American National Cellular* and found, first, that the Assistant United States Attorney did not retain control of the contempt prosecution and did not even appear to be involved in the prosecution in any way. *Id.* at 487. Second, it observed the SEC attorney was heavily involved in the underlying civil SEC action. The court held that in light of these circumstances the appointment of the SEC attorney as Special Assistant United States Attorney was plain error. *Id.* at 488.

Both *Carter* and *American National Cellular* involved facts closely analogous to the facts in *Young,* where an attorney engaged in the underlying civil action was appointed as a Special Assistant United States Attorney in a criminal contempt prosecution brought to enforce a court order arising out of the civil action. Even under closely analogous facts, these courts did not adopt a *per se* bar against dual representation by agency attorneys in a criminal action arising out of the civil action. Instead, the courts were sensitive to the specific facts of each case and whether they indicated a potential danger of abuse or the appearance of a potential for abuse by the agency attorney serving in dual capacities.

Unlike *Carter* and *American National Cellular,* the instant criminal case is related to, but does not arise out of, the SEC Civil Action. In addition, the instant criminal proceedings are not brought to enforce any action taken in the SEC Civil Action. There is therefore present in the instant case less of a risk, or the appearance of a risk, that Rosenfield and Giordano pursued their functions before the grand jury as advocates for the SEC.

In addition, Rosenfield was involved in the investigation relating to the SEC Civil Action for a period of only approximately seven months. He states he resigned from his position as SEC staff attorney at the

time he was appointed as Special Assistant United States Attorney and has not participated in the SEC Civil Action since then. Rosenfield Aff., ¶¶ 3–4. In addition, he has entered into an agreement with the SEC whereby he will not participate in the SEC Civil Action in the event he returns to the SEC after serving as Special Assistant United States Attorney. *Id.*, ¶ 5. Rosenfield has permanently ceased his association with the SEC Civil Action. He is not operating in a dual capacity such as might create a conflict of interest or the appearance of such a conflict.[40] Bertoli offers no authority to support the extension of *Young* to the circumstances present in the case of Rosenfield, and such extension is rejected. Because there is no impropriety or appearance of impropriety with respect to Rosenfield, the motion of *Bertoli* to dismiss the indictment under *Young* is denied as to the claims made with respect to Rosenfield.[41]

The Government, however, provides no information as to the involvement of Giordano in the SEC Civil Action, as to the level of his involvement in the instant criminal proceedings or as to the status of his relationship with the SEC during his tenure as Special Assistant United States Attorney.

**40.** The Government states:

Bertoli has stated that "any of the information obtained during this criminal prosecution may very well find its way back into the hands of the S.E.C. for use in the civil proceedings." Bertoli [Prosecutorial Misconduct] Brief at 12–13. The obvious implication of such a statement is that Mr. Rosenfield will ignore the rules governing his conduct as a Special Assistant U.S. Attorney and disclose information—such as secret grand jury information—to the SEC in violation of those rules. If that is what Bertoli means by this statement, it is as offensive as it is baseless. If, on the other hand, he means that Mr. Rosenfield would simply pass on information that is in the public record, it can only be said that there would be nothing improper in such conduct.

Government Brief at 20 n. 13. These assertions by the Government are well taken.

**41.** In the Bertoli Reply Brief, Bertoli observes that Rosenfield omitted to mention in his affidavit that he took an oath to execute faithfully his duties as a Special Assistant United States Attorney required under 28 U.S.C. § 244. Based on this omission, Bertoli speculates that Rosenfield

As to Giordano, the Government is to submit the pertinent information which the court must consider in order to determine the applicability of *Young.* A ruling as to Giordano's participation in the instant case is reserved until then.

### 3. Allegations as to Improper Sealing of the Indictments

Bertoli reiterates that a sealed Indictment was returned in this matter in June 1989 and the Superseding Indictment was returned and sealed on 29 September 1989 and not unsealed until 5 October 1989.[42] Bertoli Prosecutorial Misconduct Brief at 28. He asserts "there is no readily apparent reason for the U.S. Attorney's Office to have requested sealing," given Cannistraro was already incarcerated and Eisenberg and Bertoli voluntarily surrendered themselves to law enforcement officials and thus did not evince any intent to flee. *Id.* at 29. Bertoli moves for an explanation as to why the Indictment and Superseding Indictment were sealed and for production of the unredacted sealed Indictment and Superseding Indictment. *Id.*

In opposition, the Government submits the sealed affidavit of Rosenfield, in which

did not take the oath of office, rendering his appointment "deficien[t]." Bertoli Reply Brief at 51. Bertoli apparently expects that his indulgence in such speculation will be followed in kind. Bertoli's conclusion as to Rosenfield's appointment is premised on the assumption that the Government is under an obligation to offer unsolicitated information as to whether its special prosecutors took the oath of office. Bertoli sets forth no authority requiring the Government to make such unsolicited disclosures and his conclusion as to Rosenfield's status is rejected. This is yet another example of a baseless motion.

**42.** The provision regarding the sealing of indictments is set forth in Fed.R.Crim.P. 6(e)(4), which provides:

*Sealed Indictments.* The federal magistrate to whom an indictment is returned may direct that the indictment be kept secret until the defendant is in custody or has been released pending trial. Thereupon the clerk shall seal the indictment and no person shall disclose the return of the indictment except when necessary for the issuance and execution of a warrant or summons.

Fed.R.Crim.P. 6(e)(4).

the reasons for the sealing are explained. Sealed Rosenfield Aff., ¶¶ 5–9. In light of the presence of legitimate concerns warranting the sealing of the Indictment and Superseding Indictment, in light of the sensitive nature of this information and in light of the lack of basis for Bertoli's request for such discovery, the motion of Bertoli for an explanation of the reasons for the sealing or for production of the unredacted sealed Indictment and Superseding Indictment is denied.

### 4. Alleged Misconduct Relating to the Grand Jury Proceedings

Bertoli alleges the Government engaged in a variety of misconduct relating to the grand jury proceedings in this action. Bertoli states: "Concededly, the evidence submitted is sketchy. Nonetheless, given the secrecy of grand jury proceedings, it is difficult, if not impossible, to come up with rock-hard proof of improprieties. Defendant Bertoli simply asks the Court to consider whether, based on the proof outlined above, a deeper look is warranted." Bertoli Prosecutorial Misconduct Brief at 8. Based on the suspicions of misconduct set forth below, Bertoli seeks extensive discovery of grand jury materials. Bertoli seeks such discovery in order to "ferret out other abuses which would help establish his claims: (1) that the abuses substantially influenced the grand jury's decision to indict; or (2) [that] grave doubt exists as to whether the decision to indict was free from the substantial influence of the grand jury abuses," stating his Fifth Amendment right to be indicted by an unbiased grand jury may have been violated. *Id.* at 7–9.

In considering Bertoli's discovery requests, two principles must be borne in mind. First, it is a "long established policy that maintains the secrecy of grand jury proceedings in the federal courts." *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 424, 103 S.Ct. 3133, 3138, 77 L.Ed.2d 743 (1983) (quoting *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 681, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958)). This general rule of grand jury secrecy is codified in Rule 6(e) of the Federal Rules of Criminal Procedure. Rule 6(e) applies "not

only to information drawn from transcripts of grand jury proceedings, but also to anything which may reveal what occurred before the grand jury." *In re Grand Jury Matter*, 682 F.2d 61, 63 (3d Cir.1982); *see Fund for Constitutional Gov't v. National Archives & Records Serv.*, 656 F.2d 856, 869 (D.C.Cir.1981) (scope of grand jury secrecy encompasses anything which would reveal "the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of the jurors, and the like.") (quoting *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1382 (D.C.Cir.), *cert. denied*, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980)).

The secrecy of grand jury proceedings is not absolute. Rule 6(e)(3)(C)(i) authorizes disclosure by court order. The party moving for court-ordered disclosure bears a heavy burden of proving to the court that "the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222, 99 S.Ct. 1667, 1674, 60 L.Ed.2d 156 (1979) (footnote omitted). Before disclosure of the grand jury transcripts which would corroborate the Defendants' arguments can be ordered, Defendants must offer evidence of a "substantial likelihood of gross or prejudicial irregularities in the conduct of the grand jury." *United States v. Budzanoski*, 462 F.2d 443, 454 (3d Cir.) (citing *United States v. Politi*, 334 F.Supp. 1318, 1322 (S.D.N.Y.1971); *United States v. Dioguardi*, 332 F.Supp. 7, 20 (S.D.N.Y.1971)), *cert. denied*, 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220 (1972). Only after the Defendants have met this burden does a court balance the need for disclosure against the need for secrecy. *Id.*

Second, to the extent Bertoli seeks dismissal of the indictment as a sanction for such alleged misconduct, the Supreme Court has held in a recent decision that a district court may not exercise its supervi-

sory powers to dismiss an indictment for prosecutorial misconduct in such a way that by-passes the harmless error rule of Fed.R.Crim.P. 52(a).[43] *Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). Thus, dismissal is appropriate only " 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Id.* at 256, 108 S.Ct. at 2374 (quoting *United States v. Mechanik,* 475 U.S. 66, 78, 106 S.Ct. 938, .946, 89 L.Ed.2d 50 (1986)). A district court has "no authority to dismiss [an] indictment on the basis of prosecutorial misconduct absent a finding that petitioners were prejudiced by such misconduct." *Id.* 487 U.S. at 263, 108 S.Ct. at 2378.

### a. *Alleged Disclosure of Bertoli Nolo Contendere Plea*

Bertoli asserts that on information and belief, the Government disclosed to the grand jury the fact that Bertoli had entered a plea of *nolo contendere* to a previous indictment. In support of this contention, Bertoli submits the supplemental affidavit of Tolomeo. Tolomeo states, again on "information and belief," Rosenfield questioned two witnesses, Annette Barone ("Barone") and Glenn Waldron ("Waldron"), as to whether they "knew that Richard O. Bertoli was a convicted felon and/or had been convicted of securities fraud." Supp.Tolomeo Aff., ¶ 3–4. Bertoli argues such disclosure to the grand jury was improper in light of the fact that the conviction was based on a plea of *nolo contendere* and in light of the fact that Fed.R.Crim.P. 11(e)(6)(B) [44] makes a plea of

*nolo contendere* inadmissible in any civil or criminal proceeding against the defendant who made the plea. Bertoli Prosecutorial Misconduct Brief at 16.

In response to these assertions, the Government submits sealed excerpts from the transcript of the testimony of Barone and Waldron and asserts:

> [A] review of the relevant grand jury testimony establishes that there was no improper conduct by the prosecutors. Any questioning of the two grand jury witnesses concerning Bertoli's *nolo contendere* plea was done in an appropriate context.... These transcripts show that any discussion of Bertoli's *nolo* plea was appropriate, given the witnesses' close working relationships with Bertoli in connection with new companies brought public with Bertoli's assistance.

Government Brief at 33.

The Government does not explain in its brief how the working relationships of these witnesses with Bertoli bear on the propriety of reference to Bertoli's *nolo* plea. Nonetheless, Bertoli's motion is denied. Bertoli neglects to point out in urging a finding of misconduct that Fed. R.Civ.P. 11(h) [45] requires that "harmless errors" caused by violations of Rule 11(e)(6)(B) be disregarded.

▮ In deciding whether prosecutorial misconduct in grand jury proceedings amounts to harmless error, it is necessary to determine whether such misconduct " 'substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia,* 487 U.S. at 256, 108 S.Ct. at 2374.

---

**43.** Fed.R.Crim.P. 52(a) provides:

**Harmless Error.** Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.
Id.

**44.** Rule 11 provides in relevant part as follows:

(e) **Plea Agreement Procedure.**
(6) **Inadmissibility of Pleas, Plea Discussions and, and Related Statements.** Except as otherwise provided in this paragraph, evidence of the following is not, in any civil or

criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions: ....
(B) a plea of nolo contendere[.] ...
Fed.R.Crim.P. 11.

**45.** Rule 11(h) provides:

**(h) Harmless Error.** Any variance from the procedures required by this rule which does not affect substantial rights shall be disregarded.
Fed.R.Crim.P. 11(h).

■ As the Government points out, evidence presented to the jury is not governed by the Federal Rules of Evidence and a defendant may not challenge an indictment on the ground that it is not supported by competent evidence. Fed.R.Evid. 1101(d)(2); *Costello v. United States*, 350 U.S. 359, 364, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956). However, assuming *arguendo* the reference by the Government to Bertoli's *nolo* plea was inappropriate, it is clear from the submitted transcripts that the passing reference by the Government to the *nolo* plea on two occasions with two witnesses does not create "grave doubt" as to the independence of the grand jury, especially given the extensive nature of those proceedings and the fact that multiple grand juries were empaneled relative to the Superseding Indictment.[46] To the extent it is based on reference to the *nolo* plea in the grand jury proceedings, Bertoli's motion to dismiss the Superseding Indictment is denied. In addition, because Bertoli has failed to show a "substantial likelihood" of prejudice, *Budzanoski*, 462 F.2d at 454, his motion for discovery, to the extent it is based on his claims regarding this alleged misconduct, is denied.

b. *Alleged Mischaracterizations to the Grand Jury of Testimony Given Before Previous Grand Juries*

In addition, Bertoli asserts the Government mischaracterized the prior testimony of at least one witness. Bertoli asserts that when Lawrence Rohde ("Rohde") testified before the SEC, he referred to picking up theater tickets from Bertoli at Monarch. Bertoli Aff., ¶ 3. He asserts that after Rohde appeared before the grand jury on 30 October 1986, he informed Bertoli that the Government asked him during that testimony whether he had identified Bertoli as the person in charge of "tickets" for Monarch. *Id.* Bertoli requests "release of all grand jury transcripts to determine whether and to what extent such mischaracterization occurred on other occasions." Bertoli Prosecutorial Misconduct Brief at 17. In the alternative, Bertoli requests *in camera*

review of Rohde's grand jury testimony to determine whether the mischaracterization occurred, or an affidavit from the Government attorneys stating that summaries were not used before the indicting grand jury. *Id.* at 23.

In response, the Government submits sealed excerpts from the transcript of the grand jury proceedings in which Rohde testified. These transcripts make clear that Bertoli's assertions as to mischaracterization by the Government of Rohde's testimony are baseless. Because Bertoli has not made any showing regarding misconduct by the prosecution which would cast "grave doubt" on the independence of the grand jury, *Bank of Nova Scotia*, 487 U.S. at 256, 108 S.Ct. at 2374, the motion to dismiss is denied to the extent it is based on such purported misconduct. In addition, because Bertoli has failed to demonstrate a "substantial likelihood" that he was prejudiced, *Budzanoski*, 462 F.2d at 454, Bertoli's motion for discovery is denied to the extent it is based on this claim.

c. *Alleged Use of Summaries of Evidence*

■ In addition, Bertoli speculates that [i]t is likely, given the fact that not less than six grand juries were empaneled to investigate the charged offenses and many witnesses were called to testify before just one of those grand juries, that transcripts of witness testimony from prior grand juries were submitted to subsequent grand juries. Further it is substantially likely that summaries of testimony and evidence were submitted to the indicting grand jury.

Bertoli Prosecutorial Misconduct Brief at 21. Bertoli asserts that any use of such summaries was improper if the testimony itself was available, if the jury was misled into believing the summaries were actually the testimony and if he was prejudiced by such use. *Id.* Bertoli requests an order "requiring disclosure of the grand jury minutes to determine whether transcripts

---

**46.** It appears at least two grand juries were empaneled: one on 18 March 1985, Superseding Indictment, Count 4, ¶¶ 1–2 and one on 17 March 1987, *id.,* Count 5, ¶¶ 1–2.

of prior testimony were read to the indicting jury." *Id.* at 21–22.

It is clear from review of the sealed Rosenfield affidavit that Bertoli's contentions amount to misplaced speculation. *See* Sealed Rosenfield Aff., ¶¶ 2–4. Bertoli's motion to dismiss the Superseding Indictment, to the extent it is based on speculation that summaries were read to the jury, is denied. In addition, because Bertoli has not offered evidence of a substantial likelihood of prejudicial irregularities in the grand jury proceedings, his motion for discovery is denied. *See United States v. Torres,* 901 F.2d 205, 232–33 (2d Cir.) (denying motion of defendant for discovery of grand jury minutes or for *in camera* review of such minutes, where defendant failed to sufficiently allege prejudice from allegedly perjured grand jury testimony), *cert. denied sub nom.,* — U.S. —, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990).

d. *Alleged Fed.R.Crim.P. 6(e) Violations*

█ Bertoli asserts Fed.R.Crim.P. 6(e),[47] providing for the secrecy of grand jury proceedings, may have been violated on several instances. He acknowledges such instances may have "perfectly legitimate explanation[s]," and seeks such explanations. Bertoli Prosecutorial Misconduct Brief at 26. The "questionable instances" are described in the Bertoli Prosecutorial Misconduct Brief as follows:

(1) A search of 8 Avenue "C," Nanuet, New York was conducted on February 6, 1989 by the Manhattan District Attorney's Office. Notwithstanding the fact that this material was sought for a New York State grand jury investigation, it is believed such materials were transmitted to the United States Attorney's Office for the District of New Jersey. *See,* Supplemental Tolomeo Affidavit at ¶ 6.[48] This could constitute a violation of the New York State grand jury's secrecy, unless a court order was obtained.

(2) In [a] recent affidavit filed by [Eric] Moss [("Moss")] on behalf of SIPC Trustee in opposition to a motion to dismiss claims against Catherine Bertoli, Mr. Moss annexes copies of Collateral Control Ltd., Inc. checks signed by Mr. Bertoli. On information and belief, Collateral Control checks were subpoenaed by the United States Attorney's Office.

---

47. Rule 6 provides in relevant part:

**Rule 6. The Grand Jury**
**(e) Recording and Disclosure of Proceedings.**
. . . .
**(2) General Rule of Secrecy.** A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the government, or any person to whom disclosure is made ... shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. No obligation of secrecy may be imposed on any person except in accordance with this rule. A knowing violation of Rule 6 may be punished as a contempt of court.
**(3) Exceptions.**
(A) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury, other than its deliberations and the vote of any grand juror, may be made to—
(i) an attorney for the government for use in the performance of such attorney's duty; and
(ii) such government personnel (including personnel of a state or subdivision of a state) as are deemed necessary by an attorney for the government in the performance of such attorney's duty to enforce federal criminal law.

(B) Any person to whom matters are disclosed under subparagraph (A)(ii) of this paragraph shall not utilize that grand jury material for any purpose other than assisting the attorney for the government in the performance of such attorney's duty to enforce federal criminal law. An attorney for the government shall promptly provide the district court, before which was impaneled the grand jury whose material has been so disclosed, with the names of the persons to whom such disclosure has been made, and shall certify that the attorney has advised such persons of their obligation of secrecy under this rule.
Fed.R.Crim.P. 6.

48. Tolomeo states in her supplemental affidavit:
On February 6, 1989, the Manhattan District Attorney's Office conducted a search of the premises of Worldwide 800 Services, Inc., International 800 Telecom Corp., and Executive Telecard Ltd. at 8 Avenue C, Nanuet, New York (the "Nanuet search"). A copy of the search warrant is annexed hereto as Exhibit "A". On information and belief, the items seized were for a New York State grand jury. A copy of a grand jury subpoena presented at the time of the search is annexed hereto as Exhibit "B".
Tolomeo Supp.Aff., ¶ 6.

Accordingly, the checks may have been provided by that office to Mr. Moss. *See* Supplemental Tolomeo Affidavit at ¶ 11.[49]

(3) In an October 1, 1990 [*Forbes*] Magazine article entitled "The Secret World of Richard Bertoli" ... the following information was relayed:

(a) Testifying under oath, however, Peter Blake [ ("Blake") ] did say that there had been a "pool arrangement" with his brother-in-law in Santiago, Chile, who had been on the original distribution list for Toxic Waste. "Whenever necessary [the brother-in-law] sold shares and the payments were made back to the individuals, whichever their proportionate holdings was." Blake was not asked how much money was involved. The Assistant United States Attorney, Robert Warren [ ("Warren") ], did ask, "Isn't that called a nominee account?"

"Perhaps, I don't know," replied Blake.

(b) "Richard Cannistraro, for example, according to the testimony of an F.B.I. agent, once told a friend that every time he depended on legitimate information in the market, he lost money."

Bertoli Prosecutorial Misconduct Brief at 26–27.

Accordingly, Bertoli seeks

(1) an identification of every grand jury which was empaneled in the United States District Court for the District of New Jersey to investigate the offenses charged in this indictment; (2) an identification of the source of all materials submitted to such grand juries which were obtained from other law enforcement agencies and the legal basis for securing such materials; (3) identification of every disclosure of grand jury materials made by the U.S. Attorney's [sic] in this case, as well as descriptions

of such disclosures furnished to the [c]ourt as required by *R.* 6(3)(B). Disclosure of this information and/or *in camera* review by the [c]ourt is the only way to ascertain whether the United States Attorney's Office has improperly secured or released grand jury materials during its investigation and prosecution of this matter.

*Id.* at 28.

In *Bank of Nova Scotia*, the Supreme Court considered the motion of the defendants to dismiss the indictment based on prosecutorial misconduct alleged to have included, *inter alia*, a violation of Rule 6(e). The court summarily disposed, *inter alia*, of the claim based on the alleged Rule 6(e) violation, stating "it is plain that [this] alleged breach[ ] could *not* have affected the charging decision. We have no occasion to consider [it] further." *Bank of Nova Scotia*, 487 U.S. at 259–60, 108 S.Ct. at 2376 (emphasis added). Apparently the Supreme Court believed that because the relevant question is whether the alleged misconduct may have "substantially influenced," *id.* at 256, 108 S.Ct. at 2374, the decision to charge, violations of the Rule 6(e) secrecy requirements could not conceivably have had such an influence and did not warrant further inquiry. Such is the case here.

■ In addition, the Government asserts it did not violate the secrecy requirements of Rule 6(e). The Government correctly argues that as to the first instance of alleged disclosure, in which it is alleged the secrecy of a New York State grand jury was violated, such a claim is irrelevant to a determination of whether the Government violated its obligations with respect to grand jury proceedings in the instant case. *See* Government Brief at 27. As to the second instance, in which it is implied the

---

**49.** Tolomeo states in her supplemental affidavit:

Annexed hereto as Exhibit "E" is a copy of a certification by Eric H. Moss, Special Counsel to Cameron F. MacRae III, Trustee for the liquidation of Executive Securities Corp. dated March 5, 1991 and filed on March 6, 1991 with the United States Bankruptcy Court for the District of New Jersey. Annexed as Exhibits G and H to the certification are copies

of checks written by defendant Bertoli on a Collateral Control Ltd., Inc., account. On information and belief, checking account records for Collateral Control Ltd., Inc. were subpoenaed by a grand jury empaneled in the District of New Jersey to investigate the offenses charged in this indictment.

Tolomeo Supp.Aff., ¶ 11.

Government turned over to Moss, the attorney for the trustee in an action against Bertoli, checks of Bertoli obtained by the Government for use with regard to the grand jury proceedings, Rosenfield states he was told by Moss that Moss had obtained the checks from the SEC through an appropriate access request. Rosenfield Aff., ¶ 8. As to the asserted disclosure of grand jury testimony to *Forbes* magazine, the Government submits excerpts from the transcript of the testimony of Blake given at the 1 February 1990 proceedings held relative to Cannistraro's motion to withdraw his guilty plea. This testimony contains the comments by Blake referenced in the *Forbes* magazine article.[50] In addition, the Government submits excerpts from the transcript of the testimony of Cahill, given at a 24 September 1987 detention hearing relative to Cannistraro's plea on the 1987 Indictment. This testimony contains the substance of the balance of the excerpts from the *Forbes* magazine article questioned by Bertoli. Cahill testified that Bennett Simms, an executive at Cinematronics, was told by Cannistraro that Cannistraro "had tried many times to make money legitimately on the regular market and that whenever he used the information that was available to the public, he always lost money." 24 September 1987 Tr. at 104.

Bertoli offers neither legal nor factual support for his motion for dismissal of the Superseding Indictment for violations of Rule 6(e). To the extent they are based on alleged Rule 6(e) violations, Bertoli's motions to dismiss and for discovery of grand jury materials are denied. Bertoli has failed to show "a substantial likelihood of gross or prejudicial irregularities in the conduct of the grand jury" by virtue of Rule 6(e) violations. *Budzanoski*, 462 F.2d at 454.

e. *Alleged Violation of the Right to Financial Privacy Act*

■ Bertoli asserts the Government may have violated several sections of the Financial Privacy Act, 12 U.S.C. §§ 3413 [51] and 3420,[52] by issuing an overly-broad sub-

---

**50.** Blake was questioned by Assistant United States Attorney Warren and testified as follows:

Q: [A]re you familiar with a person named Hugo Jordan?
A: Yes.
Q: Who is he?
A: *A brother-in-law of mine.*
Q: *He lives in Santiago, Chile?*
A: *He does.*
Q: Isn't it a fact that you referred him to Monarch Funding?
A: *He was one of the list of persons we had submitted to Monarch Funding, yes, for on the initial distribution of stock.*
Q: Well, isn't it a fact, sir, that you received proceeds from accounts which he sold at Monarch Funding?
A: *There was a pool formed. There were several of us that acquired stock, and I'm not sure whether that was a special distribution or whether that was warrants that were exercised, but there were three or four of us that did have a pool account.*

*And when necessary, Mr. Jordan sold shares and the payments were made back to the individuals, which ever their proportionate holding was, and then Mr. Jordan advised us what the tax liability was and that was sent to Mr. Jordan.*
Q: *Isn't that called a nominee account, sir?*
A: *Perhaps, I don't know.*
1 February 1990 Tr. at 140–41 (emphasis added).

**51.** Section 3413 provides in relevant part:

**§ 3413. Exceptions**
. . . .
**(i) Disclosure pursuant to issuance of subpena [sic] or court order respecting grand jury proceeding**
Nothing in this chapter (except sections 3415 and 3420 of this title) shall apply to any subpena [sic] or court order issued in connection with proceedings before a grand jury, except that a court shall have authority to order a financial institution, on which a grand jury subpoena for customer records has been served, not to notify the customer of the existence of the subpoena or information that has been furnished to the grand jury. . . .
12 U.S.C. § 3413.

**52.** Section 3420 provides in relevant part:

**§ 3420. Grand jury information; notification of certain persons prohibited**
(a) Financial records about a customer obtained from a financial institution pursuant to a subpena [sic] issued under the authority of a Federal grand jury—
(1) shall be returned and actually presented to the grand jury unless the volume of such records makes such return and actual presentation impractical in which case the grand jury shall be provided with a description of the contents of the records.; [sic]
(2) shall be used only for the purpose of considering whether to issue an indictment or presentment by that grand jury, or of prosecuting a crime for which that indictment or

poena to financial institutions and by indiscriminately presenting responsive materials submitted by the institutions to the grand jury. Bertoli Prosecutorial Misconduct Brief at 17–20. In addition, Bertoli asserts the grand jury subpoenas may improperly have required financial institutions to keep the subpoenas confidential. *Id.* at 20; Tolomeo Supp.Aff., ¶ 10. He infers that a secrecy requirement was imposed from a 11 July 1988 letter from American Express Travel Related Services Company which stated that company was "now permitted to advise" him as to the subpoena. *See* 11 July 1988 American Express Letter to Bertoli.[53]

Bertoli seeks: "(a) discovery of any secrecy orders granted by the district court relating to subpoenas served on financial institutions during the grand jury proceedings; and (b) all cover letters from the U.S. Attorney's Office to financial institutions which accompanied any subpoenas." Bertoli Prosecutorial Misconduct Brief at 20–21.

In *Bank of Nova Scotia*, the Supreme Court also considered the claim that the indictment should be dismissed because the Government had imposed secrecy obligations in violation of Rule 6(e) on grand jury witnesses. The Court found, without commenting further, that even if such allegations were true, they "could *not* have affected the charging decision." *Bank of Nova Scotia*, 487 U.S. at 259–260, 108 S.Ct. at 2376 (emphasis added). Any violation by the Government in the instant case of the Right to Financial Privacy Act must be regarded in similar fashion, given such violation "could *not* have affected the charging decision." *Id.* (emphasis added). Bertoli's motion to dismiss the Superseding Indictment is denied to the extent it is based on alleged prosecutorial misconduct consisting of violation of the Right to Financial Privacy Act.[54] In addition, because Bertoli has failed to offer evidence of prejudicial errors or misconduct, his motion for discovery of grand jury materials is denied. *See Budzanoski,* 462 F.2d at 454.

## B. Motion to Dismiss and for Discovery Based on Alleged Cumulative Misconduct

Bertoli argues that the alleged misconduct, when considered cumulatively, constitutes a basis for dismissing the Superseding Indictment. Bertoli Prosecutorial Misconduct Brief at 3. As has been demonstrated, Bertoli's claims of prosecutorial misconduct are baseless, as a reason for moving for dismissal and for discovery. These allegations are meritless when considered singly or cumulatively. Bertoli is not entitled to dismissal of the Superseding Indictment. His allegations of misconduct, as set forth in his Prosecutorial Misconduct

---

presentment is issued, or for a purpose authorized by rule 6(e) of the Federal Rules of Criminal Procedure;

(3) shall be destroyed or returned to the financial institution if not used for one of the purposes specified in paragraph (2); and

(4) shall not be maintained, or a description of the contents of such records shall not be maintained by any Government authority other than in the sealed records of the grand jury, unless such record has been used in the prosecution of a crime for which the grand jury issued an indictment or presentment or for a purpose authorized by rule 6(e) of the Federal Rules of Criminal Procedure.

12 U.S.C. § 3420.

53. The 11 July 1988 American Express Letter to Bertoli states in relevant part:

I am writing this letter to advise you that American Express Travel Related Services Company, Inc. has been served with a subpoena ordering the production of certain information and documents relative to your American Express Card account.

We were legally obligated to comply with this subpoena, and are now permitted to advise that we have released the records requested. The subpoena was issued by Damid [sic] M. Rosenfield, AUSA on 4/11, 1988, and was answerable in the U.S. District Court Dist. of N.J. on 4/26/88.

11 July 1988 American Express Letter to Bertoli.

54. Given that courts have seen fit to deny suppression motions for such violations, it is incomprehensible how Bertoli's motion to dismiss, a much more drastic sanction than the suppression of evidence, could properly be based on such a violation. *See United States v. Kington,* 801 F.2d 733 (5th Cir.1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 495 (1987); *United States v. Mosko,* 654 F.Supp. 402 (D.Colo.1987), *aff'd in part,* 890 F.2d 1461 (10th Cir.1989), *cert. denied sub nom.,* — U.S. ——, 110 S.Ct. 1498, 108 L.Ed.2d 632 (1990).

Brief, are baseless. His motions for dismissal and for discovery are denied.

## VI. Motion to Dismiss Based on Prosecutorial Vindictiveness

■ Cannistraro moves to dismiss the Superseding Indictment against him due to prosecutorial vindictiveness. As evidence for his claim, Cannistraro recounts the procedural history of this case. He also recounts the procedural history of related proceedings, including the SEC Civil Action and the prosecution, conviction and appeal from the sentence of Cannistraro relative to the 1987 Indictment. *See* Cannistraro Brief at 2–8.

In particular, Cannistraro points out that he pleaded guilty to the 1987 Indictment on 21 September 1987. *Id.* at 3. In connection with the sentencing proceedings, Cannistraro states:

> On October 30, 1987, Cannistraro and his counsel reviewed the probation officer's PSI report which included a 28 page Government version of the crime ... for which Defendant stands convicted. This Government version of the offense expanded the area of [c]ourt consideration with allegations of Cannistraro's participation in Cayman Island entities including Eurobank, Parsico Ltd., and Venture Partners A, and with other securities transactions in addition to LCI and [Toxic Waste]. The new companies, noted above, the Cayman entities, LCI and [Toxic Waste], as well as the obstruction of justice charge involving Carl Alan Key are now the subject of the pending [Superseding] [I]ndictment.

*Id.* at 4. On 2 November 1987, Cannistraro was sentenced. *Id.; see also supra* n. 8.

In addition, Cannistraro asserts: "Between [Cannistraro's] plea and sentencing numerous efforts were made by [G]overnment counsel to gain Cannistraro's cooperation. Said efforts varied between offers of leniency for cooperation to threats of harsh treatment for failure to cooperate." *Id.* at 5. In support of this contention, Cannistraro makes reference to the Second O'Connor Affidavit, in which O'Connor states:

> 5. Before the grand jury indicted Richard Cannistraro, my office had general discussions with the Office of the United States Attorney for the District of New Jersey. The Government expressed interest in obtaining my client's cooperation and was willing to negotiate a deal as an incentive. Our offices never clarified what the terms of that deal would have been.
>
> 6. After issuance of the indictment, when Richard Cannistraro was pleading guilty, my office again had discussions with the Government concerning a possible deal in exchange for cooperation by my client. Assistant United States Attorney [Warren] made clear, however, that he would not accept a plea to anything less than the full indictment, unless Richard Cannistraro agreed to cooperate with the Government.

Second O'Connor Aff., ¶¶ 5–6.

Cannistraro states that in 1988, he appealed the sentence and the Government's seizure of bail monies for fines and restitution. In addition, he filed a complaint with the Justice Department against Warren in which he alleged prosecutorial misconduct by Warren relative to the proceedings on the 1987 Indictment. Cannistraro Brief at 5. He recounts that on 6 April 1989, the Third Circuit vacated his sentence and remanded the case to this court. *Id.* On 21 April 1989, his motion to withdraw his guilty plea was denied. *Id.* Forty-five days later, he asserts, the Indictment in the instant prosecution was filed. Cannistraro Letter–Reply at 5.

Cannistraro argues the Superseding Indictment was filed under seal on 29 September 1989 and unsealed on 5 October 1989. Cannistraro Brief at 5. He states the Superseding Indictment "closely mirrors the [SEC Civil Action] and incorporates into its entirety the conduct charged in the 1987 Indictment for which Cannistraro already stands convicted." *Id.* at 7. In addition, he states the Superseding Indictment involves the same activities alleged to have been perpetrated by Cannistraro in the 1987 Indictment in his capacity as a research analyst for Wood Gundy, the

same alleged Nominee Brokerage Accounts at Monarch, the same alleged scheme involving the portfolio managers of the M & I Fund and Bullock Fund, and the same allegation of obstruction of justice concerning the testimony of a grand jury witness. *Id.*[55]

Cannistraro argues that the chronology of events creates the appearance of prosecutorial vindictiveness. He argues that under the relevant case law, an impermissible appearance of prosecutorial vindictiveness is created where, as here, a defendant challenges a conviction through the appellate process, following which the defendant is prosecuted for new charges. *Id.* at 8–10. He asserts that under the relevant case law, the appearance of vindictiveness is present where the subsequent charges arise out of the same factual setting present in the original prosecution and are brought following the defendant's challenge to the conviction on the original charges. *Id.* at 11. In addition, he asserts that "[n]one of the information that makes up the charges in the present indictment can seriously be described as 'newly discovered'" such as might rebut the appearance of vindictiveness. *Id.* at 13.

In response, the Government agrees with Cannistraro's discussion of the relevant case law, but argues the prosecution of Cannistraro under the Superseding Indictment does not create the appearance of vindictive prosecution because it charges Cannistraro with different conduct from that charged in the 1987 Indictment. The Government argues, *inter alia:*

Here, Cannistraro was not charged in the subsequent prosecution with the same crimes that resulted in his 1987 conviction, which involved charges relating to LCI and Toxic Waste transactions and obstruction of justice. A review of the subsequent prosecution reveals that Cannistraro was charged in the [1987] Indictment with conspiring to violate the securities laws in connection with Solar Age transactions. Thereafter, in the Su-

perseding [sic] Indictment, Cannistraro was also charged with racketeering and racketeering conspiracy. As noted above, the racketeering portion of the Superseding Indictment charges that, from in or about January 1982 to at least in or about January 1989, Eisenberg, Cannistraro, Bertoli, and others conspired to, and did, conduct the affairs of Monarch through a pattern of racketeering activity. This pattern of racketeering activity consisted of acts of mail fraud, wire fraud, securities fraud, interstate transportation of money taken by fraud, and obstruction of justice, which acts were committed in connection with fraudulent schemes involving the trading of the securities of various publicly traded United States companies, including Astrosystems, Nature's Bounty, LCI, Toxic Waste, High Tech, and Solar Age. Accordingly, Cannistraro cannot seriously maintain that the subsequent prosecution merely included a substitution of more serious charges for the same criminal transactions that resulted in his 1987 conviction.

*Id.* at 37–38. Cannistraro responds by arguing these contentions of the Government do not rebut the appearance of prosecutorial vindictiveness. Cannistraro Letter–Reply at 3.

The analytical framework for evaluating claims of prosecutorial vindictiveness is set forth in *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974). In *Blackledge*, the defendant was convicted of a misdemeanor in Northampton County District Court, located in Northampton County, North Carolina. The defendant then filed a notice of appeal to the Northampton County Superior Court, which he was entitled to do under North Carolina law and which entitled him to a trial *de novo*. Prior to the commencement of the defendant's trial, the prosecutor obtained an indictment from a grand jury, charging the defendant with a felony based on the

---

**55.** As stated previously, Cannistraro filed a motion to dismiss the Superseding Indictment on double jeopardy grounds. *See supra* n. 8. The Third Circuit affirmed the denial by order, filed

9 November 1990, and the Supreme Court denied Cannistraro's petition for certiorari on 29 April 1991. *Id.*

same conduct charged previously in the misdemeanor. The Supreme Court held: "[The] Due Process Clause is not offended by all possibilities of increased punishment upon retrial after appeal, but only by those that pose a *realistic likelihood of 'vindictiveness.'*" *Id.* at 27, 94 S.Ct. at 2102 (emphasis added).

In addition, the Supreme Court observed:

A prosecutor clearly has a considerable stake in discouraging convicted misdemeanants from appealing and thus obtaining a trial *de novo* in the Superior Court, since such an appeal will clearly require increased expenditures of prosecutorial resources before the defendant's conviction becomes final, and may even result in a formerly convicted defendant's going free. And, if the prosecutor has the means readily at hand to discourage such appeals—by "upping the ante" through a felony indictment whenever a convicted misdemeanant pursues his statutory appellate remedy—the State can insure that only the most hardy defendants will brave the hazards of a *de novo* trial.

*Id.* at 27–28, 94 S.Ct. at 2102. The court held that while there was no evidence in that case that the prosecutor had acted in bad faith or maliciously in seeking the felony indictment, due process required that there be no "potential for vindictiveness" and ruled that it was impermissible for the State to respond to the defendant's "invocation of his statutory right to appeal by bringing a more serious charge against him...." *Id.* at 28–29, 94 S.Ct. at 2103. *See also United States v. Oliver*, 787 F.2d 124, 125 (3d Cir.1986) ("Actual retaliatory motivation need not exist; the Court's focus is on whether the possibility of increased punishment posed a realistic likelihood of vindictiveness.").

■ A presumption of prosecutorial vindictiveness arises where the " 'totality of circumstances surrounding the prosecutorial decision at issue' suggest the 'appearance of vindictiveness.'" *United States v. Robison*, 644 F.2d 1270, 1272 (9th Cir.1981) (quoting *United States v. Griffin*, 617 F.2d 1342 (9th Cir.), *cert. denied*, 449

U.S. 863, 101 S.Ct. 167, 66 L.Ed.2d 80 (1980)). Once the presumption is created, "the court must determine whether the prosecutorial decision was justified by either independent reasons or intervening circumstances sufficient to dispel the appearance of vindictiveness." *Id.* A "charging decision does not levy an improper 'penalty' unless it results solely from the defendant's exercise of a protected legal right, rather than the prosecutor's normal assessment of the societal interest in prosecution." *United States v. Goodwin*, 457 U.S. 368, 380 n. 11, 102 S.Ct. 2485, 2492 n. 11, 73 L.Ed.2d 74 (1982) (discussing prosecutorial misconduct in the pretrial context). *See also United States v. Schoolcraft*, 879 F.2d 64, 67 (3d Cir.) ("There is no prosecutorial vindictiveness ... where the prosecutor's decision to prosecute is based on the usual determinative factors."), *cert. denied*, 493 U.S. 995, 110 S.Ct. 546, 107 L.Ed.2d 543 (1989). "If ... the course of events provides no objective indication that would allay a reasonable apprehension by the defendant that the more serious charge was vindictive," the presumption is not overcome. *United States v. Krezdorn*, 718 F.2d 1360, 1365 (5th Cir.1983), *cert. denied*, 465 U.S. 1066, 104 S.Ct. 1416, 79 L.Ed.2d 742 (1984).

In *Blackledge*, the Supreme Court stated in dictum that the case before it would have been different if the State had shown it was unprepared to proceed on the felony at the outset of the case. 417 U.S. at 29 n. 7, 94 S.Ct. at 2103 n. 7. In other cases, the presumption has been found to have been rebutted by a showing by the Government that the decision to bring the subsequent charge was "based upon new facts or evidence not known to the Government at the time of the original indictment." *Krezdorn*, 718 F.2d at 1363. In addition, it has been found that a difference between the illegal conduct alleged in the subsequent and prior indictments weighs against a finding of prosecutorial vindictiveness. *Robison*, 644 F.2d at 1272–73; *United States v. Preciado–Gomez*, 529 F.2d 935, 939 (9th Cir.), *cert. denied*, 425 U.S. 953, 96 S.Ct. 1730, 48 L.Ed.2d 197 (1976).

In the instant case, Cannistraro does not present evidence of actual prosecutorial vindictiveness. The question, then, is whether the circumstances present in the instant case create a presumption of prosecutorial vindictiveness. As to whether there is any such presumption created, the Government correctly points out that the acts charged in the Superseding Indictment are different from those charged in the 1987 Indictment. *See e.g., supra* n. 8. Thus, it cannot be inferred from the charges contained in the Superseding Indictment that there is a "realistic likelihood" that the Government sought to "up the ante" by filing the Superseding Indictment in June 1989 in response to any action taken by Cannistraro, including Cannistraro's effort to withdraw his plea. *See Blackledge,* 417 U.S. at 27, 94 S.Ct. at 2102. The charges contained in the Superseding Indictment against Cannistraro instead reflect the use of prosecutorial discretion.

As the Third Circuit has stated: " 'Prosecutors have traditionally enjoyed discretion in deciding which of multiple charges against a defendant are to be prosecuted or whether they are all to be prosecuted at the same time.' " *United States v. Pungitore,* 910 F.2d 1084, 1112 (3d Cir.1990) (quoting *United States v. Cardall,* 885 F.2d 656, 666 (10th Cir.1989)). *See also United States v. Moscony,* 927 F.2d 742, 755 (3d Cir.1991) ("[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.") (quoting *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978)), *cert. denied,* —— U.S. ——, 111 S.Ct. 2812, 115 L.Ed.2d 984. The motion of Cannistraro to dismiss the Superseding Indictment due to prosecutorial vindictiveness is denied.[56]

## VII. Motion to Dismiss Counts 1 through 3 for Failure to State an Offense

Bertoli, joined by Eisenberg, moves to dismiss Counts 1 through 3 of the Indictment for failure to state an offense. As stated, Count 1 alleges the Defendants participated in the affairs of Monarch through a pattern of racketeering activity consisting of numerous predicate acts of mail fraud, wire fraud, securities fraud and one predicate act of interstate transportation of money taken by fraud, which act was undertaken in conjunction with the Toxic Waste Scheme. Relying on decisions of the United States Supreme Court in *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), and *Dirks v. SEC,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), Bertoli asserts Count 1 does not adequately plead securities fraud because it alleges fraud by virtue of nondisclosure, when the Defendants were under no duty of disclosure. Bertoli Dismissal Brief at 16–28. Bertoli asserts that the mail and wire fraud statutes likewise require a duty of disclosure when an alleged violation of those statutes is premised on nondisclosure.

Bertoli further argues in support of dismissal of Count 1 that once the charged predicate acts of securities, mail and wire fraud are dismissed, there are insufficient predicate acts to constitute a pattern under RICO section 1962(c). *Id.* at 30. As to Count 2, alleging conspiracy under RICO section 1962(d), and Count 3, alleging conspiracy under 18 U.S.C. § 371 to violate Section 10(b) and Rule 10b–5, Bertoli argues: "[S]ince the object of a conspiracy must be a criminal offense, ... Counts 2 and 3 of the Indictment must be dismissed as well because the allegations concerning the objects of those conspiracies do not state an offense." *Id.* at 30–31. In the alternative, Bertoli argues that if he was under a duty of disclosure, then due process prevents him from being held criminal-

---

**56.** In addition, it is observed that the allegations contained in the Second O'Connor Affidavit described, *supra,* concerning events occurring almost two years before the Indictment in the instant case was filed, do not directly or by inference describe conduct by the Government which demonstrates prosecutorial vindictiveness. Given the length of time between the period to which these allegations refer and the filing of the Indictment, they do not raise any presumption of prosecutorial vindictiveness.

ly liable for securities fraud violations because he was not on fair notice as to such duty to disclose. *Id.* at 32.

In opposition, the Government contends that *Chiarella* and *Dirks* are inapposite. It contends those two cases are distinguishable from the instant case because they involved defendants who were passive recipients of certain non-public information which they then used for their own benefit (*Chiarella*) or disclosed selectively for the benefit of only a few people (*Dirks*). The Government asserts that contrary to the scenarios in those two cases, the Defendants are accused in the instant case of "scalping," or trading on securities with advance knowledge that favorable reports were to be issued on such securities and of "bribing" certain individuals to purchase large blocks of securities in companies in which the Defendants owned stock. The distinction made by the Government is well-taken.

In *Chiarella*, the defendant was a financial printer who in the course of conducting business came across information in certain documents from which he deduced the identities of the targets of takeovers. The defendant then purchased stock in the target companies and sold the stock after the takeover attempts became public and the price of the stock rose. The defendant was convicted of violating Section 10(b) and Rule 10b–5 by trading on stock with inside information without publicly disclosing his knowledge.

The conviction was reversed by the Supreme Court. The Court found that the jury instructions were erroneous, in that they did not require the jury to ascertain whether the defendant had a duty of disclosure, but only required it to determine whether the defendant failed to disclose the inside information. *Chiarella*, 445 U.S. at 231, 100 S.Ct. at 1116. In reversing the conviction, the Supreme Court stated that liability for nondisclosure was

> premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction. Application of a duty to disclose prior to trading guarantees that corporate insid-

ers, who have an obligation to place the shareholder's welfare before their own, will not benefit personally through fraudulent use of material, nonpublic information.

*Chiarella*, 445 U.S. at 230, 100 S.Ct. at 1115–16. The Supreme Court reasoned that a defendant could not be held criminally liable for failure to disclose non-public information when he was not a corporate insider with a concomitant duty to refrain from using inside information and when no other basis for a duty of disclosure was apparent. *Id.* at 231–32, 100 S.Ct. at 1116. The Supreme Court did not make any determination of whether the defendant had a duty of disclosure but remanded the case for such determination. *Id.* at 236–37, 100 S.Ct. at 1119.

In *Dirks*, the defendant was an officer of a broker-dealer who received a tip from a former officer of an insurance company that the assets of the insurance company were overstated as a result of fraudulent corporate practices. The defendant investigated the allegations of fraud and discovered information which substantiated them. In the course of investigating the allegations, the defendant spoke openly about the fraud with clients and investors, including individuals who then sold their stock in the insurance company. After the price of the stock of the insurance company declined, the New York Stock Exchange halted trading in the stock and California insurance authorities commenced an investigation of the insurance company. The SEC then filed a complaint against the insurance company and subsequently found that Dirks aided and abetted the fraud by trading on material non-public material information. The SEC only sanctioned Dirks, however, given his "important role in bringing ... [the] massive fraud to light." *Dirks*, 463 U.S. at 651–52, 103 S.Ct. at 3260.

On Dirks' appeal to the Supreme Court from the ruling of the SEC, the Supreme Court reiterated the principle that "there can be no duty to disclose where the person who has traded on inside information 'was not [the corporation's] agent, ... was not a

fiduciary, [or] was not a person in whom the sellers [of the securities] had placed their trust and confidence.'" *Dirks*, 463 U.S. at 654, 103 S.Ct. at 3261 (quoting *Chiarella*, 445 U.S. at 232, 100 S.Ct. at 1117). The Court further observed: "Unlike insiders who have independent fiduciary duties to both the corporation and its shareholders, the typical tippee has no such relationships." *Id.* 463 U.S. at 655, 103 S.Ct. at 3261-62. The Court held that the duty of the defendant, *i.e.*, the "tippee," is coextensive with the duty of the "tippor" to make disclosure or to refrain from trading in the absence of disclosure. *Id.* at 661, 103 S.Ct. at 3265. It held the tippor in this case, the former officer of the insurance company, did not breach his duty by making disclosure of the fraud to the defendant, because the disclosure was not made for the improper purpose of trading on such information but was made for the purpose of exposing the fraud. *Id.* at 667, 103 S.Ct. at 3268.

Since the Supreme Court issued its decisions in *Chiarella* and *Dirks*, those cases have come to define the parameters of when trading on "inside information" violates the securities laws. *See, e.g., Deutschman v. Beneficial Corp.*, 841 F.2d

**57.** In *Deutschman*, the Third Circuit explained *Chiarella* and *Dirks* as follows:

> [*Chiarella* and *Dirks*] dealt not with injury caused by affirmative misrepresentations which affected the market price of securities, but with the analytically distinct problem of trading on undisclosed information.... The "disclose or abstain from trading" rule laid down in the insider trading cases imposes on insiders a duty to disclose information which need not otherwise be disclosed before they act on that information in an uninformed marketplace. Market participants who are neither insiders nor fiduciaries of another type need not disclose material facts, but can rely on the assumption that all other participants have equal access to information. *Chiarella* and *Dirks* involve only the question of when outsiders and nonfiduciaries will be treated as insiders or fiduciaries for purposes of the affirmative duty to disclose or refrain from trading. The court in those cases declined to extend the duty to disclose or abstain to mere tippees who came into possession of otherwise undisclosed information. Nothing in those opinions, however, can be construed to require the existence of a fiduci-

502, 507 (3d Cir.1988), *cert. denied,* 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989);[57] *Rothberg v. Rosenbloom,* 771 F.2d 818, 824 (3d Cir.1985) (Higginbotham, concurring). The Defendants are not charged in the instant case, however, with trading on inside information which has come into their hands without making a prior public disclosure of such information.

In the instant case, the Defendants are charged with a "scalping" scheme, whereby they bought the securities of Astrosystems, Nature's Bounty, LCI and Toxic Waste through the use of Nominee Brokerage Accounts with the advance knowledge that favorable reports, written by co-defendant Cannistraro, were to be publicly disseminated. The Defendants are charged with then selling such securities for a profit once the dissemination of the reports caused the price of the securities to rise. *See Aaron v. SEC,* 446 U.S. 680, 692, 100 S.Ct. 1945, 1953, 64 L.Ed.2d 611 (1980) (explaining meaning of "scalping" in context of violation of Investment Advisers Act of 1940);[58] *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 181, 84 S.Ct. 275, 277, 11 L.Ed.2d 237 (1963) (finding that "scalping" violated the Investment Adviser's Act of 1940).[59]

> ary relationship between a section 10(b) defendant and the victim of that defendant's affirmative misrepresentation.
> *Deutschman*, 841 F.2d at 506 (citations omitted).

**58.** In *Aaron*, the Court explained the meaning of "scalping" in the context of a violation of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6, which prohibits "any act or practice of an investment adviser that 'operates as a fraud or deceit upon any client or prospective client.'" *Aaron*, 446 U.S. at 692, 100 S.Ct. at 1953. It stated that "scalping" occurs when "an investment adviser purchases shares of a given security for his own account shortly before recommending the security to investors as a long-term investment, and then promptly sells the shares at a profit upon the rise in their market value following the recommendation." *Id.*

**59.** In *Capital Gains Research Bureau*, the Supreme Court granted injunctive relief requiring the investment adviser to disclose to the client his interest in stocks he recommended. In determining that it was not necessary to prove intent in order to obtain such relief, the Court held that a showing of intent was unnecessary to obtain the "mild prophylactic" of injunctive

In addition, the Defendants are charged with a "bribery" scheme, whereby they bought the securities of LCI, Toxic Waste and High Tech at minimal cost during the initial public offering and during the first few days of public trading. The Defendants are charged with buying such securities with the expectation that the price of such securities would rise as a result of the purchase of large blocks of these securities by the M & I Fund and Bullock Fund portfolio managers and the Hallswell research analyst. The Superseding Indictment charges that the Defendants then "bribed" the M & I Fund and Bullock Fund portfolio managers and the Hallswell research analyst to induce them to buy large blocks of shares in such companies through the use of Nominee Brokerage Accounts.

It charges the Defendants then sold their stock at a profit.

As to the Solar Age Scheme, the Defendants are charged with scalping in addition to engaging in an illegal stock transfer. This illegal stock transfer involved the transfer of 200,000 shares of Solar Age stock to High Tech, as to which the Defendants were undisclosed beneficial owners of a majority of High Tech's restricted stock, in exchange for the dissemination of a favorable research report written by Cannistraro.

The Superseding Indictment states the conduct of the Defendants amounted to violations, *inter alia*,[60] of the mail fraud statute, 18 U.S.C. § 1341,[61] the wire fraud statute, 18 U.S.C. § 1343,[62] Section

---

relief and a showing of all elements of fraud was unnecessary in an action against a fiduciary, such as an investment adviser. *Capital Gains Research Bureau*, 375 U.S. at 193–94, 84 S.Ct. at 283–84. In addition, the Court acknowledged that "[t]here has been a growing recognition by common-law courts that the doctrines of fraud and deceit which developed around transactions involving land and other tangible items of wealth are ill-suited to the sale of such intangibles as advice and securities, and that, accordingly, the doctrines must be adapted to the merchandise in issue." *Id.*

The Court concluded:

An adviser who, like respondents, secretly trades on the market effect of his own recommendation may be motivated—consciously or unconsciously—to recommend a given security not because of its potential for long-run price increase (which would profit the client), but because of its potential for short-run price increase in response to anticipated activity from the recommendation (which would profit the adviser). An investor seeking the advice of a registered agent must, if the legislative purpose is to be served, be permitted to evaluate such overlapping motivations, through appropriate disclosure, in deciding whether an adviser is serving "two masters" or only one, "especially . . . if one of the masters happens to be economic self interest." Accordingly, we hold the Investment Advisers Act of 1940 empowers the courts, upon a showing such as that made here, to require an adviser to make full and frank disclosure of his practice of trading on the effect of his recommendations. *Capital Gains Research Bureau*, 375 U.S. at 196–97, 84 S.Ct. at 285 (citations omitted).

**60.** Racketeering acts 5(j) and 5(k) also allege the Defendants violated various reporting and dis-

closure provisions, codified at 15 U.S.C. §§ 77g, 77x, 77aa(4), 77aa(6) and 77j(a)(1). The challenge of Bertoli, joined by Eisenberg, to racketeering acts 5(j) and 5(k) is discussed *infra* at 725.

**61.** The mail fraud statute provides:

**§ 1341. Frauds and swindles**

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341.

**62.** The wire fraud statute provides:

**§ 1343. Fraud by wire, radio, or television**

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television

10(b) [63] and Rule 10b–5.[64] The Government and Bertoli agree that "[b]ecause these schemes are basically securities fraud schemes, ... the critical inquiry, as recognized by the [D]efendants, is to determine whether they violate Section 10(b) and Rule 10b–5." Government Brief at 123. *See also* Bertoli Dismissal Brief at 16–28. Because mail and wire fraud violations are premised on use of the mails and wires to execute a scheme to defraud, the parties appear to be correct in their contention that the most important question is whether the Defendants' conduct constituted fraud within the meaning of the securities laws.

Section 10(b) and Rule 10b–5 prohibit the misrepresentation or omission of material facts in connection with the purchase or sale of a securities. In addition, Section 10(b) makes illegal any "manipulative or deceptive devise," which term has come to be defined as "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 *reh'g denied*, 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976). *See also Basic, Inc. v. Levinson*, 485 U.S. 224, 230, 108 S.Ct. 978, 982, 99 L.Ed.2d 194 (1988) ("The [Exchange] Act was designed to protect investors against manipulation of stock prices."); *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 473, 97 S.Ct. 1292, 1301, 51 L.Ed.2d 480 (1977) ("The language of [Section] 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception.").

In addition, as has been stated, these rules are violated by non-disclosure when there is a duty to make disclosure. *See Chiarella*, 445 U.S. at 230, 100 S.Ct. at 1115. Alternatively, in the absence of a duty to disclose, the securities laws are violated when a public statement is made which is false or misleading or is so incomplete as to be rendered false or misleading. *Greenfield v. Heublein, Inc.*, 742 F.2d 751, 756 (3d Cir.1984), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985). *See also Basic, Inc.*, 485 U.S. at 235 n. 13, 108 S.Ct. at 985 n. 13 (" 'Rule 10b–5 is violated whenever assertions are made ... in a manner reasonably calculated to influence the investing public ... if such assertions are false or misleading or so incomplete as to mislead.' ").

The purpose of Section 10(b) and Rule 10b–5 is to ensure that "investors obtain disclosure of material facts in connection with their investment decisions regarding the purchase or sale of securities." *Angelastro v. Prudential–Bache Securities, Inc.*, 764 F.2d 939, 942 (3d Cir.) (citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972)), *cert. denied*, 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985).

communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
18 U.S.C. § 1343.

**63.** Section 10(b) provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
....
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appro-

priate in the public interest or for the protection of investors.
15 U.S.C. § 78j(b).

**64.** Rule 10b–5 provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b–5.

An omitted fact is material if there is a substantial likelihood the investor would consider it important in making an investment decision. *See Basic, Inc.*, 485 U.S. at 231, 108 S.Ct. at 983; *Cannistraro*, 734 F.Supp. at 1125; *cf. T.S.C. Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (setting forth definition of materiality in context of section 14(a) of the Exchange Act); *Bolger v. First State Financial Services*, 759 F.Supp. 182, 193 (D.N.J.1991) (same).

Section 10(b) and Rule 10b–5 "must be read 'flexibly, not technically and restrictively.'" *Angelastro*, 764 F.2d at 942 (quoting *Superintendent of Insurance v. Bankers Life and Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971)). Thus, a wide variety of fraudulent schemes have been found to come within the purview of these sections. For example, allegations of churning, by which a securities broker buys and sells securities for the purpose of generating commissions and without regard to the customer's investment objectives, has been found to state a claim under Rule 10b–5. *See, e.g., Costello v. Oppenheimer & Co.*, 711 F.2d 1361, 1368 (7th Cir.1983); *Thompson v. Smith Barney, Harris Upham & Co.*, 709 F.2d 1413 (11th Cir.1983); *In re Catanella and E.F. Hutton and Co., Securities Litigation*, 583 F.Supp. 1388, 1405, 1410–11 (E.D.Pa.1984).

Most significantly, the practice known as "scalping" has been found to violate these provisions of the securities laws. In *Zweig v. Hearst Corp.*, 594 F.2d 1261 (9th Cir. 1979), the parties to a corporate merger sued a newspaper columnist under Section 10(b). The columnist had purchased stock in a company and had then written a favorable article about the company. The plaintiffs asserted the columnist violated Section 10(b) because he had a duty to disclose to his readers his financial interest in the stock and failed to make such disclosure.

While the continued vitality of *Zweig*'s holding concerning the columnist's duty is unclear in light of *Chiarella*, the reasoning of the court remains persuasive. In reversing the trial court's dismissal of the action,

the Ninth Circuit stated that a conflict of interest by the columnist was a material fact which his readers were entitled to know: "While Rule 10b–5 should not be extended to require every financial columnist or reporter to disclose his or her portfolio to all of his readers, it does cover the activities of one who uses a column as part of a scheme to manipulate the market and deceive the investing public." *Id.* at 1271. Thus, the court's holding was premised in part on its conclusion that the columnist made affirmative representations which were rendered misleading by virtue of omissions of material facts.

In *SEC v. Blavin*, 557 F.Supp. 1304 (E.D.Mich.1983), *aff'd*, 760 F.2d 706 (6th Cir.1985), the SEC filed an action against the defendant alleging violations of Section 10(b), Rule 10b–5 and various provisions of the Investment Advisers Act of 1940. The SEC alleged the defendant was an unregistered investment adviser who had purchased large amounts of securities in certain companies, touted the securities in materially false and misleading terms through a newsletter mailed to approximately 5,500 subscribers or potential subscribers and then sold the securities at a substantial profit. In granting summary judgment for the SEC on its Section 10(b) claim, the court found that the defendant's failure to disclose his financial interest in the touted securities was a material omission. *Id.* at 1311. The court stated:

> [The defendant] did not reveal his scalping scheme, and it is clear to the court that it was a scheme that should have been disclosed to those to whom he sent his investment newsletter. It is obvious, of course, that if he revealed his scalping scheme to those receiving the newsletter, those parties would not have bought the stock.
>
> It is undisputed that Blavin purchased large amounts of securities in companies and then touted those companies in glowing terms to other prospective investors. . . .
>
> There can be no doubt that this conflict of interest was material to the readers of Blavin's newsletters and that the defendant failed to inform his readers of the

conflict. The protection of the securities laws would be shallow indeed if such "scalping" schemes were permitted. Courts have uniformly held that such schemes violate the securities [laws] and that a failure to disclose such a "scalping" scheme is a material omission prohibited by § 10(b).

*Id.* at 1311 (citing *Zweig,* 594 F.2d at 1261; *Capital Gains Research Bureau,* 375 U.S. at 197, 84 S.Ct. at 285).

It is significant that the court in *Blavin* analyzed the legality of the defendant's conduct by viewing the case as one in which the defendant made a statement rendered misleading due to an omission of material fact, where violation of the securities laws is not premised on a duty of disclosure. *See Blavin,* 557 F.Supp. at 1311 (citing *TSC Industries,* 426 U.S. at 449, 96 S.Ct. at 2132; *Santa Fe Industries,* 430 U.S. at 474 n. 14, 97 S.Ct. at 1301 n. 14). The *Blavin* court apparently did not view the case as falling into the *Chiarella* line of cases where the legality of the silence of the defendant is analyzed in terms of whether the defendant was under a duty of disclosure. *See also Lowe v. SEC,* 472 U.S. 181, 209 n. 56, 105 S.Ct. 2557, 2572 n. 56, 86 L.Ed.2d 130 (Court characterized as "dangerous" the public dissemination of publications "timed to specific market activity, or to events affecting or having the ability to affect the securities industry," *i.e.,* scalping, and stated such activity can be reached through Rule 10b–5, citing *Blavin* ).[65]

■ In the instant case, the Defendants are charged with several "scalping" schemes, whereby they disseminated statements to the investing public concerning the merits of certain securities without disclosing their financial interest in such securities. The allegations of the Superseding Indictment adequately allege that the statements of the Defendants were rendered incomplete and misleading in that they failed to provide the complete picture, *i.e.,* that the author and disseminators of the statements were financially interested in the success of the securities in the market. That the Defendants were financially interested in the securities at issue would certainly be viewed as material by the investing public because such information would reflect on the credibility of the statements. Indeed, it is probable that the Defendants were able to profit from their "scalping" activity only by virtue of such material non-disclosures; a natural response by investors to disclosure of such information in research reports would be to view any recommendations contained therein with complete skepticism.

The allegations of the Superseding Indictment regarding the Defendants' public dissemination to the investing public of misleading and incomplete statements regarding certain securities state a claim under Section 10(b) and Rule 10b–5. Bertoli's attempt, joined by Eisenberg, to cast this case as an "insider trading" case falling within the purview of *Chiarella* and *Dirks* fails.

■ Likewise, the allegations as to the "bribery" schemes also state an offense under the relevant provisions of the securities laws. For all Bertoli's quibbling that "[r]eferences to 'Rigging' of prices or markets appear not at all in the Superseding Indictment and the term 'manipulation' appears but once," Bertoli Dismissal Brief at 4 n. 1, the Superseding Indictment clearly states that the Defendants bought stock in certain companies with the expectation the price of the securities would rise, because they had taken steps to assure that the

---

**65.** In addition, Justice White stated in his concurring opinion in *Lowe,* which involved a claim under the Investment Advisers Act of 1940:

The SEC has long been concerned with the problem of fraudulent and manipulative practices by some investment advisory publishers—specifically, with the problem of "scalping...." An SEC study issued in 1963 emphasized that this practice is most dangerous when engaged in by an "advisory service with a sizable [sic] circulation"—that is, a newsletter or other publication— whose recommendation "could have at least a short-term effect on a stock's market price." Report of Special Study of Securities Markets of the Securities and Exchange Commission, H.R.Doc. 95, 88th Cong., 1st Sess., pt. 1, p. 372 (1963).

*Lowe,* 472 U.S. at 224, 105 S.Ct. at 2580 (White, concurring).

price would rise by "bribing" the M & I Fund and Bullock Fund portfolio managers and the Hallswell research analyst to buy large blocks of those stocks. Such allegations amount to allegations of market manipulation, regardless of whether they employ such terminology or employ it with frequency. The Supreme Court's explanation of the term "manipulative" in the context of activity made illegal under Section 10(b) supports the determination that the allegations of "bribery" schemes contained in the Superseding Indictment state an offense. In *Ernst & Ernst*, the Supreme Court stated: "Use of the word 'manipulative' ... connotes intentional or willful conduct designed to deceive or defraud investors by *controlling or artificially affecting the price of securities*." *Ernst & Ernst*, 425 U.S. at 199, 96 S.Ct. at 1384 (emphasis added). In *Santa Fe Industries, Inc.*, the Court stated:

> The term refers generally to practices, such as wash sales, matched orders, *or rigged prices*, that are intended to mislead investors by artificially affecting market activity.... Section 10(b)'s general prohibition of practices deemed by the SEC to be "manipulate"—in this technical sense of artificially affecting market activity in order to mislead investors—is fully consistent with the fundamental purpose of the 1934 Act " 'to substitute a philosophy of full disclosure for the philosophy of *caveat emptor....*' " Indeed, nondisclosure is usually essential to the success of a manipulative scheme.... No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices....

*Santa Fe Industries, Inc.*, 430 U.S. at 476–77, 97 S.Ct. at 1303 (emphasis added). *See also Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 6–7, 105 S.Ct. 2458, 2461–62, 86 L.Ed.2d 1 (1985).[66]

In addition, Bertoli, joined by Eisenberg, argues that the conduct of the Defendants does not state an offense under the mail fraud and wire fraud statutes. Bertoli in essence reiterates his argument as to the alleged securities laws violation, asserting that criminal liability for violation of the mail and wire fraud statutes, where the conduct in question consisted of nondisclosure, is premised on a duty of disclosure. Bertoli Dismissal Brief at 28–29. As has been stated, the Superseding Indictment adequately states offenses under Section 10(b) and Rule 10b–5. The mail and wire fraud statutes premise liability on the use of the mails or of wires to further a fraudulent scheme and they are violated when misrepresentations or omissions of material fact are made. *See United States v. Burks*, 867 F.2d 795 (3d Cir.1989); *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46 (2d Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 *reh'g denied*, 485 U.S. 1030, 108 S.Ct. 1588, 99 L.Ed.2d 903 (1988); *Bender v. Southland Corp.*, 749 F.2d 1205 (6th Cir.1984). Bertoli's argument as to the allegations of mail and wire fraud violations is rejected.[67]

Bertoli then argues that once the allegations as to violations of the securities laws and the mail and wire fraud statutes are dismissed, insufficient predicate acts remain in Count 1 to meet the "pattern" requirement of RICO section 1962(c). He therefore contends Count 1 must be dismissed for failure to meet the "pattern"

---

66. Bertoli's reliance on *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22 (1st Cir.1987) is misplaced. Bertoli argues *Roeder* stands for the proposition that there is no duty to disclose a bribery scheme. Bertoli Reply Brief at 7. However, *Roeder* did not concern a claim under the securities laws based on a bribery scheme intended to manipulate stock prices. Rather, it concerned a claim under the securities laws for failure by the defendant corporation to disclose to investors its scheme to obtain contracts for the corporation through the use of bribes. *Roeder*, 814 F.2d at 23–25.

67. In addition, it is observed that the Supreme Court specifically stated that the mail fraud statute may be available to curtail the practice of "scalping." *Lowe*, 472 U.S. at 209 n. 56, 105 S.Ct. at 2572 n. 56 (in finding that the First Amendment prevented SEC from permanently enjoining the defendant from issuing newsletters as sanction for defendant's failure to register pursuant to the Investment Advisers Act of 1940, the Court noted the SEC was not without a remedy, given such conduct may be reached through the mail fraud statute).

requirement. He further argues that given that Count 1 must be dismissed, Counts 2 and 3, alleging conspiracy to commit the illegal conduct described in Count 1 in addition to the illegal stock transfer of the Solar Age Scheme, must be dismissed. *See* Bertoli Dismissal Brief at 30–31. Bertoli's arguments are without basis; the allegations as to violations of Section 10(b) and Rule 10b–5 and violations of the mail and wire fraud statutes adequately plead violations of those provisions.

Finally, Bertoli argues that under *Chiarella* and its progeny, he had no duty to make disclosure. He argues that if it is determined that he had a duty of disclosure and therefore violated the securities laws by failing to make such disclosure, the allegations as to such violation must be dismissed as violating his due process rights, because he had no notice that he had such a duty of disclosure. Bertoli Dismissal Brief at 31. However, as has been stated, the criminal activity alleged in the instant Superseding Indictment is distinct from that charged in the *Chiarella* line of cases; Bertoli's assertion is without merit. Bertoli's motion to dismiss Counts 1, 2 and 3, joined by Eisenberg, is denied.[68]

### VIII. Motion to Dismiss Racketeering Acts 5(j) and 5(k)

■ Bertoli, joined by Eisenberg, moves to dismiss predicate racketeering act numbers 5(j) and 5(k) on the ground they do not constitute an "offense involving ... fraud in the sale of securities." Bertoli Dismissal Brief at 33 (quoting 18 U.S.C. § 1961(1)). Racketeering act 5(j) alleges the Defendants willfully caused the preparation and filing of a registration statement in connection with High Tech's proposed initial public offering of securities. Superseding Indictment, Count 1, ¶ 57. It states this registration statement failed to disclose the identities of High Tech's promoter and all known persons beneficially owning more than 10% of High Tech's common stock and more than 10% of High Tech's outstanding stock. *Id.* Racketeering act 5(k) alleges the Defendants willfully and knowingly caused the preparation and distribution to the investing public of High Tech's prospectus. *Id.*, ¶ 58. It states this prospectus failed to disclose the identities of High Tech's promoter and the persons beneficially owning more than 10% of High Tech's common stock and more than 10% of High Tech's outstanding stock. *Id.* Bertoli urges the court to read the language "offense ... involving fraud in the sale of securities" contained in section 1961(1) narrowly and not to read it as encompassing the full breadth of conduct made illegal by the securities laws. Bertoli Reply Brief at 24–26. Under this narrow reading, he argues racketeering acts 5(j) and 5(k) are not offenses involving fraud in the sale of securities and should be dismissed.

As has been stated, it is well-settled that "the provisions of [RICO] shall be liberally construed to effectuate its remedial purposes." *United States v. Turkette*, 452 U.S. at 587, 101 S.Ct. at 2531. Bertoli's espousal of a narrow reading of the relevant language of section 1961(1) is rejected. There is ample authority holding that failure to report ownership of stock pursuant to various reporting provisions of the securities laws may constitute a predicate act of racketeering where, as here, the failure to report was part of an affirmative scheme to defraud. *See, e.g., Lou v. Belzberg*, 728 F.Supp. 1010, 1025–26 (S.D.N.Y.1990);

---

**68.** In addition, Bertoli asserts in a footnote:

The predicate racketeering acts of alleged securities fraud are defective on a ground wholly independent of the fatally defective lack of duty. Even if the allegations adequately charged a violation of § 10(b), *i.e.*, a fraud "in connection with the purchase or sale of any security", the allegations concerning nondisclosures in the research reports do not constitute a "fraud *in* the sale of securities," as required to fall within the meaning of "racketeering activity" as defined in 18 U.S.C.

§ 1961(1)(D). "Fraud in the sale of securities" is obviously much more narrow than "fraud in connection with the purchase or sale of any security."

Bertoli Dismissal Brief at 12. It is well-settled that "the provisions of [RICO] shall be liberally construed to effectuate its remedial purposes." *United States v. Turkette*, 452 U.S. 576, 587, 101 S.Ct. 2524, 2531, 69 L.Ed.2d 246 (1981) (quoting section 904(a) of RICO, 84 Stat. 947). Bertoli's argument is rejected. *See also* Part VIII, *supra.*

*Spencer Companies, Inc. v. Agency Rent–A–Car,* [1981–82 Transfer Binder] Fed.Sec. L.Rep. (CCH), § 98,361 at 92,215, 1981 WL 1707 (D.Mass.1981). Bertoli's motion to dismiss racketeering acts 5(j) and 5(k) is denied.

## IX. *Constitutional Challenge to the RICO "Pattern" Requirement*

As stated previously, Count 1 of the Superseding Indictment charges the Defendants with violating RICO section 1962(c). Count 2 charges the Defendants with conspiring to violate RICO section 1962(c) in violation of RICO section 1962(d). As explained previously, RICO section 1962(c) makes it illegal to participate "in the conduct of [an] enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c). A pattern of racketeering activity is defined in RICO section 1961(5) as consisting of at least two predicate acts of racketeering with no more than a span of ten years intervening between the two most recent acts. *See* 18 U.S.C. § 1961(5). Racketeering activity is defined in RICO section 1961(1) to include mail fraud, wire fraud, obstruction of justice, interstate transportation of money taken by fraud and any offense involving fraud in the sale of securities. 18 U.S.C. § 1961(1). Bertoli, joined by Eisenberg, moves for dismissal of Counts 1 and 2 of the Superseding Indictment on the ground that the " 'pattern' element of the charged RICO offenses is unconstitutionally vague on its face and as applied to [the Superseding Indictment]." Bertoli Dismissal Brief at 2.

As to his facial challenge to the "pattern" requirement, Bertoli relies heavily on the concurring opinion of Justice Scalia in *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 251–56, 109 S.Ct. 2893, 2906–09, 106 L.Ed.2d 195 (1989). In *H.J.,* the Court considered the question of whether RICO's "pattern" requirement is met only where more than one scheme is alleged. In the opinion for the Court, written by former Justice Brennan, the jurisprudence which had developed to date on the "pattern" requirement was reviewed. The Court reiterated that the definition of

"pattern" set forth in RICO section 1961(5) "does not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern." *Id.* at 237, 109 S.Ct. at 2899 (citing *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). It repeated the concept set forth in RICO's legislative history that acts of racketeering form a pattern where they exhibit "continuity plus relationship." *Id.* 492 U.S. at 239, 109 S.Ct. at 2900 (citing 116 Cong.Rec. 18940 (1970) (Sen. McClellan), as quoted in *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14).

As to the relatedness requirement, the Court repeated the principle that "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* 492 U.S. at 240, 109 S.Ct. at 2901 (citing *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14). The Court found it necessary to analyze the continuity requirement at greater length than the relatedness requirement. The Court commenced by stating that in order to form a pattern, "the predicate acts themselves [must] amount to, or ... they [must] otherwise constitute a threat of, *continuing* racketeering activity." *Id.* (emphasis in original). The Court eschewed the requirement that continuity be demonstrated through allegations of multiple schemes, holding: "What a plaintiff or prosecutor must prove is continuity of racketeering activity, or its threat, *simpliciter.* This may be done in a variety of ways, thus making it difficult to formulate in the abstract any general test for continuity." *Id.* at 241, 109 S.Ct. at 2901.

In fleshing out the meaning of the continuity requirement, the Court stated: " 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* (citing *Barticheck v. Fidelity Union Bank/First National State,* 832 F.2d 36,

39 (3d Cir.1987)). It stated that a party alleging a RICO violation "may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* 492 U.S. at 242, 109 S.Ct. at 2902. The Court further explained:

> Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.
>
> Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case. Without making any claim to cover the field of possibilities—preferring to deal with this issue in the context of concrete factual situations presented for decision—we offer some examples of how this element might be satisfied. A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit.... The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business....
>
> The limits of the relationship and continuity concepts that combine to define a RICO pattern, and the precise methods by which relatedness and continuity or its threat may be proved, cannot be fixed in advance with such clarity that it will always be apparent whether in a particular case a "pattern of racketeering activity" exists. The development of these concepts must await future cases, absent a decision by Congress to revisit RICO to provide clearer guidance as to the Act's intended scope.

*Id.* at 242–43, 109 S.Ct. at 2902.

In his concurring opinion, Justice Scalia characterized the discussion of the "pattern" requirement in the opinion for the Court as uninformative: "[T]he Court counsels the lower courts: 'continuity plus relationship.' This seems to me about as helpful to the conduct of their affairs as 'life is a fountain.'" *Id.* at 252, 109 S.Ct. at 2907. However, he attributed what he saw as the Court's inability to home the meaning of the "pattern" requirement not to any fault of the Court, but to the fact that the "pattern" requirement was not readily susceptible of precise definition. Justice Scalia stated:

> It is ... unfair to be so critical of the Court's effort, because I would be unable to provide an interpretation of RICO that gives significantly more guidance concerning its application. It is clear to me from the prologue of the statute, which describes a relatively narrow focus upon "organized crime," ... that the word "pattern" in the phrase "pattern of racketeering activity" was meant to import some requirement beyond the mere existence of multiple predicate acts.... But what that something is, is beyond me. As I have suggested, it is also beyond the Court. Today's opinion has added nothing to improve our prior guidance, which has created a kaleidoscope of Circuit positions, except to clarify that RICO may in addition be violated when there is a "threat of continuity." It seems to me this increases rather than removes the vagueness. There is no reason to believe that the Courts of Appeals will be any more unified in the future, than they have in the past, regarding the content of this law.
>
> That situation is bad enough with respect to any statute, but it is intolerable with respect to RICO.... RICO, since it has criminal applications as well, must, even in its civil applications, possess the degree of certainty required for criminal laws. No constitutional challenge to this law has been raised in the present case, and so that issue is not before us. That the highest Court in the land has been unable to derive from this statute anything more than today's meager guidance bodes ill for the day when that challenge is presented.

*Id.* at 254–56, 109 S.Ct. at 2908–09 (Scalia, concurring) (citations omitted).

■ Bertoli in essence seeks to respond to the invitation of Justice Scalia by bringing a facial challenge to the "pattern" requirement as unconstitutionally vague. Bertoli asserts he has standing to bring such a facial challenge because "First Amendment considerations and values are centrally implicated [in the instant case], since the failure to speak, mostly in published reports, is at the heart of each of the purportedly fraudulent schemes alleged." Bertoli Dismissal Brief at 13.

■ A statute is unconstitutionally vague on its face when it "either forbids or requires the doing of an act in terms so vague that [people] of ordinary intelligence must necessarily guess as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). *See also United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 811–12, 98 L.Ed. 989 (1954). The Supreme Court explained the policy reasons behind the voiding of a statute for vagueness:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that [people are] free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he [or she] may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to police[ ] [officers], judges and juries for resolution on an *ad hoc* basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms."

*Grayned v. Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972) (citations omitted).

■ A defendant usually does not have standing to attack a statute as unconstitutional "on its face," or in all its applications. As the Supreme Court explained in *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982): "[T]his rule reflects two cardinal principles of our constitutional order: the personal nature of constitutional rights, and prudential limitations on constitutional adjudication." *Id.* at 767, 102 S.Ct. at 3360 (citations omitted). The *Ferber* Court reiterated the principle that the "First Amendment overbreadth doctrine is one of the few exceptions to this principle ... and is predicated on the sensitive nature of protected expression: 'persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected expression.' " *Id.* at 768, 102 S.Ct. at 3360–61 (citations omitted).

■ It must be remembered in considering a facial challenge that a "strong presumptive validity ... attaches to an Act of Congress...." *United States v. National Dairy Products Corp.*, 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 *reh'g denied*, 372 U.S. 961, 83 S.Ct. 1011, 10 L.Ed.2d 13 (1963). A law should not be found invalid on its face unless it reaches a "substantial number of impermissible applications ...," *Ferber*, 458 U.S. at 771, 102 S.Ct. at 3362, not just marginal offenses. *National Dairy Products Corp.*, 372 U.S. at 32, 83 S.Ct. at 597. *See also United States v. Powell*, 423 U.S. 87, 93, 96 S.Ct. 316, 320, 46 L.Ed.2d 228 (1975). "While a sweeping statute, or one incapable of limitation, has the potential to repeatedly chill the exercise of expressive activity by many individuals, the extent of deterrence of protected speech can be expected to decrease with the declining reach of the regulation." *Ferber*, 458 U.S. at 772, 102 S.Ct. at 3362.

■ In determining whether the overbreadth doctrine applies to allow a facial challenge, it must be ascertained whether "a penal statute ... does not aim

specifically at evils within the allowable area of state control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press." *Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940). *See also Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). A statute may not be challenged on its face under the overbreadth doctrine where it is directed at conduct "which is neither constitutionally protected nor socially desirable." *National Dairy Products Corp.*, 372 U.S. at 36, 83 S.Ct. at 600.

Bertoli strains to characterize the alleged misrepresentations made in connection with the "scalping" and "bribery" schemes alleged in the Superseding Indictment as exercises of free speech. Such alleged misrepresentations, however, state offenses under the securities laws and mail fraud and wire statutes, as stated previously and therefore do not come within the purview of the overbreadth doctrine. *See, e.g., Lowe*, 472 U.S. at 209 n. 56, 105 S.Ct. at 2572 n. 56 (Court found First Amendment prevented SEC from prohibiting publication as sanction against investment adviser who failed to register in case brought under Investment Advisers Act of 1940; Court observed no misrepresentations were alleged and observed that sanctions against "scalping," activity not alleged in that case, could be brought under Section 10(b) and the mail fraud statute); [69] *Blavin*, 557 F.Supp. at 1309 (in action brought by SEC against investment adviser under Investment Advisers Act of 1940 for "scalping,"

the court was "convinced" that the First Amendment did not carve out protection from punishment for such activity, observing the defendant's " 'scalping' activity [was] the very type of activity Congress sought to address when it enacted the Investment Advisers Act of 1940.").

 Where the overbreadth doctrine does not apply, a party has standing to raise a vagueness challenge only in its application to the alleged conduct at issue. *United States v. Powell*, 423 U.S. 87, 92, 96 S.Ct. 316, 320, 46 L.Ed.2d 228 (1975); *United States v. Woods*, 915 F.2d 854, 862 (3d Cir.1990), *cert. denied sub nom.*, — U.S. —, 111 S.Ct. 1413, 113 L.Ed.2d 466 (1991); *Pungitore*, 910 F.2d at 1104. In determining whether the "pattern" requirement is vague as applied in the instant case, it must be determined whether persons of ordinary intelligence would know that the conduct alleged in the Superseding Indictment constitutes a pattern of racketeering within the meaning of RICO. *See Pungitore*, 910 F.2d at 1104.

Bertoli argues the "pattern" requirement is unconstitutionally vague as applied to the instant case because the instant allegations concern a legitimate business, as opposed to organized crime. Bertoli Dismissal Brief at 14. He further argues:

> Additionally, the period within which the schemes are alleged to have occurred is of sufficiently short duration as to raise a serious question of whether the allegations here "meet any conceivable application" of the continuity aspect of the pat-

---

**69.** Curiously, Bertoli relies on *Lowe* in support of his facial challenge. Bertoli asserts:

> It is equally well established that preparation, publication and distribution of impersonal investment or financial analysis or advice triggers First Amendment protections and considerations. *Lowe v. S.E.C.*, 472 U.S. 181, 105 S.Ct. 2557, 2570, 2573 [86 L.Ed.2d 130] (1985), and the District Court opinion, 556 F.Supp. 1359, 1365–1367 (E.D.N.Y.1983) (Weinstein, C.J.). Thus, defendants are clearly entitled to raise the facial vagueness challenge which has been foreclosed in other cases since *H.J. Inc.* due to the absence of First Amendment considerations.

Bertoli Dismissal Brief at 14. As stated, the court considered in *Lowe* whether the First

Amendment foreclosed a sanction, rendered under the Investment Advisers Act of 1940 for failure to register as an investment advisor, consisting of a prohibition on publication by the defendant. In that case, the Court observed that "[t]here was ... no contention that any of the information published ... had been false or materially misleading." *Lowe*, 472 U.S. at 185–86, 105 S.Ct. at 2560. The Court found the First Amendment foreclosed a prohibition of publication on the facts of that case. In addition, the Court distinguished the case of "scalping," observing that such conduct was reachable under Section 10(b) and the mail fraud statute. *Id.* at 209 n. 56, 105 S.Ct. at 2572 n. 56.

tern requirement. The vagueness defect is further compounded here because virtually every predicate act alleged against defendant Bertoli is itself potentially vague as applied, due to the duty of disclosure element. Finally, prevention of arbitrary and discriminatory law enforcement is perhaps the primary concern of the due process prohibition on vagueness. Yet, as far as counsel has been able to determine, other than the prior Cannistraro prosecution, the instant proceeding is the first prosecution for purported frauds premised on non-disclosures in gratuitous, unsolicited research reports of a securities analyst. This prosecution itself exemplifies the type of arbitrary and discriminatory enforcement meant to be precluded by the due process vagueness doctrine.

*Id.* at 15.

Bertoli's contentions that the "pattern" requirement is vague as applied "due to the disclosure element" and that it is vague as applied because it apparently is only the second instance in which it has been applied to non-disclosures by a securities analyst need not be addressed. These contentions are premised on the argument by Bertoli, described in Part VII, *supra*, that the instant case is governed by the *Chiarella* line of cases and that Bertoli was under no duty to disclose. As has been explained, the instant case does not fall within the *Chiarella* line of cases. The only new contentions of Bertoli raised in his instant argument are that the "pattern" requirement is vague as applied because the periods in which the predicate acts are alleged to have taken place is insufficiently long to meet the "continuity" aspect of the "pattern" requirement and it is vague as applied because the allegations of the Superseding Indictment relate to a legitimate business.

Bertoli's argument that the "pattern" requirement is vague as applied because the allegations of the Superseding Indictment relate to a legitimate business is rejected. The Supreme Court stated in *H.J.*:

As this Court stressed in *Sedima*, in rejecting a pinched construction of RICO's provision for a private civil action, adopted by a lower court because it perceived that RICO's use against non-organized-crime defendants was an "abuse" of the Act, "Congress wanted to reach both 'legitimate' and 'illegitimate' enterprises." 473 U.S. at 499 [105 S.Ct. at 3286]. Legitimate businesses "enjoy neither an inherent incapacity for criminal activity nor immunity from the consequences"; and, as a result, § 1964(c)'s use "against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is hardly a sufficient reason for assuming that the provision is being misconstrued." *Ibid.* If plaintiffs' ability to use RICO against businesses engaged in a pattern of criminal acts is a defect, we said, it is one "inherent in the statute as written," and hence beyond our power to correct. *Ibid.* RICO may be a poorly drafted statute; but rewriting it is a job for Congress, if it is so inclined, and not for this Court. There is no more room in RICO's "self-consciously expansive language and overall approach" for the imposition of an organized crime limitation than for the "amorphous 'racketeering injury' requirement" we rejected in *Sedima*, see *id.*, at 495, 498 [105 S.Ct. at 3284, 3286]. We thus decline the invitation to invent a rule that RICO's pattern of racketeering concept requires an allegation and proof of an organized crime nexus.

*H.J.*, 492 U.S. at 249, 109 S.Ct. at 2905. The "pattern" requirement is not vague as applied to the instant allegations simply because those allegations concern racketeering activity by a "legitimate business."

Bertoli does not challenge the sufficiency of the allegations as to the "relatedness" aspect of the "pattern" requirement. Rather, he argues the "pattern" requirement is vague as applied because the period of alleged racketeering activity is of insufficient duration to meet the "continuity" aspect of the "pattern" requirement. As has been stated, Count 1 of the Superseding Indictment charges the Defendants participated in the affairs of Monarch through a pattern of racketeering con-

sisting of seven schemes lasting between 1982 and at least 1988, a period of at least six years.

As to the first scheme alleged in Count 1, the Astrosystems Scheme, the Superseding Indictment alleges the Defendants perpetrated six acts of mail fraud, two acts of wire fraud and one act of securities fraud between November 1982 and August 1983, a period of approximately ten months. As to the second scheme, the Nature's Bounty Scheme, the Superseding Indictment alleges the Defendants perpetrated five acts of mail fraud, three acts of wire fraud and one act of securities fraud between December 1982 and March 1983, a period of approximately four months. As to the third scheme, the LCI Scheme, the Superseding Indictment alleges the Defendants perpetrated six acts of mail fraud, five acts of wire fraud and one act of securities fraud between October 1982 and November 1983, a period of approximately thirteen months. As to the fourth scheme, the Toxic Waste Scheme, the Superseding Indictment alleges the Defendants perpetrated eleven acts of mail fraud, two acts of wire fraud and one act of interstate transportation of money taken by fraud between December 1982 and October 1983, a period of approximately eleven months. As to the fifth scheme, the Beneficial Owners Concealment Scheme, the Superseding Indictment alleges the Defendants perpetrated six acts of mail fraud, three acts of wire fraud and two acts of securities fraud between March 1983 and October 1984, a period of approximately nineteen months. As to the sixth scheme, the High Tech Scheme, the Superseding Indictment alleges the Defendants perpetrated nine acts of mail fraud, three acts of wire fraud and one act of securities fraud between March 1983 and February 1983, a period of approximately eleven months. As to the seventh and last scheme, the Cover-up Scheme, the Superseding Indictment alleges Eisenberg and Cannistraro perpetrated four acts of obstruction of justice between August 1985 and September 1988, a period of more than three years.

There is no doubt that the substantial number of predicate acts perpetrated by one or more of the Defendants, over a period of at least six years, amounted to a continuous stream of acts of racketeering and that the pattern requirement is not vague as applied in the instant case. *See Woods,* 915 F.2d at 862–64 (predicate acts committed over a period of four years satisfied "continuity" aspect of the "pattern" requirement); *Pungitore,* 910 F.2d at 1104 (predicate acts spanning eight years satisfied "continuity" aspect). Moreover, the courts which have considered constitutional challenges to the "pattern" requirement on the ground that it is vague as applied have uniformly rejected the challenges, with one exception. *See United States v. Glecier,* 923 F.2d 496, 497 n. 1 (7th Cir.1991); *United States v. Coiro,* 922 F.2d 1008, 1016–17 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991); *Woods,* 915 F.2d at 862–64; *Pungitore,* 910 F.2d at 1102–05; *United States v. Angiulo,* 897 F.2d 1169 (1st Cir.), *cert. denied sub nom.,* —— U.S. ——, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990); *United States v. Gatto,* 746 F.Supp. 432, 454–55 (D.N.J.1990); *United States v. Gigante,* 737 F.Supp. 292, 294–96 (D.N.J.1990); *United States v. Lobue,* 751 F.Supp. 748, 752–54 (N.D.Ill.1990); *United States v. Paccione,* 738 F.Supp. 691, 694–99 (S.D.N.Y.1990). *But see Firestone v. Galbreath,* 747 F.Supp. 1556 (S.D.Ohio 1990). In addition, the Supreme Court has observed that "proof that a RICO defendant has been involved in multiple criminal schemes would certainly be highly relevant to the inquiry into the continuity of the defendant's racketeering activity...." *H.J.,* 492 U.S. at 240, 109 S.Ct. at 2901. The "highly" probative factor of multiple schemes is present in the instant case.

The motion of Bertoli, joined by Eisenberg, to dismiss Counts 1 and 2 because the "pattern" requirement is vague both on its face and as applied is denied.

## X. Motion for Recusal

■ The instant motion for recusal brought by Cannistraro, in which Bertoli joins, is one in a string of such motions

brought by one or more of the Defendants for recusal pursuant to 28 U.S.C. § 455.

On 22 March 1990, the motions of Cannistraro and Bertoli for recusal (collectively, the "First Recusal Motion") were denied. *See United States v. Eisenberg,* 734 F.Supp. 1137 (D.N.J.1990). The First Recusal Motion of Bertoli was based entirely upon his own conduct in reaction to the sentencing of Cannistraro for Cannistraro's conviction on the 1987 Indictment. Specifically, Bertoli referred to a letter he wrote to the court on 2 November 1987, the date Cannistraro was sentenced, in which he demanded my resignation within thirty days and stated that if I failed to comply with his demand he would "refer this matter to the Judiciary Committee and bar association for action." *Id.* at 1144. In addition, Bertoli referred to letters he subsequently wrote to then Justice Thurgood Marshall, Senator Edward Kennedy, then Congressman Peter Rodino and to the Ethics Committee of the American and New Jersey Bar Associations in which he stated "Mr. [sic] Lechner has displayed a lack of judicial temperament and truly needs psychiatric help and analysis." *Id.* at 1144–45. All parties to whom Bertoli corresponded ignored him. *Id.* at 1144 n. 17. In moving for recusal, Bertoli asserted I could not be unbiased in light of this past conduct on his part. In addition, both Bertoli and Cannistraro argued I could not be unbiased toward them in light of certain information disclosed during the proceedings relative to the 1987 Indictment. *Eisenberg,* 734 F.Supp. at 1144 n. 17.

In denying the First Recusal Motion, it was observed that neither Bertoli nor Cannistraro was able to cite any comment or point to any action which indicated prejudice toward either of them. *Id.* at 1151. It was held:

> Nothing in the record shows ill will on my part toward Bertoli, nor has anything been shown to demonstrate emotional involvement.... In the case *sub judice* there have been no allegations that anything I have done or said points to extra judicial prejudice toward Bertoli. The record discloses only actions by Bertoli. Any remarks made by him were made in

a fit of pique years ago. A reasonable person knowing all the circumstances in this matter would not question my impartiality as to either Bertoli or Cannistraro. *Id.* at 1167. On 12 April 1990, the motion of Bertoli for reconsideration of the denial of his First Recusal Motion was denied. *See United States v. Eisenberg,* 734 F.Supp. 1168 (D.N.J.1990). Cannistraro did not move for reconsideration.

On 16 August 1990, a second motion for recusal brought by Cannistraro, in which Bertoli joined (the "Second Recusal Motion"), was denied in an unpublished letter-opinion and order. *See United States v. Eisenberg,* Crim. No. 90–218 (D.N.J. 16 August 1990) (the "16 August 1990 Opinion"). The basis for the Second Recusal Motion was summarized as follows:

> The asserted reason for requesting my recusal in the present motion is that ... [b]etween the time when he [Cannistraro] entered his plea of guilty [to the 1987 Indictment] and was sentenced in November 1987, the stock market crashed on 19 October 1987. Not unlike most other stock issues at the time, the three companies which I had, and continue to have a very modest investment, suffered a decline in value because of the stock market crash. These companies are in no way related to the companies involved in the Superseding Indictment—[Astro-systems, Nature's Bounty, LCI, Toxic Waste, High Tech and Solar Age].

In substance, Cannistraro and Bertoli contend the average person on the street would believe I could not fairly and impartially have sentenced Cannistraro in the First Indictment or continue to preside over the litigation in the Superseding Indictment concerning both Cannistraro and Bertoli because the value of the three stocks which I purchased declined. At Cannistraro's sentencing hearing on 2 November 1987, I mentioned the fact that Cannistraro, through his conduct, took money out of the pockets of small investors....

Cannistraro argues, joined by Bertoli, that my comments at sentencing mean I consider myself among the class of small

investors who lost money due to the turmoil of the stock market. Cannistraro and Bertoli argue these comments indicate that I would properly seek to vindicate the rights of small investors who Cannistraro and Bertoli perceive as being victimized by bad advice provided by professionals in the securities industry.

16 August 1990 Opinion at 3–4.

In denying the Second Recusal Motion, it was observed that to the extent the value of some modest investments I owned declined, these investments were in companies unrelated to those mentioned in the Superseding Indictment. Moreover, such loss occurred at the time of the collapse of the stock market in October 1987 and was not the result of the alleged criminal conduct of the Defendants. *Id.* at 5–6. It was observed: "There is nothing to suggest I considered or consider myself a victim of stock fraud or believe that I am in a class of investors who have been defrauded by conduct such as that engaged in by Cannistraro in the [1987] Indictment or by the conduct concerning Cannistraro and Bertoli alleged in the Superseding Indictment." *Id.* at 8. It was concluded:

> There is nothing to suggest that a reasonable person, fully appraised of all the facts, would have any basis to doubt or infer that I was not fair and impartial to Cannistraro in the [1987] Indictment or that I have not been or cannot continue to be fair and impartial to Cannistraro and Bertoli in the Superseding Indictment.
>
> To accept the baseless argument of Cannistraro and Bertoli in this recusal motion, is to conclude that any judge with investments which declined in value, would have to recuse him or herself whenever an *unrelated* company was involved as a victim in *unrelated* criminal matters. Section 455 does not require such a wholesale recusal and does not provide a basis for obvious attempts to judge shop.

*Id.* at 8.

In the instant motion, Cannistraro, joined by Bertoli, submits a "public opinion survey [which] was commissioned to ascertain what a citizen of New Jersey would feel concerning the [c]ourt's impartiality knowing the background of this case." Cannistraro Brief at 14. This purported public opinion survey presents the following three scenarios as follows:

1. Suppose that a man is accused of rape. A week before the case comes to trial the wife of the judge to whom the case is assigned is raped. Do you think the judge whose wife had just been raped would be fair and impartial to the accused rapist, or do you think he would not be fair and impartial and should have the case assigned to another judge?

2. Now consider another situation. A stock market analyst is accused of having manipulated the price of some low-cost "penny stocks" in such a way that *he* made a profit while *other* investors who followed his advice lost money. Shortly before the case comes to trial, the judge to whom the case is assigned loses lots of money in the stock market on similar low-cost "penny stocks." Do you think the judge who just lost a lot of money by investing in low-cost stocks would be fair and impartial to a man accused of having caused investors to lose money in similar stocks, or do you think that judge would not be fair and impartial and should have the case assigned to another judge?

3. In our third and last example, a citizen, outraged by a particular judge's verdict, publicly called the judge an absolute disgrace to the judiciary, requested that the Bar Association reprimand him, said the judge needs psychiatric help, and demanded that the judge resign. This citizen, also accused of illegal stock market dealings, is now scheduled to be tried by the same judge whose competence and sanity he had vehemently and publicly questioned. Do you think this judge would be fair and impartial to the alleged stock market swindler who had suggested that the judge would not be fair and impartial and should have the case assigned to another judge?

*See* Recusal Motion Survey at 1; Cannistraro Brief at 14–15.

The Recusal Motion Survey states the above questions were posed by Centrac, Inc. to five hundred randomly-selected adult residents of New Jersey. Recusal Motion Survey at 1. The Recusal Motion Survey broke down the responses by question and response and concluded: "In each of these cases, an overwhelming majority of New Jersey citizens believe, by a margin of more than two to one, that the judge would NOT be fair and impartial and should have the case assigned to another judge." Recusal Motion Survey at 1–2. Cannistraro argues the results of the Recusal Motion Survey demonstrate the "reasonable man" would believe the court cannot sit fairly and impartially, warranting recusal under 28 U.S.C. § 455. Cannistraro Brief at 15; Cannistraro Letter–Reply at 2–3. In the alternative Cannistraro asserts a hearing should be held in which "the people who were polled can be brought before the court and questioned so that the [c]ourt can determine the validity of the poll and the reasonable man standard can be determined by objective analysis." Cannistraro Letter–Reply at 3.

As has previously been stated,

[t]he test when considering a recusal motion is whether a reasonable person aware of all the circumstances would have doubts concerning the impartiality of the particular judge. [U.S. v.] Martorano, 866 F.2d [62] at 67 [ (3rd Cir. 1989) ]; [U.S. v.] Dalfonso, 707 F.2d [757] at 760 [ (3rd Cir.1983) ]. The existence of actual prejudice is not required. United States v. Sciarra, 851 F.2d 621, 635 (3d Cir.1988). However, the basis for recusal must arise from the incidents

or activities outside of the judges' trial role; the Third Circuit has described this as extrajudicial bias.

"Extrajudicial bias" refers to a bias that is not derived from the evidence or conduct of the parties that the judge observes in the course of the proceedings.

Johnson v. Trueblood, 629 F.2d 287, 291 (3d Cir.1980) (citations omitted), cert. denied, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981).

Eisenberg, 734 F.Supp. at 1153. The law on recusal was exhaustively discussed in that previous opinion and is not repeated in similar detail here.

The instant recusal motion, the third submitted by Bertoli and Eisenberg, is an attempt to foist on the court the identical arguments raised unsuccessfully in the First and Second Recusal Motions, in the guise of a "public opinion survey." This so-called public opinion survey is transparent as to its goal of leading the respondent toward the desired answer by commencing the questioning with an explosive scenario. More importantly, the second and third scenarios set forth in the public opinion survey were previously raised by Bertoli and Cannistraro in their First and Second Recusal Motions as bases for recusal and their motions were denied out-of-hand. Moreover, as the Government points out, Bertoli and Cannistraro petitioned the Third Circuit for a writ of mandamus regarding the denial of the First Recusal Motion. Government Brief at 7. The Third Circuit likewise dismissed the petition for a writ of mandamus out-of-hand, without even requiring the Government to respond. Id.[70] The instant

---

**70.** The denial of the Second Recusal Motion was also appealed. By order, filed 9 November 1990, the Third Circuit dismissed that appeal on the ground that it was not within its jurisdiction at that stage in the proceedings.

However, Cannistraro raised before the Third Circuit the identical claim contained in the Second Recusal Motion during his appeal from his resentencing for his conviction on the 1987 Indictment, held on 23 April 1990. The court stated in its unpublished opinion:

We cannot regard the motion that the judge should have recused himself on the remand as substantial.... The basis advanced for the

recusal is that the judge suffered losses in transactions in low cost stocks and was thus biased against Cannistraro who was involved in the distribution of similar securities. The difficulty with the allegation is that the judge did not buy stock in the companies involved in this case and there is no suggestion that Cannistraro had anything to do with the companies in which the judge did deal. Thus, the judge's impartiality could not reasonably be questioned.

United States v. Cannistraro, Nos. 90–5344, 90–5369, slip op. at 2 (3d Cir. 15 October 1990) [919 F.2d 133, 137 (table) ].

motion deserves the same treatment and is denied.

*Conclusion*

For the foregoing reasons, the pretrial motions of Bertoli, Eisenberg and Cannistraro are denied, except that decision is reserved on Bertoli's motion to dismiss the Superseding Indictment due to prosecutorial misconduct, to the extent it is based on an alleged conflict of interest by Giordano. A decision on that motion will be rendered upon receipt from the Government of submissions bearing on that issue.